MATTHEW G. BALL (SBN NO. 208881)
matthew.ball@klgates.com
RACHEL CHATMAN (SBN No. 206775)
rachel.chatman@klgates.com
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94105-3493
Telephone:  (415) 882-8200
Facsimile:  (415) 882-8220

IRENE C. FREIDEL (admitted *pro hac vice*)
irene.freidel@klgates.com
STACEY L. GORMAN (*pro hac vice* pending)
stacey.gorman@klgates.com
DAVID D. CHRISTENSEN (admitted *pro hac vice*)
david.christensen@klgates.com
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Telephone: (617) 261-3100
Facsimile: (617) 261-3175

Attorneys for Defendants
PAUL FINANCIAL, LLC,
HSBC BANK USA, NATIONAL
ASSOCIATION, AND LUMINENT
MORTGAGE TRUST 2006-2

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| GREGORY M. JORDAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>PAUL FINANCIAL LLC, LUMINENT MORTGAGE CAPITAL, INC., LUMINENT MORTGAGE TRUST 2006-2, HSBC NATIONAL ASSOCIATION, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. CV07-04496 SI<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANTS PAUL FINANCIAL, LLC, HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE OF LUMINENT MORTGAGE TRUST 2006-2, AND LUMINENT MORTGAGE TRUST 2006-2 IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date:  January 20, 2009<br>Time:            4:00 p.m.<br>Place:           Courtroom 10<br>Judge:          Hon. Susan Illston |

# **Table of Contents**

Page

I.    INTRODUCTION ................................................................................................1

II.   STATEMENT OF ISSUES .................................................................................3

III.  FACTUAL BACKGROUND ...............................................................................4

      A.    Option ARM Mortgage Loans...............................................................4

      B.    Paul Financial, LLC...............................................................................5

      C.    Plaintiff Gregory Jordan's Loan Transaction .......................................7

      D.    The Assignment And Securitization Of Plaintiff's Loan ......................9

      E.    The Servicing Of Plaintiff's Loan .......................................................10

      F.    The Complaint ......................................................................................11

IV.  STANDARD FOR CLASS CERTIFICATION ..................................................11

V.   ARGUMENT ......................................................................................................12

      A.    Plaintiff Is Not An Adequate Representative Of The Nationwide TILA Class, Because His Claim Is Barred By TILA's One-Year Statute Of Limitations.........................................................................................12

      B.    Plaintiff's Claims Are Not Typical......................................................14

            1.    The relief plaintiff seeks on behalf of the state putative class members based on alleged misapplication of payments cannot be effectuated against the defendants before the Court; plaintiff does not have standing to seek relief against other putative class members' note holders..........................................................14

            2.    Plaintiff's claims are not typical because they are subject to unique defenses regarding his reliance on alleged written or verbal misrepresentations and omissions that may have been made by Asia Pacific or Paul Financial or any other entity ...........16

            3.    Plaintiff's claims are not typical because the operative language upon which his claims rest differs from other class members .....................................................................................19

      C.    The Putative Class Does Not Satisfy Rule 23(b)(2)...................................20

            1.    Plaintiff primarily seeks monetary damages .................................20

|  |  | a. | Plaintiff's TILA damages class cannot satisfy Rule 23(b)(2) | 21 |

|  |  | b. | Plaintiff's state law classes primarily seek monetary damages | 21 |

|  | 2. | Plaintiff is not entitled to the injunctive relief he seeks | 22 |

|  | 3. | The putative classes are not homogenous | 25 |

| D. | The Putative Classes Do Not Satisfy Rule 23(b)(3) Or The Commonality Requirement Of Rule 23(a)(2) | 26 |

|  | 1. | Common questions do not predominate | 26 |

|  |  | a. | Common questions do not predominate as to plaintiff's TILA class | 26 |

|  |  | b. | Common questions do not predominate as to plaintiff's fraud claim | 29 |

|  |  | c. | Common questions do not predominate as to plaintiff's UCL claims | 34 |

|  |  | d. | Common questions do not predominate as to plaintiff's breach of contract claim | 36 |

|  |  | e. | Common questions do not predominate as to plaintiff's tortious breach of implied covenant claim | 37 |

|  | 2. | Class treatment is not superior to individual adjudication | 38 |

| E. | There Is No Basis For The Court To Find Assignee Liability On Behalf Of The Putative Classes Against HSBC Bank as Trustee of Luminent Trust 2006-2 | 40 |

| VI. | CONCLUSION | 40 |

1

**TABLE OF AUTHORITIES**

2

**CASES**

Aron v. U-Haul Co.,
    49 Cal. Rptr. 3d 555 (Cal. Ct. App. 2005)........................................................36

3

Affiliated Ute Citizens of Utah v. United States,
    406 U.S. 128 (1972) ............................................................................................32

4

In re America Continental Corp./Lincoln Savings & Loan Securities Litigation,
    140 F.R.D. 425 (D. Ariz. 1992).....................................................................33, 34

5

6

Andrews v. Chevy Chase Bank,
    545 F.3d 570 (7th Cir. 2008) ...........................................................12, 21, 24, 25

7

Arikat v. JP Morgan Chase & Co.,
    430 F. Supp. 2d 1013 (N.D. Cal. 2006)..............................................................29

8

9

Biggs v. Eaglewood Mortgage LLC,
    --- F. Supp. 2d ----, 2008 WL 4702662 (D. Md. Sept. 17, 2008) ...........4, 18, 31

10

Binder v. Gillespie,
    184 F.3d 1059 (9th Cir. 1999) ............................................................................32

11

12

Blakemore v. Superior Court,
    27 Cal. Rptr. 3d 877 (Cal. Ct. App. 2005)..........................................................36

13

Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC,
    76 Cal. Rptr. 3d 325 (Cal. Ct. App. 2008)..........................................17, 25, 29

14

15

Buckland v. Threshold Enters., Ltd.,
    66 Cal. Rptr. 3d 543 (Cal. Ct. App. 2007).........................................................17

16

Burton v. Mountain W. Farm Bureau Mutual Insurance Co.,
    214 F.R.D. 598 (D. Mont. 2003) ........................................................................22

17

18

Carma Developers, Inc. v. Marathon Development California, Inc.,
    2 Cal. 4th 372 (1992).....................................................................................37, 38

19

Caro v. Proctor & Gamble Co.,
    18 Cal. App. 4th 644 (1993) ...............................................................................18

20

21

Cattie v. Wal-Mart Stores, Inc.,
    504 F. Supp. 2d 939 (S.D. Cal. 2007) ...........................................................17, 35

22

Christ v. Beneficial Corp.,
    --- F.3d ----, 2008 WL 4716751 (11th Cir. Oct. 28, 2008)................................21

23

24

Coleman v. GMAC,
    296 F.3d 443 (6th Cir. 2002) ..............................................................................25

25

Commercial Capital Bankcorp Inc. v. St. Paul Mercury Insurance Co.,
    419 F. Supp. 2d 1173 (C.D. Cal. 2006)..............................................................24

26

27

28

Dash v. FirstPlus Home Loan Owner Trust 1996-2,
    248 F. Supp. 2d 489 (M.D.N.C. 2003) ....................................................... 14, 16

Deitz v. Comcast Corp.,
    2007 WL 2015440 (N.D. Cal. July 11, 2007) ............................... 18, 26, 30, 31

Department of Fair Employment & Housing v. Lucent Technologies, Inc.,
    2008 WL 5157710 (N.D. Cal. Decl. 8, 2008) .................................................. 35

Doniger v. Pacific Northwest Bell, Inc.,
    564 F.2d 1304 (9th Cir. 1977) ........................................................................ 11

Easter v. America West Finance,
    381 F.3d 948 (9th Cir. 2004) ..................................................................... 14, 16

Edwards v. First America Corp.,
    251 F.R.D. 449 (C.D. Cal. 2007)................................................................ 28, 29

Endres v. Wells Fargo Bank,
    2008 WL 344204 (N.D. Cal. Feb. 6, 2008) ................... 13, 18, 26, 28, 29, 36, 37

Eversole v. EMC Mortgage Corp.,
    2007 WL 1558512 (E.D. Ky. May 29, 2007)................................ 16, 22, 25, 37

Feitelberg v. Credit Suisse First Boston, LLC,
    36 Cal. Rptr. 3d 592 (Cal. Ct. App. 2005)....................................................... 35

In re Ferrell,
    539 F.3d 1186 (9th Cir. 2008) ........................................................................ 26

In re First Alliance Mortgage Co.,
    471 F.3d 977 (9th Cir. 2006) .............................................................. 32, 33, 34

In re Tobacco II Cases,
    47 Cal. Rptr. 3d 917 (Cal. Ct. App. 2006)...................................................... 34

Foley v. Bates,
    2007 WL 1430096 (N.D. Cal. May 14, 2007)................................................. 36

Gabriella v. Wells Fargo Finance, Inc.,
    2008 WL 3200190 (N.D. Cal. Aug. 4, 2008) .................................................. 12

Gartin v. S&M Nutec LLC,
    245 F.R.D. 429 (C.D. Cal. 2007)................................ 13, 17, 26, 29, 30, 31, 32, 35, 37, 38

General Telegraph Co. of the S.W. v. Falcon,
    457 U.S. 147 (1982) .................................................................................. 12, 17

Gibbons v. Interbank Funding Group,
    208 F.R.D. 278 (N.D. Cal. 2002) .................................................................... 21

Gillibeau v. Richmond,
    417 F.2d 426 (9th Cir. 1969) .......................................................................... 11

Gonzalez v. Proctor & Gamble Co.,
    247 F.R.D. 616 (S.D. Cal. 2007) ................................................. 16, 21, 30, 31, 32, 34, 36

In re Graphics Processing Units Antitrust Litigation,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) .......................................................... 16

Hanon v. Dataproducts Corp.,
    976 F.2d 497 (9th Cir. 1992) ............................................................... 12, 14, 17

Jefferson v. Security Pacific Financial Services, Inc.,
    161 F.R.D. 63 (N.D. Ill. 1995) ..................................................................... 12

Kassa v. BP West Coast Products, LLC,
    2008 WL 3494677 (N.D. Cal. Aug. 12, 2008) ................................................ 38

Kelley v. Galveston Autoplex,
    196 F.R.D. 471 (S.D. Tex. 2000) ............................................................ 13, 14

Knox v. Ameriquest Mortgage Co.,
    2005 WL 1910927 (N.D. Cal. Aug. 10, 2005) ................................................ 13

Lamumba Corp. v. City of Oakland,
    2007 WL 3245282 (N.D. Cal. Nov. 2, 2007) .................................................. 12

Laster v. T-Mobile USA, Inc.,
    407 F. Supp. 2d 1181 (S.D. Cal. 2005) .................................................... 17, 35

Lazar v. Hertz Corp.,
    143 Cal. App. 3d 128 (1983) ................................................................. 37, 38

Lewallen v. Medtronic USA, Inc.,
    2002 WL 31300899 (N.D. Cal. Aug. 28, 2002) ................................ 20, 25, 29, 30, 38, 39

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992) .................................................................................. 16

McKenna v. First Horizon Home Loan Corp.,
    475 F.3d 418 (1st Cir. 2007) ...................................................................... 21

McPhail v. First Command Finance Planning, Inc.,
    247 F.R.D. 598 (S.D. Cal. 2007) ............................................................ 33, 34

Miller v. Pacific Shore Funding,
    224 F. Supp. 2d 977 (D. Md. 2002) .............................................................. 16

Mirkin v. Wasserman,
    23 Cal. Rptr. 2d 101 (Cal. 1993) ................................................................. 32

Norwest Mortgage, Inc. v. Superior Court,
  72 Cal. App. 4th 214 (1999) ............................................................29

In re Paxil Litigation,
  218 F.R.D. 242 (C.D. Cal. 2003) ..............................21, 22, 23, 35

Perrone v. GMAC,
  232 F.3d 433 (5th Cir. 2000) ..........................................................26

Pettrey v. Enterprise Title Agency, Inc.,
  241 F.R.D. 268 (N.D. Ohio 2006) ..................................................22

Pfizer v. Superior Court,
  45 Cal. Rptr. 3d 840, 844 (Cal. Ct. App. 2006) ............................34

Plascencia v. Lending 1st Mortgage,
  2008 WL 1902698 (N.D. Cal. Apr. 28, 2008) ................................27

Poulos v. Caesar's World, Inc.,
  379 F.3d 654 (9th Cir. 2004) ..............................................31, 32, 35

Rodriguez v. Gates,
  2002 WL 1162675 (C.D. Cal. May 30, 2002) ....................16, 25, 39

Rosen v. State Farm General Insurance Co.,
  135 Cal. Rptr. 2d 361 (Cal. Ct. App. 2002) ..................................24

S. Bay Chevrolet v. General Motors Acceptance Corp.,
  85 Cal. Rptr. 2d 301 (Cal. Ct. App. 1999) ....................................18

Santa Maria v. Pacific Bell,
  202 F.3d 1170 (9th Cir. 2000) ........................................................13

Spiegler v. Home Depot U.S.A., Inc.,
  552 F. Supp. 2d 1036 (C.D. Cal. 2008) ..........................................24

Sweet v. Pfizer,
  232 F.R.D. 360 (C.D. Cal. 2005) ....................................................17

Ticor Title Insurance Co. v. Brown,
  511 U.S. 117 (1994) ........................................................................21

Turner v. Beneficial Corp.,
  242 F.3d 1023 (11th Cir. 2000) ......................................................26

Valentino v. Carter-Wallace, Inc.,
  97 F.3d 1227 (9th Cir. 1996) ....................................................26, 38

Williams v. Gerber Products Co.,
  523 F.3d 934 (9th Cir. 2008) ..........................................................36

Zelman v. JDS Uniphase Corp.,
  376 F. Supp. 2d 956 (N.D. Cal. 2005) ............................................35

Zinser v. Accufix Research Institute,
    253 F.3d 1180 (9th Cir. 2001), amended by 273 F.3d 1266 (9th Cir. 2001) ............passim

**FEDERAL STATUTES**

15 U.S.C. § 1640 ............................................................................................... 12

Fed. R. Civ. P. 8 ............................................................................................... 40

Fed. R. Civ. P. 23 ........................................................................... 11, 25, 38, 39, 40

**STATE STATUTES**

12 C.F.R. § 226............................................................................................. 27, 28

Cal. Bus. & Prof. Code  § 17200 .......................................................................... 34

Cal. Bus. & Prof. Code § 17203 ........................................................................... 34

Cal. Bus. & Prof. Code § 17204 ..................................................................... 17, 34

Cal. Code Civ. Proc. § 382 ................................................................................. 35

# I.     INTRODUCTION

Plaintiff claims that Paul Financial made misrepresentations and material omissions to prospective borrowers regarding the terms of Option ARM loans when it purportedly marketed those loans to the public.  In particular, plaintiff argues that, in order to "lure" borrowers in, Paul Financial uniformly failed to tell borrowers that if they made the "minimum" payment option on their loan, they would experience negative amortization and the principal balance of their loans would increase. Plaintiff, however, neglects to tell the Court that Paul Financial was a wholesale lender that did not market or "sell" its loan products to consumers; plaintiff's loan application was submitted to Paul Financial by a mortgage broker *after* plaintiff decided to obtain an Option ARM loan and *after* the mortgage broker submitted plaintiff's application to one or two other lenders. Plaintiff also does not mention that the payment schedule contained in the Truth in Lending Disclosure that he received from Paul Financial and signed prior to loan closing expressly showed that if plaintiff made only the minimum payments on his loan, his principal balance would re-amortize (as a result of negative amortization) at the 31st payment due date.

Rather than focus on the disclosure issues, which raise numerous individual issues that are not suitable for class certification, plaintiff attempts to transform this disclosure case into one that seeks sweeping equitable relief that has little connection to the alleged violations that are pled in the Second Amended Complaint.  Plaintiff bases his class certification motion on the erroneous presumption that all Option ARM loans are *per se* illegal[1] regardless of the disclosures borrowers received.  Based on this erroneous predicate, plaintiff asks the Court to re-write all of the putative class members' Notes, turn them into 1% fixed rate "no-negative amortization" loans, and ultimately order the re-allocation of principal and interest of all payments made by every Option ARM borrower based on the new loan terms.

Plaintiff's putative class claims do not support the relief he seeks, and for the following reasons, plaintiff's motion for class certification should be denied.  First, plaintiff is not an adequate

---

[1] See SAC at ¶ 23 (alleging that an Option ARM is a "deceptively devised financial product").

MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION

1

Case No. 3:07-cv-004496-SI

1  class representative because he is not a member of the national TILA class.  Plaintiff's claim is

2  barred by TILA's statute of limitations, and plaintiff does not fall within his own class definition.

3  Second, plaintiff's TILA and state law claims are not typical because (1) plaintiff's TILA disclosures

4  are necessarily different than those of other borrowers; (2) plaintiff does not have standing to seek

5  relief on behalf of putative class members from note holders that are not before the Court; and (3)

6  plaintiff's state law fraud claims are subject to unique defenses regarding reliance and causation.

7      Third, plaintiff's claims do not satisfy Rule 23(b)(2).  Plaintiff overwhelmingly seeks

8  monetary damages, not injunctive relief.  In particular, plaintiff seeks damages under TILA, as well

9  as restitutionary and other monetary relief under the UCL and other state laws.  The only injunctive

10  relief that plaintiff seeks – against the recasting[2] and foreclosure of putative class members' loans –

11  cannot be enforced because the entities that hold those loans (excluding the 131 loans in Luminent

12  Trust 2006-2) are not before the Court.  Even if the Court could enjoin the recasting of loans and

13  require the unwinding of loans on a class-wide basis and reapplication of payments made by

14  borrowers to interest and principal, doing so would afford primarily monetary relief to borrowers.

15      Fourth, plaintiff cannot satisfy the predominance and superiority requirements of Rule

16  23(b)(3).  By plaintiff's own concession, his claims are based on fraud.  Pl. Memo. at 2.  But,

17  contrary to plaintiff's argument, the claims are not based on a "common fraud," because, in part,

18  each putative class member's loan was arranged by a different independent mortgage broker, which

19  provided different information to each putative class member regarding terms and operation of

20  Option ARM loans.  Further, the written disclosures each borrower received from Paul Financial

21  after it received the borrower's loan application from the mortgage broker were necessarily

22  transaction-specific.  See Declaration of Dennis Tussey dated December 22, 2008 ("Tussey Decl.")

23  at ¶¶ 13, 15-17.  No fraud can be established without the Court hearing evidence from both the

24

25

---

26  [2]  The term "recasting" refers to the re-amortization of the principal balance of a borrower's loan
   when the balance reaches the negative amortization threshold set forth in the Note.  Plaintiff's
27  principal balance will recast when it reaches 110% of the original balance.  Tussey Decl. at ¶ 64.

borrower and the defendants regarding causation and reliance, which hearing will require evidence

regarding each individual borrower's circumstances.

Finally, class certification is not superior because the individual damages sought by each

putative class member are substantial.  Plaintiff appears to be seeking $50,000 to $100,000 in

damages (not including statutory or punitive damages) for his individual loan.  And each borrower

may avail themselves of individual remedies for rescission (if such a right exists) or counterclaims in

foreclosure, if necessary.  Moreover, each borrower is in the best position to identify his or her note

holder and/or servicer from whom relief may be sought, which entities are not currently before the

Court.  For these reasons, and the reasons set forth below, class certification should be denied.

**II.    STATEMENT OF ISSUES**

1)    Is plaintiff an adequate representative of the TILA class where his claim is barred by the one-

year statute of limitations?

2)    Are plaintiff's claims typical of the putative class members where: (a) plaintiff does not have

standing to seek relief on behalf of all putative class members; (b) plaintiff is subject to unique

defenses regarding his reliance on the alleged misrepresentations and omissions; and (c) the

operative language of plaintiff's loan documents differs from other class members'?

3)    Should the proposed classes be certified under Fed. R. Civ. P. 23(b)(2) where plaintiff

primarily seeks money damages and where plaintiff is not entitled to the injunctive relief sought?

4)    Should the proposed classes be certified under Fed. R. Civ. P. 23(b)(3) where individual

questions of fact and law predominate as to each of plaintiff's claims and class treatment is not

superior to individual adjudication?

## III.     FACTUAL BACKGROUND[3]

### A.     Option ARM Mortgage Loans

An "Option ARM" loan (also referred to as a "pay option" loan) has an adjustable interest rate and allows a borrower to make one of several payment amounts each month.  See Tussey Decl. at ¶ 7.  Typically, Option ARM loans provide four monthly payment options: (1) an amount equal to a fully amortizing loan over 30 years; (2) an amount equal to a fully amortizing loan over 15 years; (3) an interest-only option that allows for full payment of monthly interest; and (4) a minimum payment, which may be less than the amount of interest currently due on the loan.  Id.  To the extent that a borrower chooses to make the minimum payment in any given month, Option ARM loans can lead to deferred interest or negative amortization, that is, the difference between the amount paid and the amount of interest due is added to the outstanding principal balance of the loan.  Id.  Contrary to plaintiff's oft-repeated argument, payments on Option ARM loans are not certain to result in negative amortization.  Negative amortization will only result if the minimum payment option in a particular month is not sufficient to cover the interest due, and the borrower nonetheless chooses that option rather than the interest-only or fully-amortized payment.  Tussey Decl. at ¶ 7.

Accordingly, while some borrowers' loans may be negatively amortized, others' loans may be fully amortized depending upon the monthly payment option selected by each borrower.  Id. at ¶ 63.  Indeed, certain borrowers who obtained Option ARM loans from Paul Financial had not experienced negative amortization as of December 1, 2008.  See, e.g., Biggs v. Eaglewood Mortgage LLC, --- F. Supp. 2d ----, 2008 WL 4702662, at *1 n.3 (D. Md. Sept. 17, 2008) (describing Option ARM loans).  As such, negative amortization is anything but certain for Option ARM borrowers.

Contrary to the implication of this lawsuit, Option ARM loans are not inherently unlawful.  The existence of Option ARM loans has been recognized and regulated by numerous federal agencies, including the Federal Reserve Board ("FRB"), which administers and implements the

---

[3] In his Memorandum of Points and Authorities, plaintiff makes and relies upon numerous misstatements that have no factual support.  Defendants incorporate by reference as if fully set forth herein Addendum A of their brief in Opposition to Plaintiff's Application for a Preliminary Injunction, which addresses some of those misstatements.

1   Truth in Lending Act.  Indeed, the FRB has recognized both the risks *and* the salutary benefits of the

2   Option ARM loan product for certain borrowers.  The agency notes that Option ARM loans may be

3   appropriate for borrowers who meet the following characteristics: (1) borrowers who have "modest

4   current income but are reasonably certain that [their] income will go up in the future (for example, if

5   [they're] finishing [a] degree or training program);" (2) borrowers who "have sizable equity in

6   [their] home and will use the money that would go toward principal payments for other

7   investments;" and (3) borrowers who "have irregular income (such as commissions or seasonal

8   earnings) and want the flexibility of making [interest only] or option-ARM minimum payments

9   during low-income periods and larger payments during higher-income periods."  See "Interest-Only

10  Mortgage Payments and Payment-Option ARMs—Are They for You?" at

11  http://www.federalreserve.gov/pubs/mortgage_interestonly/.  The FRB also issues a Consumer

12  Handbook on Adjustable-Rate Mortgages ("CHARM Booklet"), which lenders are required by law

13  to provide to each prospective borrower who applies for an adjustable rate mortgage loan. 12 C.F.R.

14  § 226.19(b)(1); see also http://www.federalreserve.gov/pubs/arms/arms_english.htm.

15          **B.      Paul Financial, LLC**

16          From June 2003 through November 2007, Paul Financial was a wholesale residential

17  mortgage lender.  Tussey Decl. at ¶ 1.  Until December 1, 2008, Paul Financial also serviced

18  residential mortgage loans for investors.  Paul Financial is ceasing all operations as of December 31,

19  2008 and its current asset value is less than $1,000.  Id. at ¶ 3.  As a wholesale lender, Paul Financial

20  did not market loans to consumers.  Id. at 4.  Instead, Paul Financial received loan packages for

21  underwriting and approval from independent brokers who worked directly with borrowers.  Id.

22          Paul Financial funded loans secured by real property in California as well as in a number of

23  other states.  Id. at ¶ 6.  From September 2003 to November 26, 2007, Paul Financial funded 7,731

24  Option ARM loans secured by property in California and 1,816 Option ARM loans secured by

25  property outside of California.  Id. at ¶ 10.  From August 26, 2006 through November 26, 2007, Paul

26

27

28

Financial funded 4,146 Option ARM loans nationwide. Id. at ¶ 11. Paul Financial stopped funding

Option ARM loans on November 26, 2007. Id. at ¶ 9.

There were approximately 44 variations of the Option ARM loan products that Paul

Financial offered borrowers. Id. at ¶ 8. Due to the variation of terms, the form disclosure and loan

documents Paul Financial used varied as well. Some of those differences included the following:

- An Option ARM with: (1) an initial rate that lasted one month; (2) a fixed rate for the following 59 months; and (3) a rate that adjusted every 6 months thereafter for the remaining term of the loan. This loan expressly provided for "negative amortization" over the first 5 years of the loan due to yearly payment caps during that time period. The loan required "interest only" payments for the second five years of the loan. See Ex. 1 to Declaration of Irene C. Freidel dated December 30, 2008 ("Freidel Decl."), PF-Jordan002309-10.

- An Option ARM with a fixed interest rate for the first 10 years followed by an interest rate that adjusted every 6 months thereafter for the remaining term of the loan. This loan expressly provided for "negative amortization:" "For the first ten years, the Initial payment amount will result in accrued but unpaid interest being added to Principal. The unpaid Principal and any accrued but unpaid interest will then accrue additional interest in effect. *This practice is known as negative amortization*. The payment for the remaining 20 years will be the fully amortized interest and Principal amount." See Freidel Decl., Ex. 2 at PF-Jordan002770-71 (emphasis added).

- An Option ARM loan with an initial rate fixed for the first month followed by an interest rate that adjusted every month thereafter for the remainder of the loan. The loan states that due to yearly payment caps, monthly payments that are less than the interest portion due will cause the principal balance of the loan to increase. See Freidel Decl., Ex. 3 at PF-Jordan000414-15.

Once Paul Financial received a borrower's loan application from a mortgage broker, it

followed procedures to ensure that appropriate and accurate disclosures were made consistent with

applicable legal requirements. Tussey Decl. at ¶ 36. All potential borrowers seeking loans with an

adjustable rate feature were sent a copy of the FRB's CHARM Booklet. Id. at ¶ 22. Paul Financial

also provided the borrower with an Adjustable Rate Mortgage Loan Program Disclosure; Paul

Financial maintained a separate program disclosure for each of the Option ARM products that it

offered. Id. at ¶¶ 22-23. These disclosures were based upon the form disclosures provided in 12

C.F.R. § 226, Appendix H and modified to reflect the terms of each loan product. Id. at ¶ 23.

Paul Financial also provided the borrower with a Truth-in-Lending Disclosure and a

document entitled Truth-in-Lending Recap. Id. at ¶ 22. The disclosures provided to each borrower

varied based on the loan specific information that was relied upon by Paul Financial in preparing the documents. Id. at ¶ 24. The variable information included loan amount, interest rate, composite rate, APR, negative amortization threshold for re-casting, the index upon which the interest rate would be based, the frequency of interest rate changes, the existence of caps on interest rate changes, the frequency of payment changes, and the existence of payment caps and their effect. Id.

After a loan closed, Paul Financial sold it to an investor, but it would continue to service certain of the loans that it funded. Id. at ¶ 26. Paul Financial ceased servicing operations in December 2008. Id. at ¶ 1. When servicing loans, Paul Financial adhered to the terms of the Note and Deed of Trust in effect between the borrower and the note holder. It does not maintain records showing the current ownership or status of any Option ARM loans it originated. Id. at ¶¶ 27-28.

**C.     Plaintiff Gregory Jordan's Loan Transaction**

In December 2004, plaintiff Gregory M. Jordan ("plaintiff" or "Mr. Jordan") purchased a newly built home located in Discovery Bay, California. Jordan Dep. at 31:5-10, attached as Ex. 8 to Freidel Decl. ("Jordan Dep."). This was the fourth home plaintiff had purchased since 1985. Id. at 18:10-31:10. Mr. Jordan financed the property through two loans totaling approximately $482,000. Id. at 32:07-32:24. One of the original loans on his Discovery Bay property carried an adjustable rate. Tussey Decl. at ¶ 46, Ex. 21. Within a year after the purchase, Mr. Jordan decided to refinance his mortgage loans to "cash out" the equity in his home. Jordan Dep. at 36:02-36:06, 38:15-38:17.

To explore refinancing, plaintiff approached his acquaintance and co-worker, Russell Ng, who also worked at Asia Pacific, a mortgage broker. Id. at 39:17-40:17; Declaration of Russell Ng dated December 18, 2008 ("Ng Decl.") at ¶ 16. By the time plaintiff contacted Mr. Ng, he had executed mortgage documents on several prior occasions and was experienced regarding the mortgage financing process. Jordan Dep. at 18:10-31:10. According to Mr. Ng, Mr. Jordan was a savvy consumer who asked a lot of questions. Ng Decl. at ¶ 21.

Mr. Ng discussed the different types of loan products available to plaintiff, including an Option ARM loan. Id. at ¶ 19. He described the manner in which an Option ARM loan worked,

including its different payment options.  Id. at ¶ 20.  Specifically, Mr. Ng informed Mr. Jordan that if he made the minimum payments on an Option ARM loan he would not necessarily be covering the interest due, and the difference might be added to the principal.  Id.; Jordan Dep. at 47:7-17. Mr. Jordan expressed confidence that his home value would continue to rise and that he wanted the Option ARM loan in order to "buy time."  Ng Decl. at ¶ 17.  In late November 2005, Mr. Jordan submitted a loan application to Mr. Ng and Asia Pacific.  Id. at ¶ 18.  At that time, neither Asia Pacific nor Mr. Jordan knew which lender would approve Mr. Jordan's application.  Id. at ¶ 12. Shortly thereafter, Asia Pacific provided plaintiff with two separate TIL disclosures.  Ng Decl., Exs. 2-3.  At that time, Asia Pacific had not yet submitted plaintiff's loan application to Paul Financial or otherwise contacted Paul Financial in connection with the application.  Ng Decl. at ¶¶ 23-26.

Asia Pacific first submitted plaintiff's application to one or more lenders other than Paul Financial; these contacts did not result in a loan being made to Mr. Jordan.  Id. at ¶ 26.  Asia Pacific thereafter submitted plaintiff's loan application to Paul Financial.  Id.  Indeed, Paul Financial was unaware of plaintiff or his desire to obtain an Option ARM loan until December 7, 2005, when Paul Financial received a Broker Submission Form from Asia Pacific, which stated that Mr. Jordan was seeking an ARM loan in the amount of $535,000.  Tussey Decl. at ¶ 31.

On December 8, 2005, Paul Financial sent a package of disclosures to Mr. Jordan including a preliminary Truth In Lending Disclosure Statement ("Preliminary TIL Disclosure") (Tussey Decl., Ex. 7), an ARM Program Disclosure ("Program Disclosure") (Id. at Ex. 11), and a copy of the FRB's CHARM Booklet (Id. at Ex. 12).  Tussey Decl. at ¶ 35.  Other than mailing the required disclosures, Paul Financial had no contact with Mr. Jordan until after the loan closing.  Id. at ¶¶ 41-42; Jordan Dep. at 51:2-5.

For the closing, Paul Financial prepared the final financing documents for plaintiff's loan, which included the Adjustable Rate Note, Adjustable Rate Rider, Deed of Trust, the Final TIL Disclosure, a Program Disclosure as well as other required documents.  Tussey Decl. at ¶ 41.  At the

1  document signing on December 30, 2005,[4] plaintiff had the opportunity to review all of the mortgage

2  documents and ask any questions that he might have had.   Ng Decl. at ¶ 28.  Plaintiff, however,

3  asked no questions.  Jordan Dep. at 55:16-55:23, 61:12-64:20, 65:14-66:08, 66:12-66:22.  Rather, he

4  executed the final loan documents, including disclosures, but admits that he did not fully review or

5  read them.  Id. at 54:02-55:12, 61:25-62:12, 66:18-66:22.  The documents executed by plaintiff

6  clearly identified the terms and conditions of his loan.  Tussey Dec. Ex. 13-14, 18-20.

7          Throughout the loan origination process, plaintiff was made aware, by both Asia Pacific and

8  Paul Financial (and possibly others), of the important terms of his transaction, including the variable

9  rate of the Option ARM loan and the risk of negative amortization if he made the "minimum"

10  payment option.  Indeed, plaintiff testified that he was aware that his interest rate would change and

11  that he chose this loan product over a 30-year fixed loan because he wanted lower monthly

12  payments.  Id. at 42:12-43:10.  Plaintiff also concedes that Mr. Ng mentioned negative amortization,

13  but he could no longer recall what he was told about it or whether he asked any questions about

14  negative amortization or its effects.  Id. at 47:07-47:17.

15          **D.      The Assignment And Securitization Of Plaintiff's Loan**

16          After plaintiff's loan transaction closed, Paul Financial sold the loan to Luminent Capital

17  Mortgage, Inc. ("Luminent").  Tussey Decl. at ¶ 57.  Thereafter, the loan was assigned to MAIA

18  Mortgage Finance Statutory Trust, which later assigned the loan to Greenwich Capital Acceptance,

19  Inc.  Declaration of Fernando Acebedo ("Acebedo Decl.") at ¶ 19.  The loan was then pooled with

20  other adjustable rate loans and assigned to HSBC Bank, as Trustee for Luminent Mortgage Trust

21  2006-2 ("Luminent Trust 2006-2" or "Trust"), as the nominal holder for the benefit of the certificate

22  holders of the Trust.  Id.  Of the approximately 909 loans currently in the Trust, 131 (or less) are

23  Option ARM loans originated by Paul Financial.  Id. at ¶ 57.  HSBC Bank's role as Trustee is

24  limited to providing corporate trust services for the certificate holders consisting predominately of

25

26

27  _____

[4] Paul Financial was not present at the signing.  Tussey Decl. at ¶ 42.

28  **MEMORANDUM OF POINTS AND AUTHORITIES**          9          **Case No. 3:07-cv-004496-SI**
   **IN OPPOSITION TO PLAINTIFF'S MOTION FOR**
   **CLASS CERTIFICATION**

1   nominal participation in legal proceedings and distribution of notices concerning the Trust to the

2   certificate holders and the parties to the Pooling and Servicing Agreement as applicable.  Id. at ¶ 9.

3         **E.**      **The Servicing Of Plaintiff's Loan**

4         Although Paul Financial sold plaintiff's loan to Luminent, Paul Financial serviced the Jordan

5   loan from the date of closing until December 1, 2008, when servicing of the loan was transferred to

6   another entity.  Tussey Decl. at ¶ 58.  As set forth in the loan documents received and signed by

7   plaintiff, plaintiff's interest rate adjusted periodically effective with the March 2006 payment.  See,

8   e.g., Tussey Decl, Ex. 10 (TILA Recap) (indicating interest rate would change with first payment).

9   Each month, Paul Financial sent a monthly statement and payment coupon to plaintiff, which

10   provided him with several payment options: a minimum payment, an interest-only payment, and a

11   30-year fully amortized payment.  Id. at Ex. 22.  The statement described each payment: (1) the

12   "minimum" payment was "the minimum amount that must be paid.  As the interest rate may change

13   monthly, paying this 'minimum' payment amount may not be enough to pay all of the monthly

14   interest due.  If this occurs, the unpaid interest is then added to your loan balance;" (2) the "Interest

15   Only Payment" was "applied only to [the] interest due for [that] month.  No funds are included to

16   reduce the loan's principal balance....;" and (3) the "Fully Amortized Payment" was the "principal

17   and interest amount due.  It is calculated using the current interest rate (determined by adding index

18   plus margin) and the balance over the remaining term of the loan."  See id.

19         On or about March 8, 2006, Paul Financial received plaintiff's first payment of $1,375.54,

20   which was the minimum amount due.  See Tussey Decl. at ¶ 59, Ex. 22.  Because this was the

21   minimum amount and did not cover all of the interest due, the payment was applied to a portion of

22   the outstanding interest, and the unpaid interest still due on plaintiff's account for the month of

23   March was added to the loan's principal balance (negative amortization).  Id. at ¶ 61.  The

24   application of this payment and the increase to plaintiff's balance was reflected in his monthly

25   statement dated March 16, 2006.  Id. at Ex. 22.  If plaintiff had made the interest only or fully

26

27

1   amortized payment in March 2006, his principal would not have been negatively amortized.  Tussey

2   Decl. at ¶ 62.  This is true for each subsequent payment plaintiff made on his loan.  Id.

3        Plaintiff received and reviewed his monthly mortgage statements.  Jordan Dep. at 71:23-

4   72:13.  Within several months, he observed that his principal balance was increasing and his interest

5   rate had changed.  Id. at 56:25-57:10.  Plaintiff also understood that he had various payment options

6   (id. at 72:11-72:13), and he did not ignore his increasing balance, but instead made occasional

7   payments to principal.  Tussey Decl. at ¶ 68.

8        **F.**    **The Complaint**

9        On August 30, 2007, plaintiff filed this putative class action lawsuit against Paul Financial

10  bringing claims under TILA and state law, including the UCL.  Plaintiff filed a First Amended

11  Complaint on October 11, 2007.  On May 14, 2008, plaintiff filed a Second Amended Complaint,

12  which included claims against Luminent, the Trust, and HSBC Bank USA, National Association, as

13  Trustee.  On September 5, 2008, Luminent filed for bankruptcy and the case against it was stayed.

14  **IV.**    **STANDARD FOR CLASS CERTIFICATION**

15       Plaintiff bears the burden of demonstrating that the putative classes meet the four

16  requirements of Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements of

17  Rule 23(b).  Fed. R. Civ. P. 23.; Zinser v. Accufix Research Inst., 253 F.3d 1180, 1186 (9th Cir.

18  2001), amended by 273 F.3d 1266 (9th Cir. 2001).  Under Rule 23(a), the party seeking class

19  certification must establish: (1) that the class is so large that joinder of all members is impracticable;

20  (2) that there are one or more questions of law or fact common to the class; (3) that the named

21  parties' claims are typical of the class; and (4) that the class representatives will fairly and

22  adequately protect the interests of other members of the class.  Fed. R. Civ. P. 23(a).  Plaintiffs must

23  provide facts to satisfy these requirements, and "[m]ere repetition of the language of the Rule is

24  inadequate."  Doniger v. Pac. Nw. Bell, Inc., 564 F.2d 1304, 1309 (9th Cir. 1977) (citing Gillibeau v.

25  Richmond, 417 F.2d 426, 432 (9th Cir. 1969)).  In addition to the explicit requirements set out by

26  Rule 23(a), the class definition must set forth a class which is ascertainable and clearly identifiable.

27

28  **MEMORANDUM OF POINTS AND AUTHORITIES**     11     **Case No. 3:07-cv-004496-SI**
    **IN OPPOSITION TO PLAINTIFF'S MOTION FOR**
    **CLASS CERTIFICATION**

1    Lamumba Corp. v. City of Oakland, 2007 WL 3245282, at *4 (N.D. Cal. Nov. 2, 2007) (denying

2    class certification because class definition was not sufficiently definite).

3          The Court, in turn, must conduct a searching and "rigorous analysis" into whether plaintiffs

4    have met their burden.  Hanon v. Dataprods. Corp., 976 F.2d 497, 509 (9th Cir. 1992) (citing Gen.

5    Tel. Co. of the S.W. v. Falcon, 457 U.S. 147, 161 (1982)).  The Court may look beyond the

6    pleadings and at the substantive claims of the parties to determine whether the elements of Rule 23

7    have been met.  Falcon, 457 U.S. at 160.  Additionally, the Court may "consider evidence which

8    goes to the requirements of Rule 23 even though the evidence may also relate to the underlying

9    merits of the case."  Hanon, 976 F.2d at 509.  Finally, the Court need not accept plaintiff's

10   conclusory or generic allegations in support of class certification.  See Gabriella v. Wells Fargo Fin.,

11   Inc., 2008 WL 3200190, at *2 (N.D. Cal. Aug. 4, 2008) (Illston, J.).

12   **V.    ARGUMENT**

13        **A.    Plaintiff Is Not An Adequate Representative Of The Nationwide TILA Class,
               Because His Claim Is Barred By TILA's One-Year Statute Of Limitations**[5]

14

15        Plaintiff is not a member of the nationwide putative TILA damages class, which he defines as

16   including "[a]ll individuals in the United States who, between August 29, 2006, and the date Notice

17   is mailed to the Class, have an ARM loan that was sold or owned by Defendants which was secured

18   by real property on their primary residence located within the United States."  Pl. Memo. at 6.

19   Plaintiff's loan closed on January 6, 2006.  Tussey Decl. at ¶ 43.  He did not file his lawsuit until

20   nearly 20 months later, on August 30, 2007.  See Docket No. 1.  As such, plaintiff's TILA claim for

21   statutory damages is barred by TILA's one-year statute of limitations period, 15 U.S.C. § 1640(e),[6]

22   and he cannot represent a class of which he is not a member.  See Jefferson v. Sec. Pac. Fin. Servs.,

23   Inc., 161 F.R.D. 63, 70 (N.D. Ill. 1995) (Rule 23(a) not satisfied where TILA claim time barred).

24

25   [5] Defendants do not challenge numerosity, but instead note that the nationwide TILA class has 4,146
     members (Tussey Decl. at ¶ 11), not more than 9,000 as plaintiff states.  Pl. Memo. at 8.

26   [6] Plaintiff does not seek to represent a class of borrowers seeking TILA rescission, nor could he.  See

27   footnote 8 infra and Andrews v. Chevy Chase Bank, 545 F.3d 570, 577-78 (7th Cir. 2008).

28   **MEMORANDUM OF POINTS AND AUTHORITIES**              12              **Case No. 3:07-cv-004496-SI**
     **IN OPPOSITION TO PLAINTIFF'S MOTION FOR**
     **CLASS CERTIFICATION**

Plaintiff cannot overcome his lack of typicality by asserting that the statute of limitations on his TILA claim is equitably tolled or estopped.  Equitable estoppel requires evidence of fraudulent conduct outside of the TILA disclosures themselves.  See Kelley v. Galveston Autoplex, 196 F.R.D. 471, 478 (S.D. Tex. 2000); see also Santa Maria v. Pac. Bell, 202 F.3d 1170, 1177 (9th Cir. 2000) ("Fraudulent concealment necessarily requires active conduct by a defendant, above and beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the plaintiff from suing in time."); Knox v. Ameriquest Mortgage Co., 2005 WL 1910927, at *3 (N.D. Cal. Aug. 10, 2005).  Moreover, a finding of equitable estoppel involves the consideration of whether the plaintiff reasonably relied upon the defendant's conduct or representations.  Santa Maria, 202 F.3d at 1177.  Such a determination necessarily requires an inquiry into the unique circumstances of the borrower's loan. See Kelley, 196 F.R.D. at 477-78; Gartin v. S&M Nutec LLC, 245 F.R.D. 429, 441 (C.D. Cal. 2007) (defendant's statute of limitations defense will "require any individualized determination for each putative class member because these defenses turn, in large part, on each class member's knowledge and conduct").  In the case of equitable tolling, the analysis "focuses on whether there was excusable delay by the plaintiff," or in other words, whether a reasonable plaintiff should have known of his claims.  Santa Maria, 202 F.3d at 1178-79.  This analysis is inherently individualized.

Plaintiff cannot establish that either equitable estoppel or equitable tolling applies to his claim.  Plaintiff's central allegation of harm is that he experienced negative amortization and "equity stripping" as a result of his Paul Financial loan.  See, e.g., Pl. Memo. at 1-3; SAC at ¶¶ 28, 30-31, 35-42, 45.  But plaintiff admits that his mortgage broker, Russell Ng, talked to him about negative amortization (Jordan Dep. at 47:07-47:17; Ng Decl. at ¶ 20) and that he was fully aware of negative amortization occurring on his loan four months after closing, and thus approximately 16 months prior to filing suit.  Under these facts, plaintiff cannot demonstrate either "excusable delay" or fraudulent concealment by Paul Financial.  See Jordan Dep. at 56:25-57:6; 72:18-74:5.  Accordingly, plaintiff's TILA claim is not typical and he is not an adequate class representative of the nationwide TILA class.  See Endres v. Wells Fargo Bank, 2008 WL 344204, at *12 (N.D. Cal. Feb. 6, 2008)

1  (denying certification where statute of limitations analysis requires inquiry into each putative class

2  member's awareness of defendant's disclosures); Kelley, 196 F.R.D. at 477; Hanon, 976 F.2d at 508.

3      **B.      Plaintiff's Claims Are Not Typical**

4          **1.      The relief plaintiff seeks on behalf of the state putative class
                      members based on alleged misapplication of payments cannot**
5              **be effectuated against the defendants before the Court;
                   plaintiff does not have standing to seek relief against other**
6              **putative class members' note holders**

7          Plaintiff purports to represent two state law classes of borrowers, which together consist of

8  over 9,500 individuals.  The classes are defined as borrowers who obtained Option ARM loans from

9  Paul Financial, and they seek relief arising from two types of conduct: (1) the manner in which Paul

10 Financial provided disclosures to borrowers in connection with the marketing and origination of the

11 Option ARM loans, and (2) the manner in which payments were applied by the entities that serviced

12 the Option ARM loans after they were funded.  As to the second point, plaintiff argues that all

13 payments should have been applied to interest *and* principal even if the payment was the minimum

14 amount due and insufficient under the loan documents to cover the interest due in a given month.

15 The ultimate relief plaintiff seeks consists of the unwinding of class members' mortgage loans and

16 the "re-allocation of Class members' prior payments … by applying [prior] monthly payments to

17 both principal and interest and a re-accounting of the amounts Class members are shown on

18 Defendants' books to owe."  Pl. Memo. at 11.  Certification of the putative classes, to the extent that

19 they seek relief as to payment applications, should be denied for several reasons.

20         First, the Court could not order the class-wide relief plaintiff seeks without bringing every

21 putative class member's note holder and/or servicer before the Court.  See, e.g., Dash v. FirstPlus

22 Home Loan Owner Trust 1996-2, 248 F. Supp. 2d 489, 503-04 (M.D.N.C. 2003) (named plaintiffs

23 did not have standing against named loan assignees where named plaintiffs' loans were not serviced

24 or held by those assignees); Easter v. Am. West Fin., 381 F.3d 948, 961-62 (9th Cir. 2004).  Paul

25 Financial currently services no loans, and, prior to December 2008, only serviced a small percentage

26 of the putative class members' loans.  Paul Financial currently holds title to no putative class

27

28 **MEMORANDUM OF POINTS AND AUTHORITIES**          14          **Case No. 3:07-cv-004496-SI**
   **IN OPPOSITION TO PLAINTIFF'S MOTION FOR**
   **CLASS CERTIFICATION**

1   members' loans, and when it did so, its ownership of any one loan was brief, pending assignment to

2   an investor.  Similarly, HSBC Bank as Trustee is not in the business of servicing mortgage loans and

3   has not serviced any putative class member's loan.  HSBC Bank as Trustee is also not an entity that

4   applies or distributes loan payments by borrowers.  To the extent that HSBC Bank as Trustee has

5   any association with a putative class member's loan, it is in its nominal capacity as trustee of the

6   Trust, which currently holds not more than 131 Option ARM loans originated by Paul Financial.

7         Second, defendants do not have the means to identify the servicers and/or note holders of

8   every putative class member.  See Tussey Decl. at ¶¶ 27-28.  Paul Financial sold loans shortly after

9   funding to approximately ten third-party investors.  Id. at ¶ 27.  Those investors may or may not

10  have sold the loans to other investors or purchasers.  Paul Financial does not have records to show

11  downstream purchasers for each loan that it funded.  Id.  The individuals who are best suited to

12  identify their note holders and seek relief from them are the borrowers themselves.

13        Third, and similarly, even if there were a basis for the Court to order the relief sought, which

14  defendants dispute, the parties before the Court have no means to determine which borrowers would

15  be entitled to the relief.  Plaintiff asks the Court to rewrite the loan contracts turning each contract

16  into a 1% fixed rate "no negative-amortization" home loan.  Pl. Memo. at 11.  Plaintiff further states

17  that he is ultimately seeking the "re-allocation of Class members' prior payments and a re-

18  accounting of the amounts Class members are shown on Defendants' books to owe."  Id.  It is not

19  clear whether plaintiff is seeking the re-allocation of funds only as to borrowers who paid the

20  minimum payment option or as to all borrowers, even those who made fully amortizing payments

21  under the indexed rate in the first instance.  Similarly, it is unclear whether plaintiff is including only

22  borrowers whose loans are extant or also borrowers whose loans are paid off.  Under any scenario, it

23  is difficult to imagine how the relief plaintiff seeks could be provided.  For current purposes, the

24  defendants before the Court are not in a position to identify the status of each putative class

25  member's loan; only the borrowers know the status of their loans and, because the relief sought is

26  substantial, they should be required to pursue their claims on an individual basis.

27

28  **MEMORANDUM OF POINTS AND AUTHORITIES**          15          **Case No. 3:07-cv-004496-SI**
    **IN OPPOSITION TO PLAINTIFF'S MOTION FOR**
    **CLASS CERTIFICATION**

Last, plaintiff does not have standing to seek relief from other putative class members' note holders or servicers that are not his own. To establish Article III standing, plaintiff must establish (1) an injury in fact; (2) traceability, i.e., a causal connection between the injury and the action complained of; and (3) redressability. Easter, 381 F.3d at 961 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).[7] To satisfy the traceability requirement, plaintiff must demonstrate "a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants." Id. Plaintiff, whose loan was not serviced or held by the same entities as every other putative class member, cannot have claims against those entities. See Dash, 248 F. Supp. 2d at 503-04 (named plaintiffs did not have standing against named loan assignees where named plaintiffs' loans were not serviced or held by those assignees); Easter, 381 F.3d at 961-62; Miller v. Pac. Shore Funding, 224 F. Supp. 2d 977, 995-96 (D. Md. 2002) (same); Eversole v. EMC Mortgage Corp., 2007 WL 1558512, at *11 (E.D. Ky. May 29, 2007) (same); see also Rodriguez v. Gates, 2002 WL 1162675, at *10 (C.D. Cal. May 30, 2002) (plaintiff did not have standing to seek injunctive relief on behalf of all class members). Stated otherwise, plaintiff is not in a position to seek relief for any alleged injury suffered by other borrowers (except arguably those whose loans are held in the Trust), because their injury cannot fairly be traced to either Paul Financial or HSBC Bank as Trustee. See Easter, 381 F.3d at 961-62 (traceable injury only exists between borrower and note holder); Dash, 248 F. Supp. 2d at 503-04 (traceability and redressability lacking against entity that did not hold or service borrower's loan); Miller, 224 F. Supp. 2d at 995-96 (same).

### 2. Plaintiff's claims are not typical because they are subject to unique defenses regarding his reliance on alleged written or verbal misrepresentations and omissions that may have been made by Asia Pacific or Paul Financial or any other entity

The "test of typicality is whether … the action is based on conduct which is not unique to the named plaintiff[]." Gonzalez v. Proctor & Gamble Co., 247 F.R.D. 616, 621 (S.D. Cal. 2007) (citing

---

[7] The Court should determine whether plaintiff has standing to bring his claims and represent the class before it adjudicates the merits of class certification. See Easter, 381 F.3d at 962; In re Graphics Processing Units Antitrust Litig., 527 F. Supp. 2d 1011, 1026 (N.D. Cal. 2007).

1  Gen. Tel., 457 U.S. at 153). "Where the substantive claims depend on individual permutations …

2  the claims of the named plaintiffs who have the same general complaint against the defendant as the

3  class are not typical." Gartin, 245 F.R.D. at 434; see also Sweet v. Pfizer, 232 F.R.D. 360, 367 (C.D.

4  Cal. 2005); Rodriquez, 2002 WL 11626745, at *7; Hanon, 976 F.2d at 508 (plaintiff's "unique

5  background and factual situation require him to prepare to meet defenses that are not typical of the

6  defenses which may be raised against other members of the proposed class").

7      Plaintiff's claims that arise from alleged disclosure violations are not typical because, for

8  example, their proof and defense require the fact finder to consider evidence regarding whether

9  plaintiff relied upon Paul Financial's alleged inadequate disclosures or other unfair conduct and

10  whether such reliance caused him harm.  See Blickman Turkus, LP v. MF Downtown Sunnyvale,

11  LLC, 76 Cal. Rptr. 3d 325, 362 (Cal. Ct. App. 2008) (fraudulent omission claim requires justifiable

12  reliance that led to plaintiff suffering damages); Cattie v. Wal-Mart Stores, Inc., 504 F. Supp. 2d

13  939, 947 (S.D. Cal. 2007) (post-Proposition 64, UCL requires actual reliance and causation);

14  Laster v. T-Mobile USA, Inc., 407 F. Supp. 2d 1181, 1193-94 (S.D. Cal. 2005) (same); Cal. Bus. &

15  Prof. Code § 17204 (UCL actions may be brought "by any person who has *suffered injury in fact* and

16  has lost money or property *as a result* of the unfair competition") (emphasis added).  Here, contrary

17  to plaintiff's claim of "common fraud" (Pl. Memo. at 1-2), there is no uniform conduct or set of

18  documents that applied to the putative classes and from which a "common fraud" could be

19  determined.  Instead, the proof will show that plaintiff could not have relied upon the alleged

20  conduct of Paul Financial, and that proof as to every other putative class member's claim is similarly

21  unique.  See Buckland v. Threshold Enters., Ltd., 66 Cal. Rptr. 3d 543, 549-50 (Cal. Ct. App. 2007)

22  (fraud claims fail for lack of reliance when a plaintiff acts upon his own understanding).

23      What plaintiff relied upon in making his decision to obtain an Option ARM loan, and

24  whether he relied upon information from Paul Financial or other sources will require the presentation

25  of evidence regarding the following, but not limited to: (1) plaintiff's experience in mortgage

26  financing; (2) plaintiff's oral and written communications with Russell Ng at Asia Pacific, his long

27

1   time work colleague (Jordan Dep. at 39:5-41:1); (3) plaintiff's oral and written communications with

2   other lenders that may have considered plaintiff's loan application before it was submitted to Paul

3   Financial; and (4) plaintiff's oral and written communications with Paul Financial.  The evidence

4   shows that Mr. Jordan was experienced in obtaining mortgage loans prior to approaching Asia

5   Pacific, he was a savvy and experienced consumer, and he was well-informed by Mr. Ng who

6   discussed Option ARM loans with Mr. Jordan and informed him that the principal balance of his

7   loan could increase if he made the minimum payment.  Ng Decl. at ¶ 21.  Plaintiff also received

8   written disclosures from Asia Pacific regarding his loan.  Id. at Ex. 1-3.  Plaintiff admits that he did

9   not have any direct contact with Paul Financial until after his loan closed (Jordan Dep. at 51:2), and

10  he cannot state with any confidence whether he read his loan documents from Paul Financial prior to

11  the closing.  Id. at 55:7-10; 62:9-12 (plaintiff "probably looked at" his Note); 65:4-8 (plaintiff looked

12  at part of his Note and "kind of overlooked the rest").

13          There is an absence of evidence supporting any argument that plaintiff relied upon any

14  alleged misrepresentations or omissions of Paul Financial when entering the transaction, thus

15  precluding a finding that plaintiff's claims are typical of the class.  See Endres, 2008 WL 344204, at

16  *6, *13 (denying class certification of UCL claim where named plaintiffs admitted that they did not

17  read defendants' disclosures); Deitz v. Comcast Corp., 2007 WL 2015440, at *5 (N.D. Cal. July 11,

18  2007); Caro v. Proctor & Gamble Co., 18 Cal. App. 4th 644, 663 (1993) (denying class certification

19  on California fraud and UCL claims where plaintiff failed to read the disclosures provided by

20  defendant); see also S. Bay Chevrolet v. Gen. Motors Acceptance Corp., 85 Cal. Rptr. 2d 301, 316-

21  17 (Cal. Ct. App. 1999); Biggs, 2008 WL 4702662, at *4-7 (granting summary judgment to

22  defendant lender on fraud-based Option ARM loan claims where the evidence demonstrated that

23  plaintiffs were familiar with the terms of Option ARM loans).  Indeed, where a named plaintiff has

24  failed to read the very documents upon which his misrepresentation claims are based, this Court has

25  held that the named plaintiff will be subject to unique defenses (i.e., lack of reliance) rendering him

26  an atypical representative.  See Deitz, 2007 WL 2015440, at *5.

27

28  MEMORANDUM OF POINTS AND AUTHORITIES          18          Case No. 3:07-cv-004496-SI
    IN OPPOSITION TO PLAINTIFF'S MOTION FOR
    CLASS CERTIFICATION

### 3. Plaintiff's claims are not typical because the operative language upon which his claims rest differs from other class members

Contrary to plaintiff's claims that the material statements of the loan documents at issue are "virtually identical" (see, e.g., Pl. Memo. at 13), differences exist among the various Option ARM loan products used by Paul Financial. Plaintiff alleges that Paul Financial omitted material information regarding the likelihood of negative amortization occurring in connection with each borrower's loan. Plaintiff asserts that "[e]ach of the Promissory Notes … created and used by Defendants during the class period, contain identical material statements and omissions." Pl. Memo. at 3. As proof that negative amortization was not adequately disclosed, plaintiff primarily relies upon the following statement in *his* Note: "I will pay principal and interest by making a payment every month." <u>Id.</u> at 4. Plaintiff's bald assertions are not supported by the factual record, and his loan documents are not "identical" to every other putative class members'.

The phrase "I will pay principal and interest by making a payment every month," which plaintiff isolates out of context to support his claims, is not common to all of the Option ARM loans funded by Paul Financial. For example, one of Paul Financial's Option ARM loan notes reads:

> I will make a payment on the first day of every month … Each monthly payment will be applied as of its scheduled due date, and <u>if the payment includes both Principal and interest, it will be applied to interest before Principal</u>…. <u>For the first ten years</u>, the Initial payment amount <u>will</u> result in accrued but unpaid interest being added to Principal. The unpaid Principal and any accrued but unpaid interest <u>will</u> then accrue additional interest at the rate in effect. <u>This practice is known as negative amortization</u>. The payment for the remaining 20 years will be for the fully amortized interest and Principal amount.

Freidel Decl., Ex. 4 at PF-Jordan002953 (emphasis added). Another Option ARM similarly reads: "Payment of the Minimum Payment amount <u>will</u> result in accrued but unpaid interest being added to Principal…. <u>This practice is known as negative amortization</u>." Freidel Decl., Ex. 5 atPF-Jordan002715 (emphasis added).

Further, plaintiff's assertion that "[e]ach Loan Program Disclosure that Defendants used during the liability period failed to even mention the term 'negative amortization'" (Pl. Memo. at 5) is patently untrue. Many of the ARM Program Disclosures, which Paul Financial produced to

plaintiff, expressly use the term "negative amortization" and the process by which it occurs. For

example, the following statements are contained in certain Paul Financial Option ARM disclosures:

> Your initial monthly payment will be calculated based upon a yearly
> rate which may be less than the note rate. This rate is the Minimum
> Payment Rate. The Initial payment amount <u>will result</u> in accrued but
> unpaid interest being added to Principal. The unpaid Principal and any
> accrued but unpaid interest will then accrue additional interest at the
> rate in effect. <u>This practice is known as negative amortization</u>.
> (Freidel Decl., Ex. 6 at PF-Jordan002511 (emphasis added)).

and

> With the exception of the first payment your payments during the first
> five years will not be sufficient to cover the interest due on the loan.
> <u>This means your loan balance will increase.  This is known as negative
> amortization</u>…. After the first ten years of your loan the interest only
> period will end and your monthly payments will begin to reduce your
> loan balance.  (Freidel Decl., Ex. 7 at PF-Jordan002318-19 (bold in
> original)).

Despite this language, plaintiff asserts that Paul Financial failed to disclose the possibility of

"negative amortization" *in every putative class member's transaction*.  <u>See</u>, <u>e.g.</u>, Pl. Memo. at 13.

Plainly, plaintiff's assertion is directly contradicted by the evidentiary record in this case.  That

record reflects that there is not uniformity among putative class members and plaintiff's claim is not

typical of the claims of any borrower who does not share the same disclosures plaintiff received.

### C.   The Putative Class Does Not Satisfy Rule 23(b)(2)

A Rule 23(b)(2) class may only be certified where plaintiff can establish that: (1) the party

opposing the class has acted or refused to act on grounds generally applicable to the class; and (2)

the primary relief sought is injunctive or declaratory.  <u>Zinser</u>, 253 F.3d at 1195.  Plaintiff cannot

establish either of these requirements.

### 1.   Plaintiff primarily seeks monetary damages

Where, as here, the class representative seeks monetary damages, a Rule 23(b)(2) class is

appropriate only if "such relief is 'merely incidental to the primary claim for injunctive relief.'"  <u>Id.</u>;

<u>Lewallen v. Medtronic USA, Inc.</u>, 2002 WL 31300899, at *3 (N.D. Cal. Aug. 28, 2002).  Indeed,

courts are wary of certifying Rule 23(b)(2) classes where monetary relief is sought because they

1   present due process concerns for absent class members, who become bound by a judgment without a

2   right to opt out. <u>See</u> <u>In re Paxil Litig.</u>, 218 F.R.D. 242, 248 (C.D. Cal. 2003) (citing <u>Ticor Title Ins.</u>

3   <u>Co. v. Brown</u>, 511 U.S. 117, 121 (1994)). When determining whether to certify a Rule 23(b)(2)

4   class seeking monetary relief, the Court must "examine the specific facts and circumstances of the

5   case, focusing predominantly on the plaintiff's intent in bringing the suit." <u>Gonzalez</u>, 247 F.R.D. at

6   626. In determining whether claims for monetary damages predominate, "the Court may ask

7   whether a reasonable party would bring the suit to obtain the injunctive relief and whether the

8   injunctive relief sought would be both reasonably necessary and appropriate were the party to

9   succeed on the merits." <u>In re Paxil Litig.</u>, 218 F.R.D. at 247.

10                  **a.      Plaintiff's TILA damages class cannot satisfy Rule 23(b)(2)**

11          Plaintiff's request to certify a Rule 23(b)(2) national TILA class, <u>see</u> Pl. Memo. at 6, must be

12   rejected on its face. That request is limited to statutory damages. <u>See id.</u> at 6, n.3. Plaintiff seeks no

13   injunctive relief for the national class, making Rule 23(b)(2) certification entirely inappropriate. <u>See</u>

14   <u>Zinser</u>, 253 F.3d at 1195 (Rule 23(b)(2) certification only appropriate where primary relief sought is

15   injunctive). Moreover, TILA does not permit injunctive relief. <u>See</u> <u>Christ v. Beneficial Corp.</u>, ---

16   F.3d ----, 2008 WL 4716751, at *4 (11th Cir. Oct. 28, 2008).[8]

17                  **b.      Plaintiff's state law classes primarily seek monetary damages**

18          Plaintiff's putative state law classes also center on the recovery of money damages.[9] That

19   plaintiff primarily seeks monetary damages is clear from the Second Amended Complaint where he

20   asks for the award of actual damages, compensatory damages, consequential damages, statutory

21   damages, punitive damages, restitution, and disgorgement of profits. <u>See</u> SAC at p. 40. Plaintiff's

22   request for the equitable remedies of restitution and disgorgement of profits do not support

23   ───────────────
     [8] While TILA grants a right of rescission to certain borrowers, courts have rejected the pursuit of

24   rescission on a class-wide basis for reasons that are applicable to the injunctive relief plaintiff seeks
     here. <u>See</u> <u>Andrews</u>, 545 F.3d at 577-78; <u>McKenna v. First Horizon Home Loan Corp.</u>, 475 F.3d

25   <u>418, (1st Cir. 2007)</u>; <u>Gibbons v. Interbank Funding Group</u>, 208 F.R.D. 278, 285 (N.D. Cal. 2002).

     [9] Indeed, plaintiff expressly admits that his primary goal is the recovery of money damages. When
26   asked at his deposition "[w]hat are you expecting to get out of this case?" plaintiff responded: "I
     expect to be made whole and damages for anxiety, pain, suffering … And monetary damages."
27   Jordan Dep. at 95:3-12.

1    certification of a Rule 23(b)(2) class.  Rule 23(b)(2) does not distinguish between equitable remedies

2    and compensatory damages, but rather "between final injunctive relief … with respect to the class as

3    a whole and all other forms of relief."  In re Paxil Litig., 218 F.R.D. at 247 (denying Rule 23(b)(2)

4    class where court found that restitution predominates); see also Burton v. Mountain W. Farm Bureau

5    Mut. Ins. Co., 214 F.R.D. 598, 610 (D. Mont. 2003) ("Though couched in terms of seeking equitable

6    relief, 'an injunctive remedy in the form of an order compelling payment of benefits' is nothing

7    more than a request for money damages for breach of contract.").  The only potentially significant

8    and permanent relief that plaintiff seeks in his Motion for Class Certification is a "re-allocation of

9    Class members' prior payments … by applying [prior] monthly payments to both principal and

10   interest and a re-accounting of the amounts Class members are shown on Defendants' books to

11   owe."  Pl. Memo. at 11.  Plaintiff's requested reallocation and re-accounting remedies – which have

12   no legal basis – amount to nothing more than monetary relief.  Indeed, any such reallocation or re-

13   accounting would require the note holder to unwind the transaction and credit a specific dollar

14   amount to each such putative class members' loan account.  Because these remedies predominantly

15   require the transfer of funds and do not seek to enjoin future activity, they are appropriately

16   characterized as compensatory monetary relief, and plaintiff's request for a Rule 23(b)(2) class

17   should be denied.  See Eversole, 2007 WL 1558512, at *12 (denying request for Rule 23(b)(2) class

18   where plaintiff sought audit of each loan account so that refunds could be credited where defendant

19   allegedly failed to apply to monthly payments to principal); Burton, 214 F.R.D. at 610 ("'an

20   injunctive remedy in the form of an order compelling payment of benefits' is nothing more than a

21   request for money damages …").

22              **2.      Plaintiff is not entitled to the injunctive relief he seeks**

23          Plaintiff is not entitled to the injunctive relief he seeks, and thus, he may not avail himself

24   and the putative class of Rule 23(b)(2) certification.  See Pettrey v. Enter. Title Agency, Inc., 241

25   F.R.D. 268, 283 (N.D. Ohio 2006) (noting that the right to injunctive relief is "critical" for

26

27

1  certification under Rule 23(b)(2)); see also Zinser, 253 F.3d at 1195 (Rule 23(b)(2) certification only

2  appropriate where predominant relief sought is injunctive).

3       First, plaintiff asks the Court for a "mandatory injunction" that would require Paul Financial

4  to re-word its Option ARM disclosures. See SAC, Prayer for Relief at ¶ L. Paul Financial, however,

5  has ceased its lending operations and no longer funds or services mortgage loans of any kind, let

6  alone Option ARM loans. See Tussey Decl. at ¶¶ 1, 3. While the voluntary cessation of conduct

7  does not necessarily render an issue moot, that most, if not all, of the offending conduct has ceased

8  "speaks to the essential goal of the litigation." See In re Paxil Litig., 218 F.R.D at 247-48. Were

9  plaintiff to succeed on the merits, the "mandatory injunction" sought in his Complaint would be of

10 no use to him or the class because Paul Financial has left the mortgage lending business altogether.

11      Second, and more important, plaintiff seeks for himself and the class to enjoin the recasting

12 of loans and the transformation of each Option ARM loan into a 1% fixed rate "no-negative

13 amortization home loan." Pl. Memo. at 11. Under this scheme, all past payments – paid by

14 consumers pursuant to the terms of their Note – would now be reallocated to both principal and

15 interest, even though the payments were not sufficient to cover interest in the first instance. Id.

16 Plaintiff's request presumes that the parties agreed to a note with a 1% fixed interest rate, when in

17 reality, plaintiff's Note clearly states that the interest rate is adjustable and could change after the

18 first month. Indeed, the following text appears at the top of plaintiff's Note in bold, capital letters:

19            **THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE
             INTEREST RATE AND MONTHLY PAYMENT. THERE MAY BE A**

20           **LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN
             INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO**

21           **REPAY COULD BE GREATER THAN THE AMOUNT
             ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT**

22           **STATED IN THIS NOTE**

23 Tussey Decl., Ex. 18. Plaintiff's Program Disclosure also explained that multiple payment options

24 would be calculated, including a minimum amount and the amount sufficient to pay the unpaid

25 balance in full by the maturity date. Here, the Program Disclosure stated that "if you pay anything

26 less than the Full Payment, which would not be sufficient to cover the interest due, the difference

27

28

1   will be added to your loan amount.  This means that the balance of your loan could increase." <u>Id.</u> at

2   Ex. 13.  Nowhere do plaintiff's loan documents promise a fixed rate for any period beyond the first

3   month, nor do the loan documents promise that the principal balance would not increase, nor was

4   plaintiff ever promised such a loan by Asia Pacific (through Mr. Ng) (Ng Decl. at ¶ 29) or Paul

5   Financial (Tussey Decl. at ¶¶ 39-42, 50).

6           By requesting a 1% fixed rate "no-negative amortization home loan," plaintiff asks the Court

7   to draft a new contract for the parties, one to which they did not agree.  Such a redrafting of a

8   contract is beyond the scope of the relief to which he is entitled.  <u>Spiegler v. Home Depot U.S.A.,</u>

9   <u>Inc.</u>, 552 F. Supp. 2d 1036, 1046 (C.D. Cal. 2008) (the "UCL cannot be used to rewrite [the parties']

10  contracts or to determine whether the terms of their contracts are fair"); <u>Commercial Capital</u>

11  <u>Bankcorp Inc. v. St. Paul Mercury Ins. Co.</u>, 419 F. Supp. 2d 1173, 1179 (C.D. Cal. 2006) ("Under

12  California law, courts "do not rewrite any provision of any contract … for any purpose." (citing

13  <u>Rosen v. State Farm Gen. Ins. Co.</u>, 135 Cal. Rptr. 2d 361, 362 (Cal. Ct. App. 2002))).  Moreover,

14  even if plaintiff was entitled to such far reaching relief, the Court could not order it without bringing

15  every note holder and/or servicer before the Court.

16          Third, the Court cannot issue the injunctive relief sought by plaintiff on a class-wide basis for

17  similar reasons that TILA rescission claims cannot be certified.  As just discussed, plaintiff asks the

18  Court to rescind his current loan and replace it with a new one; he asks that the Court unwind every

19  other putative class member's loan and order the re-allocation of payments.  This type of remedy,

20  just like rescission, is "highly individualized" and too complicated to order on a class-wide basis.

21  <u>See</u>, <u>e.g.</u>, <u>Andrews</u>, 545 F.3d at 574.  Indeed, "[t]he variations in the transactional 'unwinding'

22  process that may arise from one rescission to the next make it an extremely poor fit for the class-

23  action mechanism."  <u>Id.</u>  Because rescission is an equitable remedy, it "entitles the affected creditor

24  to judicial consideration of the particular transaction."  <u>Id.</u>; <u>McKenna</u>, 475 F.3d at 427 n.6.

25  Accordingly, individual controversies are likely to "erupt" that will lead to a "host of individual

26

27

1  proceedings." <u>Andrews</u>, 545 F.3d at 574.  The same considerations apply here.  The far-reaching

2  relief plaintiff now seeks cannot appropriately be applied on a class-wide basis.

3               **3.      The putative classes are not homogenous**

4         The hallmark of Rule 23(b)(2) is the homogeneity of the class members' claims.  <u>See</u>

5  <u>Rodriguez</u>, 2002 WL 1162675 at *10 (denying class certification because proposed class was not

6  homogeneous).  To meet the homogeneity requirement, plaintiff must bear the burden of establishing

7  that "the party opposing the class has acted or refused to act on grounds generally applicable to the

8  class."  Fed. R. Civ. P. 23(b)(2); <u>see</u> <u>Zinser</u>, 253 F.3d at 1195 (denying Rule 23(b)(2) motion to

9  certify class).  Homogeneity ensures that injuries remedied through Rule 23(b)(2) actions are really

10 group injuries, as opposed to individual injuries.  <u>See</u> <u>Coleman v. GMAC</u>, 296 F.3d 443, 446-47 (6th

11 Cir. 2002) (finding Rule 23(b)(2) requirements are designed to permit only classes with homogenous

12 interests).  A case should not proceed as a (b)(2) class action where the issues would have to be

13 litigated individually to determine whether a particular alleged class member was entitled to

14 damages at all.  <u>Lewallen</u>, 2002 WL 31300899, at *3 ("the requisite cohesiveness [of Rule 23(b)(2)]

15 is lacking where individual issues predominate"); <u>Eversole</u>, 2007 WL 1558512, at *12.

16        As discussed below in Part D.1.A, individual issues predominate as to plaintiff's claims.

17 This case does not revolve around uniform documents or a common scheme, but rather depends

18 significantly on the disclosures and discussions that each borrower had with their mortgage broker

19 and other entities prior to the wholesale funding of their loan by Paul Financial.  Paul Financial

20 funded loans that were originated by over 1,621 different mortgage brokers, <u>see</u> Tussey Decl. at ¶

21 13, and it offered approximately 44 variations of its Option ARM loan product.  Thus any assertion

22 that each putative class member received the same information regarding Option ARM loans is not

23 true.  In light of the individual determinations of reliance and causation necessary to resolve this

24 action, plaintiff has not satisfied his burden of establishing that Rule 23(b)(2) certification is

25 appropriate.  <u>See</u> <u>Blickman Turkus</u>, 76 Cal. Rptr. 3d at 362; <u>Lewallen</u>, 2002 WL 31300899, at *3.

26

27

1

**D.     The Putative Classes Do Not Satisfy Rule 23(b)(3) Or The Commonality Requirement Of Rule 23(a)(2)**

2

3       The Court should deny plaintiff's Motion for Class Certification because plaintiff cannot

4   demonstrate that any common questions would predominate over individualized inquiries or that the

    class mechanism would be the superior method for adjudicating plaintiff's claims.

5

**1.       Common questions do not predominate**

6       "The first requirement of Rule 23(b)(3) is the predominance of common questions over

7   individual ones.  Implicit in the satisfaction of the predominance test is the notion that the

8   adjudication of common issues will help achieve judicial economy."  <u>Valentino v. Carter-Wallace,</u>

9   <u>Inc.</u>, 97 F.3d 1227, 1234 (9th Cir. 1996); <u>Deitz</u>, 2007 WL 2015440, at *6.  Most importantly,

10  certification under Rule 23(b)(3) is inappropriate where adjudication of the claims would require

11  "individualized inquiries into the circumstances of each member of the class."  <u>Endres</u>, 2008 WL

12  344204, at *11-12; <u>Gartin</u>, 245 F.R.D. at 436.

13

**a.       Common questions do not predominate as to plaintiff's TILA class**

14      Putting aside that plaintiff's TILA damages claim is barred by the statute of limitations, his

15  TILA class claim for statutory damages nonetheless fails to meet the predominance requirement of

16  Rule 23(b)(3).[10]  Plaintiff's TILA claims depend on an analysis of the adequacy of the disclosures

17  plaintiff received with respect to, among other things, negative amortization, the composite APR, <u>see</u>

18  SAC at ¶¶ 95-98, the interest rate upon which the TIL payment schedule was based, and that the

19  payment schedule was based on the initial interest rate, rather than the APR listed, <u>see id.</u> at ¶¶ 69-

20  71. These claims are derived from information that is contained in the various form disclosures that

21  were used with different borrowers and information that is specific to each putative class member's

22  loan.  None of the information that must be analyzed is contained in "identical loan documents" as

23  plaintiff asserts.  Pl. Memo. at 13.

24  _____

    [10] Certification of a TILA actual damages class is inappropriate because each putative class member

25  is required to prove detrimental reliance, a requirement that leads to the predominance of individual
    issues.  <u>See</u>, <u>e.g.</u>, <u>Turner v. Beneficial Corp.</u>, 242 F.3d 1023, 1028 (11th Cir. 2000) (denying

26  certification of actual damages class under TILA); <u>Perrone v. GMAC</u>, 232 F.3d 433, 440 (5th Cir.
    2000) (same); <u>see also</u> <u>In re Ferrell</u>, 539 F.3d 1186, 1192 (9th Cir. 2008) (TILA actual damages

27  claim requires proof of detrimental reliance).

28  | **MEMORANDUM OF POINTS AND AUTHORITIES** | 26 | **Case No. 3:07-cv-004496-SI** |
    | **IN OPPOSITION TO PLAINTIFF'S MOTION FOR** | | |
    | **CLASS CERTIFICATION** | | |

First, plaintiff challenges loan-specific information that was provided to each borrower, such as the <u>actual</u> APR and payment schedule disclosed on <u>each</u> individual TIL Disclosure.  <u>See</u> SAC at ¶¶ 70 ("The scheduled payment amounts and the APR listed in the Note and TILDS for each of the subject loans are unclear and inconspicuous…. [t]he payment amounts … are not based on the APR listed in the TILDS but instead, were based upon an APR listed in the Note."); 98.  To determine whether Paul Financial violated TILA in its disclosure of the specific APR and payment schedule on each class member's loan will require a transaction-specific review that will predominate over any common issues.  Plaintiff has not shown the Court that the contrary is true.

As laid out in more detail in defendants' Motion for Summary Judgment, with respect to the determination of the APR in variable rate transactions, the Official Commentary to Regulation Z explains that where a loan has an initial discounted rate, "the disclosures should reflect a composite annual percentage rate based on the initial rate for as long as it is charged, and for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation."  12 C.F.R. § 226, Supp. I (Official Commentary) at Section 226.17(c)(10)(i); <u>see also</u> 12 C.F.R. § 226.17(c)(8).  Therefore, the appropriate APR on plaintiff's loan is a composite of the initial low rate (for the time it was in effect) and the rate that would be in effect based on the formula or index set forth in the note at the time of consummation.  <u>Plascencia v. Lending 1st Mortgage</u>, 2008 WL 1902698, at *7 (N.D. Cal. Apr. 28, 2008) (Wilken, J.).  The APRs disclosed on Paul Financial's TIL Disclosures amount to a composite rate – a weighted average of the initial discounted interest rate and the fully indexed rate based on the index (and margin) at the time the TIL Disclosure was produced.  <u>See</u> Tussey Decl. at ¶ 53.  Each borrower's composite APR must be determined based upon the specific terms of the Note, including the initial interest rate, the length of the initial interest rate period, and the margin.  <u>Id.</u> at ¶ 24.

Similarly, as to payment schedules, Section 17(c)(1) of the Official Commentary provides that "the disclosures shall reflect the credit terms to which the parties are bound as of the outset of the transaction."  Moreover, Section 17(c)(10)(iii) provides that "if a loan contains a rate or payment

cap that would prevent the initial rate or payment, at the time of the first adjustment, from changing to the rate determined by the index or formula at consummation, the effect of that rate or payment cap should be reflected in the disclosures."  12 C.F.R. § 226, Supp. I (Official Commentary). Further, Section 17(c)(10)(v)(C) provides detailed guidance on how a creditor is to determine the appropriate payment schedule where a loan contains a discounted rate, a periodic rate cap and a cap on payment adjustments.  Id. at § 226.17(c)(10)(v)(C).   Each borrower's payment schedule is calculated based upon the specific terms of the Note, including the initial interest rate, the margin, annual payment adjustments, and the payment cap.  Because any determination regarding Paul Financial's APR and payment schedule (as well as negative amortization) disclosures requires a borrower-by-borrower review, individual issues predominate as to plaintiff's TILA claims.  See Edwards v. First Am. Corp., 251 F.R.D. 449, 453 (C.D. Cal. 2007) (denying certification under Rule 23(b)(3) where recovery would require analysis of each individual transaction of the putative class); Endres, 2008 WL 344204, at *12 (denying Rule 23(b)(3) class where "customer-by-customer analysis would be required under [plaintiff's] failure-to-disclose theory").

Second, contrary to plaintiff's claims that the material statements in the loan documents at issue are identical or uniform (Pl. Memo. at 3, 13, 14, 20, 22), significant differences exist among the various Option ARM loan products used by Paul Financial.  See discussion in Part V.B.3, *supra*. The statement that plaintiff primarily relies upon to establish a failure to adequately disclose the potential for negative amortization is a single line taken from his Note out of context: "I will pay principal and interest by making a payment every month."  Pl. Memo. at 4.  This statement, however, is not common to all of the Option ARM loans funded by Paul Financial.  Similarly, while plaintiff's Program Disclosure does not specifically use the term "negative amortization,"[11] many of the other Program Disclosures did and described how negative amortization would occur.  Because the operative statements upon which plaintiff relies vary among class members, common issues do

---

[11] Defendants deny that the failure to use the actual term "negative amortization" is material to plaintiff's claims where Paul Financial's loan documents expressly disclosed that plaintiff's loan balance would increase if he failed to make a fully amortizing payment.

not predominate.  See Edwards, 251 F.R.D. at 453; Endres, 2008 WL 344204, at *12 (denying Rule 23(b)(3) class under "failure-to-disclose theory").

> **b.    Common questions do not predominate as to plaintiff's fraud claim[12]**

Plaintiff's fraudulent omission claim cannot be resolved as to the putative classes merely by an analysis of plaintiff's loan documents, because there was no uniform omission made by Paul Financial from which the Court could determine materiality and reliance as to each putative class member.  To establish a fraudulent omissions claim, plaintiff must show that: (1) the defendant concealed a material fact, (2) the defendant was under a duty to disclose the fact to the plaintiff, (3) the defendant intentionally concealed the fact with the intent to defraud the plaintiff, (4) the plaintiff was unaware of the fact and justifiably relied upon the concealed fact, and (5) the concealment of the fact caused the plaintiff to sustain damage.  Blickman Turkus, 76 Cal. Rptr. 3d at 362; Arikat v. JP Morgan Chase & Co., 430 F. Supp. 2d 1013, 1022 (N.D. Cal. 2006).  To determine if each element is met, the Court must consider the information possessed by the borrower when he or she decided to obtain an Option ARM loan, the verbal and written information the borrower received from his or her independent mortgage broker, and the information the borrower received from Paul Financial.  All of this information is variable.

---

[12] Plaintiff asks the Court to apply California law to the claims of putative class members whose Option ARM loan transactions concern real property located outside of California ("Category II class").  See Pl. Memo. at 6 n.5, 14 n.9.  The very case that plaintiff cites to support this assumption, Norwest Mortgage, Inc. v. Superior Court, requires the Court to conduct a choice of law analysis prior to applying California law to claims by non-residents based upon a defendant's conduct occurring in California.  See 72 Cal. App. 4th 214, 225, n.13, 229 (1999); see also Lewallen, 2002 WL 31300899, at *5.  Because Paul Financial funded Option ARM mortgages in 10 different states (Tussey Decl. at ¶ 10), certification of the California Category II class will require a state-by-state analysis to determine which states' laws should apply to plaintiff's claims.  The complex analysis of variances in state law will predominate over any alleged common issues as to non-California borrowers.  See Gartin, 245 F.R.D. at 439 (predominance requirement not met where choice of law analysis required); Lewallen, 2002 WL 31300899, at *5 (denying class certification where California law would not apply to all class members).

1    At the outset, plaintiff must establish justifiable reliance and causation as elements of his

2  fraud and misrepresentation claim; this cannot be done on a class basis.  See, e.g., Deitz, 2007 WL

3  2015440, at *6-7; Gartin, 245 F.R.D. at 438; Gonzalez, 247 F.R.D. at 623-24; Lewallen, 2002 WL

4  31300899, at *4.  Plaintiff's characterization of this case as involving a "common fraud" ignores a

5  critical component of each mortgage transaction of the proposed class, namely the borrowers'

6  interaction with their respective mortgage brokers.  Indeed, plaintiff cannot establish reliance in his

7  own transaction, because he admits that he did not read all of the documents provided to him by Paul

8  Financial prior to the closing, Jordan Dep. at 62:2-12; 64:25-65:8, and he decided to obtain an

9  Option ARM loan *before* Asia Pacific submitted plaintiff's loan application to Paul Financial.

10   Despite plaintiff's litigation strategy, the brokers cannot be ignored, because they played the

11  single most critical role in most borrowers' decision to apply for and obtain an Option ARM loan.

12  To the extent that this case involves, in plaintiff's word, a "sales pitch," the "pitch" came from the

13  broker, not Paul Financial.  Paul Financial played no role in the "sales pitch" that any individual

14  borrower may have experienced with his or her mortgage broker, and the broker, not the borrower,

15  decided to submit the application to Paul Financial.

16   The degree to which plaintiff's broker, Mr. Ng, discussed negative amortization with plaintiff

17  (see Ng Decl. at ¶¶ 20, 29) is demonstrative of the varying nature of each individual Option ARM

18  transaction.  Plaintiff also acknowledges that he did not read all of the operative loan provisions

19  upon which his Complaint is based.  When asked if he understood and read the provisions of his

20  mortgage note regarding how his interest rate could change, he responded that he only read the

21  provision stating that his rate "may change," but that he "kind of overlooked the rest of this stuff."

22  Jordan Dep. at 64:25-65:8; see also id. at 62:2-12 (plaintiff acknowledges receiving his mortgage

23  note prior to closing and that he "probably looked at it").  Paul Financial's liability to thousands of

24  putative class members cannot be adjudicated based on a class representative who admits to possibly

25  not reviewing documents that he now claims fraudulently omitted material information.

1    Further, not all Option ARM borrowers were alike.  For example, in <u>Biggs</u>, the plaintiffs

2   brought fraud claims against their lender alleging that it misrepresented the nature and terms of their

3   Option ARM loan – allegations very similar to those asserted by Mr. Jordan here.  <u>See Biggs</u>, 2008

4   WL 4702662, at *1.  The District of Maryland, however, dismissed those claims finding that because

5   the plaintiffs "were active and continuous shoppers of mortgage financing" who entered into a

6   second Option ARM loan, they could not have reasonably relied on any alleged misrepresentations.

7   <u>See id.</u> at *5, *7.  Plaintiff, however, asks the Court to presume that none of the borrowers were

8   knowledgeable like the <u>Biggs</u> plaintiffs and none would have obtained their loans had Paul Financial

9   provided additional disclosures regarding negative amortization and payment caps, for example.  But

10   Rule 23(b)(3) certification is inappropriate where some class members may not have relied upon the

11   alleged omissions or misrepresentations at issue, and clearly, a presumption cannot be made that all

12   of them did so rely.  <u>See Gartin</u>, 245 F.R.D. at 437; <u>Deitz</u>, 2007 WL 2015440, at *6; <u>Gonzalez</u>, 247

13   F.R.D. at 623.  As a matter of law, a plaintiff cannot sustain a fraud-based claim predicated on the

14   terms of an Option ARM loan when he understood the loan terms.  <u>See Biggs</u>, 2008 WL 4702662, at

15   *7.  Whether putative class members understood the terms of their loans will vary from borrower to

16   borrower, and thus individual issues will predominate.  <u>See, e.g.</u>, <u>Gartin</u>, 245 F.R.D. at 437.

17    To overcome the inherently individualized nature of the justifiable reliance inquiry, plaintiff

18   asserts that the class is entitled to a presumption of reliance.  <u>See</u> Pl. Memo. at 3, 18-20.  A

19   presumption of reliance is unwarranted.  California federal courts have held that a presumption of

20   reliance is limited to securities fraud cases, and then only where the misrepresentation claim can be

21   primarily characterized as one of omissions rather than misstatements.  <u>See Gartin</u>, 245 F.R.D. at

22   438 (presumption of reliance inapplicable outside of securities fraud context); <u>Gonzalez</u>, 247 F.R.D.

23   at 623 (same); <u>see also Poulos v. Caesar's World, Inc.</u>, 379 F.3d 654, 666-67 (9th Cir. 2004);

24

25

26

27

28

1   <u>Mirkin v. Wasserman</u>, 23 Cal. Rptr. 2d 101, 117 (Cal. 1993) (declining to extend the presumption of

2   reliance in securities fraud cases to common law fraud).[13]

3          Even if the presumption of reliance applied outside of the securities fraud context, plaintiff's

4   fraudulent omission claim is properly characterized as a "mixed claim" asserting both alleged

5   omissions and misstatements.  Indeed, while plaintiff labels his claims as one for fraudulent

6   omission, plaintiff repeatedly asserts that Paul Financial made affirmative misstatements as well.

7   <u>See, e.g.</u>, SAC at ¶¶ 27, 148 ("Defendants lured Plaintiff … into the Option ARM loan with

8   promises of lowed fixed interest"); 151 ("Based upon the Defendants' representations and conduct,

9   Plaintiff … agreed to finance … through Defendants' Option ARM loan."); Pl. Memo. at 3-4

10  ("[Plaintiff's] loan contract[] expressly but falsely promised that the monthly payments would

11  amortize both principal and interest."), 16-17.  Moreover, plaintiff concedes that Paul Financial, in

12  its loan documents, disclosed the potential for negative amortization.  <u>See</u> SAC at ¶ 31; Pl. Memo. at

13  5.  Any misrepresentation will necessarily involve the omission of some fact – otherwise it would

14  not be a misrepresentation.  The failure to adequately disclose, however, does not support a claim

15  primarily based upon omissions.  <u>See</u> <u>Poulos</u>, 379 F.3d at 667 (no presumption of reliance where

16  claims were "based as much on what is there as what is purportedly missing").  Plaintiff's fraud

17  claim is a "mixed claim" of both omissions and misstatements, and thus a presumption of reliance is

18  inappropriate.  <u>See id.</u>; <u>Gartin</u>, 245 F.R.D. at 438 (presumption of reliance unwarranted in mixed

19  cases of misstatements and omissions); <u>Gonzalez</u>, 247 F.R.D. at 623 (same).

20         Plaintiff cites to <u>In re First Alliance Mortgage Company</u>, 471 F.3d 977 (9th Cir. 2006), and

21  other similar decisions, for the proposition that Rule 23(b)(3) certification is appropriate for fraud

22  claims based upon a "common course of conduct."  <u>See</u> Pl. Memo. at 15-16, 18-19.  <u>First Alliance</u>,

23  however, is inapposite.  Unlike the factual allegations in this case, <u>First Alliance</u> and other cases

24  cited by plaintiff revolve around allegations of standardized sales pitches, "centrally orchestrated

25

26  ───────────────
    [13] Plaintiff's citation to <u>Binder v. Gillespie</u>, 184 F.3d 1059 (9th Cir. 1999) and <u>Affiliated Ute
    Citizens of Utah v. United States</u>, 406 U.S. 128 (1972) fails to establish a presumption of reliance in
27  the context of common law fraud, as both cases were limited to securities fraud.

28  **MEMORANDUM OF POINTS AND AUTHORITIES**          32          **Case No. 3:07-cv-004496-SI**
    **IN OPPOSITION TO PLAINTIFF'S MOTION FOR**
    **CLASS CERTIFICATION**

1  strategies," and uniform "marketing script[s]," see First Alliance, 471 F.3d at 991; McPhail v. First

2  Command Fin. Planning, Inc., 247 F.R.D. 598, 614 (S.D. Cal. 2007); In re Am. Cont'l Corp./Lincoln

3  Sav. & Loan Secs. Litig., 140 F.R.D. 425, 430 (D. Ariz. 1992), none of which is present here.

4         For example, in First Alliance, the defendant lender originated and sold loans through a

5  "network of retail branches" whereby loan officers "would employ standardized sales presentations"

6  based upon a uniform script that officers were required to "memorize verbatim."  471 F.3d at 984-

7  85, 991-92.  Further, First Alliance loan officers were specifically trained to misrepresent the

8  borrower's loan terms.  Id. at 992.  Similarly, in McPhail, First Command trained and "directed its

9  sales representatives to memorize" and deliver a "homogenized" presentation to potential customers,

10  so that each customer would hear the "same story." 247 F.R.D. at 602.  Finally, in Lincoln Savings,

11  Lincoln Savings devised a "common sales approach" that was communicated to sales representatives

12  "with the expectation that it would be conveyed by them to prospective bond purchasers."  140

13  F.R.D. at 430.  The Lincoln Savings court also found that the sales representatives were "merely

14  conduits of information" that was communicated to prospective customers.  Id. at 431.

15         In marked contrast, plaintiff here fails to offer *any* evidence that Paul Financial, along with

16  the independent mortgage brokers that arranged the putative class members' loans, devised any sort

17  of standardized or "homogenized" sales presentations or marketing scripts.  Plaintiff also fails to

18  offer any evidence that Paul Financial directed how the mortgage brokers would present or market

19  the Option ARM loans to prospective borrowers.[14]  To the contrary, Paul Financial did not provide

20  any of the 1,621 mortgage brokers from whom it received loan applications with standardized scripts

21  or presentations for use in discussing Option ARM loans with borrowers.  See Tussey Decl. at ¶ 17;

22  Ng Decl. at ¶ 13.  Paul Financial did not dictate how information regarding Option ARM loans

23  would be presented to borrowers by mortgage brokers.  Tussey Decl. at ¶¶ 15-16.

24         First Alliance, McPhail, and Lincoln Savings are also readily distinguished from this case in

25  that they each involved defendants using their own sales agents and employees to perpetrate the

---

26  [14] Prior to filing his Motion for Class Certification, plaintiff took no depositions of the parties or
    relevant witnesses.

27

alleged fraud.  See First Alliance, 471 F.3d at 984-85; McPhail, 247 F.R.D. at 602, 609; Lincoln Savings, 140 F.R.D. at 430.  Here, the mortgage brokers who were in a position to make misrepresentations to plaintiff and the putative class were entirely independent from Paul Financial and did not act as Paul Financial's agents.  See Tussey Decl. at ¶¶ 15-17, 19; Ng Decl. at ¶ 13. While plaintiff heavily relies upon First Alliance, McPhail, and Lincoln Savings, plaintiff fails to cite any evidence that would show a similarity between this case and those.  Accordingly, plaintiff's vague assertions of a "centrally-orchestrated scheme" should be disregarded by the Court.

### c.   Common questions do not predominate as to plaintiff's UCL claims

Plaintiff brings two claims under the UCL.  The first is predicated entirely on plaintiff's claimed violations of TILA.[15]  See SAC at paras. 115-26.  The second is based on the "unfair" and "fraudulent" prongs of the UCL.  See SAC at paras. 143-64.[16]  For the same reasons articulated above, individual issues of reliance and causation will predominate as to plaintiff's UCL claim.

The UCL states that a person can "pursue relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure."  Cal. Bus. & Prof. Code § 17203.   Section 17204 limits claims to persons who have "suffered injury in fact and lost money or property as a result of such unfair competition."  Cal. Bus. & Prof. Code § 17204 (emphasis added).  The plain language of the UCL warrants that putative class members, as well as plaintiff, must establish reliance and causation.[17]  Gonzalez, 247 F.R.D. at 625;

---

[15] Plaintiff's UCL claim that is predicated on TILA should be dismissed for the reasons set forth in the accompanying Motion for Summary Judgment filed contemporaneously herewith.  Moreover, plaintiff fails to seek certification of the Second Cause of Action and thus has waived the right to do so.  See Pl. Memo. at 20.

[16] The California UCL proscribes "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.

[17] Two California Court of Appeal decisions have held that post-Proposition 64, named plaintiffs and putative class members must establish reliance and causation to prevail on a UCL claim.  See In re Tobacco II Cases, 47 Cal. Rptr. 3d 917, 921 (Cal. Ct. App. 2006); Pfizer v. Superior Court, 45 Cal. Rptr. 3d 840, 844 (Cal. Ct. App. 2006).  The California Supreme Court has granted review of these cases but has yet to issue a decision.  See 51 Cal. Rptr. 3d 707 (2006).

1  Cattie, 504 F. Supp. 2d at 947 (post-Proposition 64, UCL requires actual reliance by plaintiff as well

2  as causation); Laster, 407 F. Supp. 2d at 1193-94 (same).[18]

3      Moreover, the incorporation of Section 382 of the Civil Code of Procedure into the UCL

4  mandates that putative class members share the same injury with class representatives.  See, e.g.,

5  Dep't of Fair Employment & Housing v. Lucent Techs., Inc., 2008 WL 5157710, at *18-19 (N.D.

6  Cal. Decl. 8, 2008) (named plaintiff could not represent the putative UCL class where he could not

7  show "that the group of employees he seeks to represent were afflicted with identical disabilities and

8  suffered the same adverse employment actions").[19]  Indeed, under both California and federal law, a

9  class action is not intended to permit a class representative to assert claims that the absent class

10  members do not have.  See Feitelberg v. Credit Suisse First Boston, LLC, 36 Cal. Rptr. 3d 592, 606

11  (Cal. Ct. App. 2005) ("If a specific form of relief is foreclosed to claimants as individuals, it remains

12  unavailable to them even if they congregate into a class.") (internal citations omitted); Zelman v.

13  JDS Uniphase Corp., 376 F. Supp. 2d 956, 966 (N.D. Cal. 2005) (class is limited to those

14  "ascertainable individuals who have standing to bring the action").[20]  Further, the class action device

15  cannot be used to alter the underlying requirements of the claims it aggregates.  See Feitelberg, 36

16  Cal. Rptr. at 606 ("[C]lass action status does not alter the parties' underlying substantive rights.");

17  Gartin, 245 F.R.D. at 442 ("the burden of proof must be satisfied with regard to each class member's

18  claim – thus requiring that liability and damages be proven on an individual basis").

19      Because the UCL now expressly limits UCL private actions to plaintiffs who have "suffered

20  injury in fact and lost money or property as a result of such unfair competition," putative class

21  _____

22  [18] In cases involving misrepresentations, "reliance provides a key causal link between the … alleged misrepresentations and the [plaintiff's] injury."  Poulos, 379 F.3d at 664-65.

23  [19] Section 382 of the Code of Civil Procedure, which governs class actions in California, permits
24  representative actions "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."  Cal. Code Civ. Proc. § 382.

25  [20] If putative class members are not required to demonstrate injury in fact and causation as plaintiff
26  suggests, the named plaintiff will be an atypical and inadequate representative because he will be representing a class with which he does not share the same injury.  See In re Paxil Litig., 218 F.R.D.
27  at 246-47.

28  **MEMORANDUM OF POINTS AND AUTHORITIES**          35          **Case No. 3:07-cv-004496-SI**
   **IN OPPOSITION TO PLAINTIFF'S MOTION FOR**
   **CLASS CERTIFICATION**

1  members must satisfy the same standing criteria of named plaintiffs, namely that their reliance upon

2  the alleged unfair or fraudulent practice caused them harm.[21]  As discussed above in Part V.D.1.B.,

3  the need to establish reliance and causation is fatal to plaintiff's assertion that common issues

4  predominate as to his UCL claim.  Whether each putative class member understood the terms of his

5  or her Option ARM loan and to what extent their independent mortgage broker disclosed those terms

6  are questions that can only be determined on an individualized basis.  Accordingly, certification of

7  plaintiff's UCL claim is inappropriate.  See Gonzalez, 247 F.R.D. at 626 (denying certification of

8  UCL claim where individual issues of reliance would predominate); Endres, 2008 WL 344204, at

9  *12 (denying certification of UCL claim under failure-to-disclose theory).

10              d.      **Common questions do not predominate as to plaintiff's breach of contract claim**

11

12      The essence of plaintiff's contract claim is that Paul Financial, as the servicer of plaintiff's

13  loan on behalf of the note holder, failed to apply monthly mortgage payments to both principal and

14  interest.  See Pl. Memo. at 22; SAC at ¶¶169-72.  To establish a breach of contract claim, the

15  plaintiff must prove (1) the existence of a valid contract; (2) plaintiff's performance or non-

16  performance; (3) defendant's unexcused failure to perform; and (4) damages to plaintiff.  Foley v.

17  Bates, 2007 WL 1430096, at *4 (N.D. Cal. May 14, 2007).[22]

18      Putting aside that the note holders for each putative class member's loan are not before the

19  Court, plaintiff will still not be able to establish a breach of contract on behalf of the class.  With

20  respect to the Option ARM loans that it serviced, Paul Financial provided borrowers a monthly

21  choice between several different payment amounts, including a fully amortizing option.  See Tussey

22  _____

[21] Plaintiff's citation to several post-Proposition 64 cases does not alter this conclusion.  Those cases
23  do not address the issue of whether the post-Proposition 64 UCL requires putative class members to
   demonstrate injury caused by the alleged unfair or fraudulent conduct.  See generally Aron v. U-
   Haul Co., 49 Cal. Rptr. 3d 555 (Cal. Ct. App. 2005); Blakemore v. Superior Court, 27 Cal. Rptr. 3d
24  877 (Cal. Ct. App. 2005) (failing to even mention language of Cal. Bus. & Prof. Code § 17204);
   Williams v. Gerber Prods. Co., 523 F.3d 934 (9th Cir. 2008).  Further, that the "likely to deceive"
25  standard may have continued relevance post-Proposition 64 is not pertinent to the question of
   whether injury in fact and causation apply to putative class members.

26  [22] Paul Financial did not service every class member's loan; moreover, the breach of contract claim
   is arguably more appropriately brought against the borrower's note holder, which entities – for the
27  putative class – are not before the Court.

1   Decl. at ¶¶ 7, 60-61 and Ex. 22 thereto.  Accordingly, each putative class member will be required to

2   demonstrate that he or she performed under the terms of the Note, namely that they made monthly

3   payments that satisfied one of the multiple payment options available to them.  The borrower will

4   also be required to demonstrate that Paul Financial (or other servicer) failed to properly apply any

5   one of their monthly payments in accordance with the terms of their Note, and that damages resulted

6   from misapplication.  Each putative class member's breach of contract claim thus depends on

7   individual circumstances.  See Eversole, 2007 WL 1558512, at *9 (where defendants allegedly failed

8   to correctly apply monthly mortgage payments, "each claim depends on individual interactions with

9   the Defendant").  Individual issues will therefore predominate and certification under Rule 23(b)(3)

10  should be denied.  See Endres, 2008 WL 344204, at *11-12; Gartin, 245 F.R.D. at 436.

11            **e.      Common questions do not predominate as to plaintiff's tortious
                         breach of implied covenant claim**

12           Plaintiff's claim for tortious breach of the implied covenant of good faith and fair dealing is

13  predicated on the same conduct as plaintiff's breach of contract claim, namely that that Paul

14  Financial failed to apply monthly mortgage payments to both principal and interest.  See SAC at ¶¶

15  180-82.  Moreover, even if the claim was valid, it cannot be certified.  Each putative class member

16  must demonstrate that Paul Financial (or other servicer) did not apply their monthly payments to

17  both principal and interest.  Because some putative class members made fully amortizing payments

18  each month, an individual inquiry into each putative class member's payment history will be

19  necessary to adjudicate what payments were made and how they were applied.  See Eversole, 2007

20  WL 1558512, at *9.  This inquiry will predominate over any purported common issues.  Plaintiff's

21  citation to Lazar v. Hertz Corp., 143 Cal. App. 3d 128 (1983) is unhelpful to his argument.  In Lazar,

22  the plaintiff's contract with the defendant contained an open term, namely, how the defendant would

23  compute the refueling charge.  Id. at 141.  Here, no such "open term" exists.  As discussed in detail

24  above, the express terms of plaintiff's Note provided for: (1) an interest rate that would adjust

25  monthly after the first month; (2) negative amortization; and (3) the application of monthly payments

26  to less the interest due.  Tussey Decl, Ex. 18; see Carma Developers, Inc. v. Marathon Dev.

27

28  **MEMORANDUM OF POINTS AND AUTHORITIES          37          Case No. 3:07-cv-004496-SI**
    **IN OPPOSITION TO PLAINTIFF'S MOTION FOR**
    **CLASS CERTIFICATION**

California, Inc., 2 Cal. 4th 372, 374 (1992) (the implied covenant does not prohibit a party from doing what is expressly permitted in the contract).  Moreover, <u>Lazar</u> was decided on the issue of whether reliance was an element of an implied covenant claim.  143 Cal. App. 3d at 141.  Here, defendants challenge the certification of plaintiff's *tortious* breach of the implied covenant because an individualized inquiry is necessary to determine how each borrower's payments were applied.[23]

**2.      Class treatment is not superior to individual adjudication**

In addition to requiring that questions of law or fact common to the class predominate over individual issues, Rule 23(b)(3) also requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "A class action is the superior method for managing litigation if no realistic alternative exists."  <u>Valentino</u>, 97 F.3d at 1234-35.  Beyond conclusory statements, plaintiff makes no attempt to demonstrate how a class action is superior nor does plaintiff provide any suggestion regarding management of the proposed class action. See Pl. Memo. at 24-25.  Here, class treatment of plaintiff's claims is plainly inferior to individual adjudication.

First, as discussed above, individual issues of injury, reliance, and causation predominate in this action.  "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'"  <u>Zinser</u>, 253 F.3d at 1192; <u>Lewallen</u>, 2002 WL 31300899, at *6.  Further, where as here, individual claims may involve the laws of other states, superiority is not met.  See <u>Gartin</u>, 245 F.R.D. at 441; <u>Lewallen</u>, 2002 WL 31300899, at *6.  At the very least, plaintiff bears the burden of showing "a suitable and realistic plan for trial of the class claims."  <u>Zinser</u>, 253 F.3d at 1189.  He has not done so.

Second, the value of each borrower's individual claim is large enough that the impetus for a class action, namely aggregating small claims not worth pursuing, is not present.  Plaintiff seeks relief on behalf of the class that would unwind each borrower's loan and reallocate past monthly

---

[23] Certification of plaintiff's tortious breach of the implied covenant claim is inappropriate as such claims do not extend beyond the insurance context.  See <u>Kassa v. BP West Coast Prods., LLC</u>, 2008 WL 3494677, at *6 (N.D. Cal. Aug. 12, 2008).

1    payments to both principal and interest.  See Pl. Memo. at 11.  The basis of plaintiff's relief is the

2    allegation that Paul Financial promised plaintiff and the putative class members that the initial rate

3    would remain fixed for the first 3-5 years.  See SAC at ¶¶ 23, 25, 27, 29; Pl. Memo. at 13.  Here,

4    plaintiff's original loan amount was $544,000, and the initial interest rate was 1%, which changed to

5    7.125 % in March 2006.  See Tussey Decl. at ¶ 61, Ex. 18.  Based on plaintiff's payment history, it

6    appears that plaintiff is likely seeking compensatory damages in the range of $50,000 to $100,000,

7    not including statutory or punitive damages, as well as costs and attorneys' fees.

8         Where putative class members are seeking such significant sums, incentive exists for each

9    individual to pursue and control his or her own individual actions.  See Zinser, 253 F.3d at 1191

10   (denying class certification where each class member's claims exceeded $50,000); Lewallen, 2002

11   WL 31300899, at *5; Rodriguez, 2002 WL 1162675, at *12; see also Fed. R. Civ. P. 23(b)(3)(A).

12   Moreover, plaintiff seeks attorneys' fees and costs under TILA and the UCL, the recovery of which

13   would further remove any barrier for individuals to pursue and control their own actions.

14        Third, that plaintiff seeks to litigate in a single forum the claims of putative class members

15   from 10 different states, where witnesses and evidence are located, weighs against the superiority of

16   a class action.  See Fed. R. Civ. P. 23(b)(3)(C).  As discussed above, adjudication of class members'

17   claims will require evidence of their understanding of and expectations for their individual loans and

18   the interactions each class member had with his or her mortgage broker.  Plaintiff has failed to

19   demonstrate how forcing disparate class members and witnesses to litigate before this Court will

20   serve fair and efficient adjudication of class members' claims.  This failure is more glaring

21   considering the size of each potential class member's claim and their corresponding incentive to file

22   suit where each resides.  See Zinser, 253 F.3d at 1191-92; Lewallen, 2002 WL 31300899, at *6.

23        Last, the damages calculations for each borrower – if the Court requires re-allocation of

24   mortgage payments to principal and interest – would be overwhelming.  The Court would need to

25   determine the payment history for each borrower (which would require locating the servicer for each

26   loan, which entities are not before the Court, and recovering the records for each borrower),

27

28   MEMORANDUM OF POINTS AND AUTHORITIES          39          Case No. 3:07-cv-004496-SI
     IN OPPOSITION TO PLAINTIFF'S MOTION FOR
     CLASS CERTIFICATION

including identifying which borrowers paid off their loans, which borrowers had their loans foreclosed upon, and which borrowers paid fully-amortized payments on their loan. The Court would then must decide how to re-allocate the payments as to each of those categories of borrowers.

**E.     There Is No Basis For The Court To Find Assignee Liability On Behalf Of The Putative Classes Against HSBC Bank as Trustee of Luminent Trust 2006-2**

Plaintiff has offered no basis for the Court to certify a class of borrowers with claims against HSBC Bank as Trustee. See Pl. Memo. at 24. The Trust contains approximately 131 Paul Financial loans. Tussey Decl. at ¶ 57. HSBC Bank as Trustee's connection to those loans is limited and its connection to any other putative class members' loans is non-existent. Nowhere in the Second Amended Complaint or Plaintiff's Motion does plaintiff explain his theory of liability against HSBC Bank as Trustee or why HSBC Bank as Trustee should be subject to class certification.

Plaintiff argues that "Defendants share liability" for the state law claims on the grounds that "each Defendant was acting as a co-conspirator, agent, servant, employee, assignee and/or joint venturer of each other Defendant." Pl. Memo. at 24 (citing SAC at ¶¶ 11-12). Plaintiff offers no factual support for this conclusion, and instead cites to his own allegations in the Second Amended Complaint. Not only does this thin strategy fail to explain plaintiff's basis to ask the Court to hold HSBC Bank as Trustee liable to plaintiff, let alone to a putative class of over 9,000 borrowers to which HSBC Bank as Trustee has no responsibility, it – more fundamentally – fails to satisfy basic pleading standards under Fed. R. Civ. P. 8. As discussed in defendants' accompanying Motion for Summary Judgment, HSBC Bank as Trustee had no involvement in the origination of plaintiff's loan transaction, and HSBC Bank as Trustee did not act as Paul Financial's creditor. Acebedo Decl. at ¶¶ 21-23. In short, there is no basis for liability against HSBC Bank as Trustee and thus no basis for HSBC Bank as Trustee to be subject to plaintiff's motion for class certification.

## VI.     CONCLUSION

For the foregoing reasons, defendants Paul Financial, LLC, HSBC Bank USA, N.A., as Trustee, and Luminent Mortgage Trust 2006-2, respectfully request that the Court deny plaintiff's Motion for Class Certification and adjudicate plaintiff's claims on an individual basis.

1

2

Dated:  December 30, 2008                    By:      /s/ Irene C. Freidel

3                                                        Irene C. Freidel (*pro hac vice*)
                                                         Stacey L. Gorman (*pro hac vice pending*)
4                                                        David D. Christensen (*pro hac vice*)
                                                         K&L GATES LLP
5                                                        State Street Financial Center
                                                         One Lincoln Street
6                                                        Boston, Massachusetts 02111
                                                         Telephone:  (617) 261-3100
7                                                        Facsimile:  (617) 261-3175
                                                         irene.freidel@klgates.com
8                                                        stacey.gorman@klgates.com
                                                         david.christensen@klgates.com
9
                                                         Matthew G. Ball (SBN No. 208881)
10                                                       Rachel Chatman (SBN No. 206775)
                                                         K&L GATES LLP
11                                                       4 Embarcadero Center, Suite 1200
                                                         San Francisco, California  94105-3493
12                                                       Telephone: (415) 882-8200
                                                         Facsimile:  (415) 882-8220
13                                                       matthew.ball@klgates.com
                                                         rachel.chatman@klgates.com
14
                                                         *Attorneys for Defendants Paul Financial*
15                                                       *LLC, HBSC Bank USA, National*
                                                         *Association, and Luminent Mortgage Trust*
16                                                       *2006-2*

17

18

19

20

21

22

23

24

25

26

27

28