1
2
3
4
5          IN THE UNITED STATES DISTRICT COURT
6          FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8    GREGORY M. JORDAN, on behalf of a          No. C 07-04496 SI
     putative class,
9                                               **ORDER GRANTING IN PART AND
                    Plaintiff,                  DENYING IN PART DEFENDANTS'
10                                              MOTION FOR SUMMARY JUDGMENT
        v.                                      and GRANTING IN PART AND
11                                              DENYING IN PART PLAINTIFF'S
     PAUL FINANCIAL, LLC, *et al.*,             MOTION FOR LEAVE TO FILE AN
12                                              AMENDED COMPLAINT**
                    Defendants.
13   _____/
14
15          On May 15, 2009, the Court heard oral argument on defendants' motion for summary judgment
16   and plaintiff's motion for leave to file a third amended complaint.  Having considered the arguments
17   of the parties, the papers submitted, the authority submitted after oral argument, and for good cause
18   shown, defendants' motion is GRANTED IN PART and DENIED IN PART and plaintiff's motion is
19   GRANTED IN PART and DENIED IN PART.
20
21                              **BACKGROUND**
22          The subject of this litigation is a dispute over so-called payment-option adjustable rate mortgages
23   ("option ARM" loans).[1]  On August 30, 2007, plaintiff Gregory Jordan filed a putative class action
24   complaint against defendant Paul Financial, LLC ("Paul Financial").  The complaint was amended twice
25   in order to add named defendants Luminent Mortgage Capital, Inc.; Luminent Mortgage Trust 2006-2;
26   and HSBC National Association ("HSBC"), such that the operative complaint is now the Second
27   _____
28          [1] Option ARM loans are also referred to as pay-option loans.  They typically have an adjustable
     interest rate.  Decl. of Dennis Tussey ("Tussey Decl.") ¶ 7.

United States District Court
For the Northern District of California

Amended Complaint ("SAC"), which was filed on May 14, 2008.  On January 27, 2009, the Court denied plaintiff's motion for class certification.

At all times relevant to this action, Paul Financial was in the business of originating, underwriting and funding first and second lien residential mortgage loans, and servicing those loans. Decl. of Dennis Tussey ("Tussey Decl.") ¶ 4.  Its practice was to sell approximately 75% of its loans to third-party investors, *id.* ¶ 5, and to sell the servicing rights to other investors, *id.* ¶ 26.  During the period that it originated option ARM loans, Paul Financial sold the loans to about ten investors.  *Id.* ¶ 27.  As of December 22, 2008, Paul Financial's assets amounted to less than $1,000 and the company was scheduled to cease business operations on December 31, 2008.  *Id.* ¶ 3.

Plaintiff refinanced his existing home loan and entered into an option ARM loan agreement with Paul Financial on or about December 30, 2005.  The loan documents at issue in this case are: a promissory note ("the Note"), a federal Truth in Lending Disclosure Statement ("TILDS"), and a Loan Program Disclosure.

<u>The Note</u>

The Note sets forth plaintiff's promise to pay a principal amount of $544,000.  Tussey Decl., ex. 18.  Section 2 describes the interest to be paid on the loan:

**(A) Interest Rate**
Interest will be charged on unpaid principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of 1%.  The interest rate I will pay may change. . . .
**(B) Interest Change Dates**
The interest rate I will pay may change on the first day of February, 2006, and on that day every month thereafter.  Each date on which my interest rate could change is called an "Interest Change Date."  The new rate of interest will become effective on each Interest Change Date.
**(C) Interest Rate Limit**
My interest rate will never be greater than 12.5%.
**(D) The Index**
Beginning with the first Interest Change Date, my interest rate will be based on an Index. . . . .
**(E) Calculation if Interest Rate Changes**
Before each Interest Change Date, the Note Holder will calculate my new interest by adding three and 525/1000 percentage points (3.525%) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limit of 12.5%, this rounded amount will be my new interest rate until the next Interest Change Date.

*Id.* at 92.

Section 3 describes loan payments:

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

**(A) Time and Place of Payments**

  I will pay principal and interest by making a payment every month.

  I will make my monthly payments on the first day of each month beginning on February 1, 2006. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on January 1, 2046, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date." . . .

**(B) Amount of My Initial Monthly Payments**

  Each of my initial monthly payments will be in the amount of U.S. $1,375.54. This amount may change.

**(C) Payment Change Dates**

  My monthly payment may change as required by Section 3(D) below beginning on the 1st day of February, 2007, and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay the Full Payment.

  I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

  At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." The Note Holder will then calculate the amount of my monthly payment due the month preceding the Payment Change Date multiplied by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, I may choose to pay the Limited Payment.

**(E) Additions to My Unpaid Principal**

  My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder will also add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

*Id.* at 93.

Section 7 is headed "Borrower's Failure to Pay as Required":

**(A) Late Charges for Overdue Payments**

United States District Court
For the Northern District of California

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 6.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### The TILDS

The TILDS discloses 6.99% as the APR on plaintiff's loan. *Id.* at ex. 14. The APR is placed prominently in a box explaining that the APR is "The cost of your credit as a yearly rate." *Id.* The TILDS also includes a payment schedule, as follows:

| # Payments | $ Payment | Beginning On |
|---|---|---|
| 12 | $ 1,375.54 | 2/1/2006 |
| 12 | $ 1,478.71 | 2/1/2007 |
| 6 | $ 1,589.62 | 2/1/2008 |
| 6 | $ 3,756.14 | 8/1/2008 |
| 12 | $ 3,474.43 | 2/1/2009 |
| 11 | $ 3,213.85 | 2/1/2010 |
| 420 | $ 3,819.12 | 1/1/2011 |
| 1 | $ 3,811.32 | 1/1/2046 |

*Id.*

### Loan Program Disclosure

Paul Financial's loan program disclosure provides more details about its ARM loans. The following information appears under a heading entitled "How your interest rate and payment are determined":

Your interest rate will be based on an index rate plus a margin. Please ask us for our current interest rate and margins.
. . .
Your initial interest rate is not based on the index used to make later adjustments. Please ask us for the amounts of our current interest rate discounts.
Your payment will be based on the interest rate, loan balance, and remaining loan term.

Tussey Decl., ex. 11.

4

United States District Court
For the Northern District of California

The interest rate on plaintiff's loan is pegged to a variable index.[2]  The initial interest rate on plaintiff's loan, however, was not based on the index.  Instead, it was based on a "teaser" rate of only one percent, *see* Tussey Decl., ex. 18 ¶ 2(A), which resulted in a monthly payment of $1,375.54, *id.* ¶ 3(B).  The Note limits changes in the minimum monthly payment to once a year, beginning on February 1, 2007, *see* Tussey Decl., ex. 18 ¶ 3(C), and caps increases to the minimum payment at 7.5%, *see id.* ¶ 3(D).  If the borrower does not pay the interest due, the unpaid interest is added to the principal.  Once the principal reaches 110% of the original value, the 7.5% payment cap no longer applies.

The payments disclosed in the TILDS for the first thirty months of the loan (until February 1, 2008) were based on the initial rate of 1.00%.  After the first twelve payments, the minimum monthly payment increases to $1,478.71, which reflects a 7.5% increase over the initial payment.  The following six payments are $1,589.62, again reflecting a 7.5% increase over the prior payment.  On August 1, 2008, the monthly payments increase to $3,756.14.  This increase indicates the point at which the principal has reached 110% of the original.

Although the payment schedule was based on the teaser rate of 1.00%, the actual interest rate changed after plaintiff's first monthly payment: instead of the teaser rate, the interest due was calculated according to the index.  While the interest changed almost immediately, the minimum payments were based on the initial teaser rate.  Thus, if plaintiff made payments according to the schedule disclosed in the TILDS, his payments would not cover the interest due on the mortgage.  The principal was therefore scheduled to increase if plaintiff made payments according to the TILDS.  This process is known as negative amortization.[3]  Assuming that the value of the home remains constant, negative amortization causes the borrower to lose equity in his home.

Paul Financial sold plaintiff's loan to defendant Luminent Mortgage Capital, Inc. on January 24,

---

[2]  The index, which is published by the Federal Reserve Board, is the twelve-month average of annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year.  The interest on plaintiff's loan is calculated by adding 3.525% to the index.  Tussey Decl., ex. 18 ¶ 2(D), (E).

[3]  The parties do not dispute that after plaintiff's loan closed, Paul Financial gave plaintiff the option of making a greater monthly payment than the minimum amount disclosed in the TILDS.  This fact does not affect the terms of the loan when plaintiff signed the loan documents.

2006.[4]  Tussey Decl. ¶ 57.  The loan was pooled with other adjustable rate loans in a "mortgage backed securities trust," which is a pool of mortgage loans that back securities that have been sold to investors. Decl. of Fernando Acebedo ("Acebedo Decl.") ¶¶ 5, 6.  The pool is held by defendant Luminent Trust 2006-2.  *Id.* ¶ 6.  Defendant HSBC, a national banking association, is the trustee of the pool.  *Id.* ¶ 2, 9. Paul Financial sold the servicing rights for plaintiff's loan to Greenwich Capital.  Tussey Decl. ¶ 58. Paul Financial serviced plaintiff's loan under contract with Greenwich until December 1, 2008.  *Id.*

Plaintiff brought claims under the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601, *et seq.*; and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*; as well as common law claims for fraud, breach of contract, and breach of the covenant of good faith and fair dealing.  Now before the Court are (1) the motion of defendants Paul Financial, HSBC, and Luminent Trust 2006-2 for summary judgment and (2) plaintiff's motion for leave to file a third amended complaint.

**LEGAL STANDARD**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party, however, has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial.  The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case.  *See id.* at 325.

The burden then shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'"  *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).  To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla

---

[4] Luminent Mortgage Capital filed a petition for bankruptcy on September 5, 2008.  *See* Docket No. 95.  Accordingly, this case is stayed as to this defendant.

United States District Court
For the Northern District of California

1    of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for

2    the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

3    In deciding a summary judgment motion, the evidence is viewed in the light most favorable to

4    the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id*. at 255. "Credibility

5    determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are

6    jury functions, not those of a judge [when she] is ruling on a motion for summary judgment." *Id*. The

7    evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative

8    testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat

9    summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

10

11                                      **DISCUSSION**

12

13   **1.      Defendants' Motion for Summary Judgment**

14        **A.      Truth in Lending Act**

15        The stated purpose of TILA is "to assure a meaningful disclosure of credit terms so that the

16   consumer will be able to compare more readily the various credit terms available to him and avoid the

17   uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and

18   credit card practices." 15 U.S.C. § 1601(a). "To effectuate TILA's purpose, a court must construe the

19   Act's provisions liberally in favor of the consumer and require absolute compliance by creditors." *Hauk*

20   *v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1118 (9th Cir. 2009) (internal quotation omitted).

21   Congress delegated the responsibility of "prescrib[ing] regulations to carry out the purposes of" TILA

22   to the Federal Reserve Board ("the Board"). 15 U.S.C. § 1604(a). In response to this mandate, the Board

23   promulgated "Regulation Z," 12 C.F.R. § 226; it also published its interpretation of Regulation Z in the

24   "Official Staff Interpretation," 12 C.F.R. pt. 226 Supp. I ("the Commentary"). Courts must defer to the

25   Board's interpretation of TILA unless that interpretation is obviously contrary to the statute. *Hauk*, 552

26   F.3d at 1118.

27

28        **i.      Statute of Limitations – Damages**

7

United States District Court
For the Northern District of California

Defendants move for summary adjudication of plaintiff's first cause of action, for violation of TILA, 15 U.S.C. §§ 1601, *et seq.*  TILA imposes a one year statute of limitations on private actions for damages.  *See* 15 U.S.C. § 1640(e) ("Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation.").  Here, plaintiff's loan transaction was consummated in January, 2006.  He filed this action on August 30, 2007.  Plaintiff agrees that his TILA claim for damages is barred by the one-year statute of limitations.  *See* Pl. Opp. at 8 n.3.  Accordingly, defendants' motion for summary judgment on plaintiff's TILA claim for damages is GRANTED.

### ii.        Statute of Limitations – Rescission

Plaintiff contends that his TILA claim for rescission of his loan is not barred because it is subject to a three-year statute of limitations.  Specifically, plaintiff argued at oral argument that rescission is available as a remedy for defendants' alleged failure to disclose (1) the risk of negative amortization and (2) the true APR on the loan.

Generally, TILA provides that borrowers have until midnight of the third business day following the consummation of a loan transaction to rescind the transaction.  15 U.S.C. § 1635(a).  A borrower's right of rescission is extended from three days to three years if the lender (1) fails to provide notice of the borrower's right of rescission or (2) fails to make a material disclosure.  12 C.F.R. § 226.23(a)(3).  Here, plaintiff does not contend that Paul Financial failed to provide notice of his right of rescission.  Thus, the only issue is whether Paul Financial failed to make a material disclosure.

### a.        Risk of negative amortization

Defendants argue that the alleged failure to adequately disclose the risk of negative amortization is not a "material" disclosure for purposes of the extended three-year statute of limitations for rescission.  The Court agrees.  With regard to variable-rate loans, TILA requires two sets of disclosures.  *Pulphus v. Sullivan*, 2003 WL 1964333 *14 (N.D. Ill. Apr. 28 2003).  The first set of disclosures, which generally concern features of the particular variable-rate loan, must be made "at the time an application form is provided or before the consumer pays a non-refundable fee, whichever is earlier." 12 C.F.R. § 226.19(b).

The second set of disclosures are required "before consummation of the transaction" and must include a statement "that the transaction contains a variable-rate feature" and a statement "that [the] variable-rate disclosures have been provided earlier."  12 C.F.R. § 226.18(b) & (f)(2).

Regulation Z provides that "[t]he term 'material disclosures' means the required disclosures of the annual percentage rate, the finance charge, the amount financed, the total payments, the payment schedule, and the disclosures and limitations referred to in § 226.32(c) and (d)."  12 C.F.R. § 226.23(a)(3) n.48.  The Commentary on this regulation states that only one of the required disclosures regarding variable-rate loans – that the transaction contains a variable-rate feature – is considered "material" such that it triggers the extended rescission period:

> Footnote 48 sets forth the material disclosures that must be provided before the rescission period can begin to run.  Failure to provide information regarding the annual percentage rate also includes failure to inform the consumer of the *existence* of a variable rate feature.  Failure to give the other required disclosures does not prevent the running of the rescission period, although that failure may result in civil liability or administrative sanctions.

12 C.F.R. Pt. 226, Supp. I ¶ 23(a)(3)-2 (emphasis added).  *See also Pulphus*, 2003 WL 1964333 at *14 (holding that the Commentary deserves deference because "[t]here is nothing irrational about the Board's desire to extend the period to rescind a loan, a rather Draconian remedy, only for those consumers who were completely unaware that their loan had a variable rate."); *Mandrigues v. World Savings, Inc.*, 2009 WL 160213 *6 (N.D. Cal. Jan. 20, 2009) (citing *Pulphus* with approval and reasoning that failure to provide adequate disclosures regarding risk of negative amortization does not trigger a right of rescission); *Ngwa v. Castle Point Mortg., Inc.*, 2008 WL 3891263 *10 (S.D.N.Y. Aug. 20, 2008).

Here, a box labeled "Variable Rate Mortgage" was checked on plaintiff's TILDS.  Thus, there is no dispute that Paul Financial disclosed to plaintiff that his loan contained a variable-rate feature.  Accordingly, even if plaintiff is correct that defendants otherwise violated TILA by failing to adequately disclose the risk of negative amortization, such a violation is not "material" and does not entitle plaintiff to the extended three-year statute of limitations for rescission of the loan.  Plaintiff is therefore not entitled to rescind his loan transaction due to defendants' alleged failure to disclose the risk of negative

1    amortization..[5]

2

3                    b.      APR disclosure

4           Unlike the risk of negative amortization, disclosure of the APR is a "material" disclosure; if it

5    is not made, a borrower is entitled to the extended three-year period for rescission of the loan transaction.

6    *See Mandrigues*, 2009 WL 160213 *5 ("inadequate or misleading disclosure of the APR may constitute

7    a material violation triggering the extended rescission period") (citing 12 C.F.R. § 226.23(a)(3) n.48 and

8    *Ljepava v. MLSC Props., Inc.*, 511 F.2d 935, 941 (9th Cir. 1975)).  Accordingly, if plaintiff prevails on

9    the merits of his claim that defendants violated TILA by failing to adequately disclose the APR, he is

10   entitled to the three-year statute of limitations for rescission.

11

12                iii.    TILA - Merits

13          According to plaintiff, defendants violated TILA by disclosing two different "yearly" interest

14   rates: the yearly rate in the Note and the APR in the TILDS.  *See* SAC ¶¶ 63, 64.  Lenders must disclose

15   the "annual percentage rate, using that term, and a brief description such as 'the cost of your credit as a

16   yearly rate.'"  12 C.F.R. § 226.18(e).  The Commentary provides that where, as here, a loan has an initial

17   discounted rate that is subsequently adjusted, "the disclosures should reflect a composite annual

18   percentage rate based on the initial rate for as long as it is charged and, for the remainder of the term, the

19   rate that would have been applied using the index or formula at the time of consummation."  *See* 12

20   C.F.R. Pt. 226, Supp. I ¶ 226.17(c)(10)(i); *see also id.* ¶ 226.17(c)(8) ("[I]n a variable-rate transaction

21   . . . disclosures should not be based solely on the initial terms. . . . the disclosed annual percentage rate

22   should be a composite rate based on the rate in effect during the initial period and the rate that is the basis

23   of the variable-rate feature for the remainder of the term.").  The disclosure and explanation of the cost

24   of the loan as an annual percentage rate must be "clear and conspicuous."  12 C.F.R. Pt. 226, Supp. I

25   ¶ 226.17(a)(1)-1.

26   _____

27        [5] As the financial community has developed new types of loans, such as those involved in this
     case, which pose different kinds of financial risks and different areas of potential confusion, it would
28   be appropriate for the Federal Reserve Board to re-evaluate the disclosures required by TILA generally
     and Regulation Z in particular.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Here, the TILDS states that the APR was 6.99% and explains that the APR is "[t]he cost of your credit as a *yearly rate*" (emphasis added). At the same time, the Note states that "I will pay interest at a *yearly rate* of 1%. The interest rate I will pay may change" (emphasis added). In plaintiff's view, the reference to two "yearly" rates of interest is confusing and therefore fails to comply with TILA's requirement that the disclosure of the APR be clear and conspicuous. Other district courts, considering the same language in loan documents, have found that plaintiffs successfully stated TILA claims for failure to adequately disclose the APR. *See Amparan v. Plaza Home Mortg., Inc.*, 2008 WL 5245497 *6 (N.D. Cal. Dec. 17, 2008) (Fogel, J.) (holding that plaintiff had stated a claim under TILA when the TILDS represented that the APR was 7.136%, describing this figure as the "[t]he cost of your credit as a yearly rate," while the Note represented that "I will pay interest at a yearly rate of 1.500%."); *Andrews v. Chevy Chase Bank, FSB*, 240 F.R.D. 612, 618 (E.D. Wis. 2007) (same), *rev'd on other ground by Andrews v. Chevy Chase Bank*, 545 F.3d 570 (7th Cir. 2008); *see also Plascencia v. Lending 1st Mortg.*, 2008 WL 1902698 *2 (N.D. Cal. Apr. 28, 2008) (Wilken, J.).

Relying on *Smith v. Anderson*, 801 F.2d 661 (4th Cir. 1986), defendants argue that the use of the term "yearly rate" in the Note does not render the APR disclosure unclear or inconspicuous. *Smith* held that loan documents did not violate TILA by including an interest rate that was distinct from the APR. The court reasoned that "APR" is a term of art and "differs from the general definition of interest rate because it considers, by definition, a broader range of finance charges when determining the total cost of credit as a yearly rate." 801 F.2d at 663. *Smith* is not helpful to defendants because the Fourth Circuit considered only whether loan documents are inconsistent if they disclose both an "APR" and a distinct "interest rate." *Smith* did not reach the issue of whether the APR disclosure would be rendered unclear if it were defined using the same term that was used to define the interest rate.[6]

Defendants also argue that because plaintiff's loan disclosures used the Board's model forms,

---

[6] The Court recognizes that *Velazquez v. GMAC Mortg. Corp.*, citing *Smith*, found no TILA violation when the TILDS described the APR as "[t]he cost of your credit as a yearly rate" and listed the APR as 8.253%, while the Note stated, "I will pay interest at a yearly rate of 1.950%." 605 F. Supp. 2d 1049, 1061-62 (C.D. Cal. 2008). *Velazquez*, however, did not consider the risk of confusion when instead of being "merely different ways of calculating the cost of a loan as a yearly rate," the disclosed "interest rate" was a teaser rate rather than the true interest rate on the loan. *See Andrews*, 240 F.R.D. at 619 n.3 (distinguishing *Smith*).

11

United States District Court
For the Northern District of California

defendants are entitled to the TILA "safe harbor."  Good-faith compliance with the Commentary protects a lender from civil liability under TILA.  *See* 15 U.S.C. § 1640(f).  A lender is also shielded from liability if it provides its disclosures using one of the model forms prescribed by the Board. 15 U.S.C. § 1604(b).  Here, Paul Financial used the terminology recommended by the Board in Regulation Z when it defined the APR as "the cost of your credit as a yearly rate."  *See* 12 C.F.R. § 226.18(e) (Lenders must disclose the "annual percentage rate, using that term, and a brief description such as 'the cost of your credit as a yearly rate.'").  Plaintiff contends that Paul Financial rendered the APR disclosure in the TILDS unclear by using the same term to define the initial interest rate on the loan.  The Court agrees with plaintiff that compliance with Regulation Z is not dispositive where another disclosure renders a particular term ambiguous.  *See*  12 C.F.R. Pt. 226, Supp. I, ¶ 17(a)(1)-1 ("[T]he disclosures must be presented in a way that does not obscure the relationship of the terms to each other.").

This Court adopts the reasoning in *Amparan* and *Andrews* and finds that there is a factual dispute as to whether reference in the loan documents to both the APR and the finance charge as "yearly" rates of interest would have been confusing to an ordinary consumer.  Accordingly, the Court DENIES defendants' motion for summary judgment on this issue.


**B.**      **Breach of Contract**

Defendants move for summary judgment on plaintiff's fourth cause of action, for breach of contract.  Plaintiff claims that under the Note, defendants were required to apply plaintiff's monthly payments to interest *and* principal.  The essential elements of a contract claim are: (1) the existence of a valid contract between the parties, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's unjustified or unexcused failure to perform, and (4) damages to plaintiff caused by the breach.  *See Lortz v. Connell*, 273 Cal. App. 2d 286, 290 (1969).  "In contract cases, summary judgment is appropriate only if the contract or the contract provision in question is unambiguous.  A contract or a provision of a contract is ambiguous if it is reasonably susceptible of more than one construction or interpretation."  *Castaneda v. Dura-Vent Corp.*, 648 F.2d 612, 619 (9th Cir. 1981) (citations omitted).  Under California contract law, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."  *Navarro v. Mukasey*,

518 F.3d 729, 734 (9th Cir. 2008) (quoting Cal. Civ. Code § 1641).

The following provisions of the Note are relevant to plaintiff's claim:

**[Preamble]**

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATE[D] IN THIS NOTE.**

**Section 3**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on February 1, 2006. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on January 1, 2046, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date." . . .

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $1,375.54. This amount may change.

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the 1st day of February, 2007, and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay the Full Payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." The Note Holder will then calculate the amount of my monthly payment due the month preceding the Payment Change Date multiplied by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, I may choose to pay the Limited Payment.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the

13

monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder will also add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

. . .

**Section 7**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 6.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

Plaintiff contends that, at a minimum, the Note is ambiguous as to whether defendants were required to apply plaintiff's first thirteen monthly payments to both principal and interest on the loan. Plaintiff argues the statement in section 3(A) that "I will pay principal and interest by making a payment every month" indicates that payments would be applied to both principal and interest. Section 3(B) provides that plaintiff's initial monthly payments would amount to $1,375.54. Section 3(C), subheaded "Payment Change Dates" stipulates that the monthly payments would not change until February 1, 2007. According to plaintiff, a reasonable reading of these provisions is that until February 1, 2007 (i.e. for the first thirteen payments), plaintiff would pay $1,375.54 and that this sum would be applied to principal and interest.

Defendants respond that the Note does not impose an obligation to apply payments to both principal and interest. The Court agrees. *Quezada v. Loan Center of Cal., Inc.*, 2008 WL 5100241 (E.D. Cal. 2008) analyzed identical language in a promissory note and concluded that when read in context, plaintiff's interpretation of the provision "I will pay principal and interest by making a payment every month" was not reasonable. This Court finds *Quezada* persuasive.

*Quezada* reasoned that other provisions in the Note contemplate that monthly payments could be insufficient to cover the interest owed, contradicting plaintiff's interpretation that the payments must be applied to both interest and principal. The same is true here. In section 3(E), under the heading "Additions to My Unpaid Principal," the Note states, "My monthly payment could be less than the

United States District Court
For the Northern District of California

1  amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid

2  principal I owe . . . If so, each month that my monthly payment is less than the interest portion, the Note

3  Holder will subtract the amount of my monthly payment from the amount of the interest portion and will

4  add the difference to my unpaid principal."  In addition, the preamble states in bold and all-caps: "**THE**

5  **PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT**

6  **ORIGINALLY BORROWED** . . . ."  These provisions explain that monthly payments may be less than

7  the interest due, i.e. that negative amortization is possible.  Interpreting the statement "I will pay principal

8  and interest by making a payment every month" as plaintiff proposes would render these provisions

9  describing negative amortization meaningless.

10       Defendants also cite the Deed of Trust.[7]  *See* Tussey Decl., ex. 20.  Section 2 of the Deed provides

11  that "all payments accepted and applied by Lender shall be applied in the following order of priority: (a)

12  interest due under the Note; (b) principal due under the Note . . . .  Such payments shall be applied to each

13  Periodic Payment in the order in which it became due.  Any remaining amounts shall be applied first to

14  late charges, second to any other amounts due . . . , and then to reduce the principal balance of the Note."

15  *Id.*  The Court agrees with defendants that this provision supports their interpretation that monthly

16  payments may not cover both interest and principal.

17       Plaintiff concedes that the Note contemplates the possibility of negative amortization but argues

18  that under the terms of the Note, this process could not occur during the first thirteen months.  Plaintiff

19  reconciles the various provisions as follows.  The preamble states that negative amortization can occur,

20  "but only due to the 'limit on the amount that the monthly payment can increase or decrease.'"  Pl. Opp.

21  at 37 (quoting preamble).  According to plaintiff, the "limit" on monthly increases or decreases referred

22  to in the preamble is described in Section 3(D), which provides that payments cannot increase by more

23  than 7.5% each year.  In turn, Section 3(C) provides that the monthly changes described in Section 3(D)

24  cannot begin until February 1, 2007.  Thus, as plaintiff reads it, the Note does not permit negative

25  amortization to begin until February 1, 2007 and requires that the first thirteen payments be applied to

26  both principal and interest.

27  _____

28       [7] Plaintiff does not dispute that the Deed of Trust is one of the operative contractual documents.

15

Plaintiff's argument fails because the preamble does not state that negative amortization can only occur "due to" the 7.5% cap on monthly payment increases. The full text of the preamble is:

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATE[D] IN THIS NOTE.**

The reference to the cap on monthly payment increases precedes the reference to negative amortization. The only limit on negative amortization in the preamble is stated in the last sentence. This limitation is described in more detail in Section 3(F), which provides that negative amortization is capped at 110% of the principal. Plaintiff's reading of the preamble as providing that negative amortization could not occur for the first thirteen payments is not supported by the text of the Note.

For these reasons, the Court finds that plaintiff's interpretation contradicts other terms of the Note and is therefore unreasonable. *Accord Elvin v. Am. Home Mortg. Inv. Tr. 2005-2*, 2009 WL 839930 *21 (E.D. Cal. Mar. 30, 2009) (holding that plaintiffs' interpretation of "I will pay principal and interest by making a payment every month" contradicted the express terms of the promissory note); *Plascencia v. Lending 1st Mortg.* ("*Plascencia II*"), 583 F. Supp. 2d 1090, 1100-01 (N.D. Cal. 2008) (holding that the promissory note contained "no promise, express or implied, that [p]laintiffs' payment would always be applied to both principal and interest" despite the statement that "I will pay principal and interest by making a payment every month."); *Amparan*, 2008 WL 5245497 *13 (same).[8]

Accordingly, defendants' motion for summary judgment on this issue is GRANTED.

## C.    Breach of the Implied Covenant of Good Faith and Fair Dealing

Defendants move for summary judgment on plaintiff's sixth cause of action, for breach of the implied covenant of good faith and fair dealing. "Under California law, 'every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.'" *Plascencia II*, 583 F. Supp. 2d at 1101 (citing *McClain v. Octagon Plaza, LLC*, 159 Cal. App.4th 784, 798 (2008))

---

[8] The Court recognizes that district courts in the Eastern and Central Districts of California have determined that plaintiffs stated claims for breach of contract on based on similar language in their loan documents. This Court finds the reasoning of the authorities cited herein more persuasive.

**United States District Court**
For the Northern District of California

(citation and ellipses omitted).  "The implied covenant "prevent[s] a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." *Plascencia II*, 583 F. Supp. 2d at 1101 (citing *McClain*, 15 Cal. App. 4th at 806).

Plaintiff's claim fails for two reasons.  First, plaintiff argues that defendants breached the implied covenant of good faith and fair dealing by failing to apply plaintiff's monthly payments to both principal and interest.  As discussed above, the Court concludes that defendants were under no contractual obligation to apply payments in this way.  Thus, defendants have not frustrated plaintiff's rights to the benefits of the note. *See Plascencia II*, 583 F. Supp. 2d at 1101.

Second, the Court finds that plaintiff has cited no evidence of a special relationship between plaintiff and defendants.  "Generally, no cause of action for the tortious breach of the implied covenant of good faith and fair dealing can arise unless the parties are in a 'special relationship' with 'fiduciary characteristics.'" *Pension Tr. Fund v. Fed. Ins. Co.*, 307 F.3d 944, 955 (9th Cir. 2002) (quoting *Mitsui Mfrs. Bank v. Superior Court*, 212 Cal. App. 3d 726, 730 (1989)).  "A central test of whether a lender is subject to this tort is whether there is 'a fiduciary relationship in which the financial dependence or personal security by the damaged party has been entrusted to the other.'" *Id.* (citing *Mfrs. Bank*, 212 Cal. App. 3d at 731).  A lender "owes a fiduciary duty to a borrower when it excessively controls or dominates the borrower."  *Id.* (citing *Credit Managers Ass'n v. Superior Court*, 51 Cal. App.3d 352, 359-61 (1975)).   Plaintiff contends that there is a factual dispute as to whether a fiduciary relationship existed between plaintiff and Paul Financial.  He relies on his declaration, but this document contains no  statements that could allow a rational factfinder to conclude that defendants excessively controlled or dominated him – plaintiff states only that he obtained the loan from Paul Financial to refinance his home and that he was unaware that his payments would be insufficient to pay the accruing interest or the principal on his loan.  *See* Decl. of Gregory M. Jordan ¶¶ 6-8.  Accordingly, the Court finds that there is no factual dispute as to whether there was a special relationship between Paul Financial and plaintiff. *Accord Amparan*, 2008 WL 5245497 *14 (finding no basis for plaintiff to allege special relationship between borrower and lender in loan transaction).

For these reasons, the Court GRANTS defendants' motion for summary judgment on this claim.

### D. UCL Claims

California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, prohibits "any unlawful, unfair or fraudulent business act or practice." *Cel-Tech Communic'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). "By proscribing 'any unlawful' business practice, section 17200 'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Id.* (citation omitted). Here, plaintiff contends that defendants' purported TILA violations constitute predicate unlawful acts. Plaintiff alleges that defendants violated TILA by (1) failing to disclose that negative amortization was certain to occur if plaintiff made monthly payments according to the schedule in the TILDS, (2) failing to disclose that the initial rate on plaintiff's loan was discounted, (3) failing to disclose that the initial interest rate would apply for only one month, (4) failing to adequately disclose the APR on plaintiff's loan, (5) failing to disclose the interest rate upon which the payment schedule in the TILDS was based, and (6) failing to adequately disclose the effect of the payment cap on plaintiff's loan. As discussed above, the parties agree that all of plaintiff's TILA claims for damages are barred by the statute of limitations.

Defendants argue that plaintiff's UCL claim is preempted because it is predicated on TILA claims that are barred by the statute of limitations. TILA does not preempt state law unless the state law is inconsistent with TILA. *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001, 1007 (9th Cir. 2008). The UCL has a four-year statute of limitations, *see* Cal. Bus. & Prof. Code § 17208, while TILA has a one year statute of limitations, *see* 15 U.S.C. § 1640(e). Noting this procedural difference between the two statutes, the Ninth Circuit reasoned that a plaintiff cannot enforce a time-barred TILA claim through the UCL because such an action would constitute "an attempt to enforce a state regulation in an area expressly preempted by federal law." 514 F.3d 1007 n.3; *see also Reyes v. Downey Savings and Loan Ass'n*, 541 F. Supp.2d 1108, 1115 (C.D. Cal. 2008) (citing *Silvas* for proposition that UCL claim is preempted by TILA if the underlying TILA violation is time barred); *Adams v. SCME Mortg. Bankers, Inc.*, 2009 WL 1451715 *11 (E.D. Cal. May 22, 2009) (holding that if a TILA claim is time barred, a "UCL claim based on TILA violations likewise fails").

At oral argument, plaintiff cited *Amparan* and *Plascencia II* for the proposition that TILA does not preempt his UCL claims. *Plascencia II* held that TILA does not preempt UCL claims that are

18

United States District Court
For the Northern District of California

consistent with TILA:

> [T]he fact that the UCL allows a claim to be brought within four years or may provide remedies not available under TILA[9] . . . simply provides an additional level of protection for consumers.  The UCL does not mandate additional disclosures that are substantively inconsistent with TILA's, and therefore does not bring the UCL within the scope of TILA's preemption provision.

583 F. Supp. 2d at 1099; *see also Amparan*, 2008 WL 5245497 *11 (following *Plascencia II* "in holding that TILA does not necessarily preempt [p]laintiff's UCL claims").  Both *Amparan* and *Plascencia II* found that equitable tolling could operate to toll the one-year statute of limitations on the plaintiffs' TILA claims.  The courts therefore did not consider whether a UCL claim is preempted if it is based on a TILA violation that is barred by the statute of limitations.

The Court finds that because plaintiff's UCL claim is predicated on TILA violations, it may proceed only to the extent that the TILA violations are not time barred.  As discussed above, defendants are not entitled to summary judgment on plaintiff's TILA rescission claim regarding the APR disclosure.  Accordingly, plaintiff's UCL claim is not preempted insofar as it is based on the purportedly deficient APR disclosure.  For the same reasons articulated in the discussion of plaintiff's TILA claim, there are disputed facts as to whether the APR disclosure constitutes an unlawful, unfair, or fraudulent business practice for purposes of the UCL.  The Court DENIES defendants' motion for summary judgment on this issue.

**E.  Fraud**

Plaintiff contends that defendants fraudulently failed to disclose material information about plaintiff's loan.  "The elements of fraud are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."  *Charnay v. Cobert*, 145 Cal. App. 4th 170, 184 (2006).  The Court finds that there are factual disputes on each of the elements of plaintiff's fraud claim.  Accordingly, the Court DENIES defendant's motion for summary judgment on this issue.

---

[9] Restitution and injunctive relief are available as remedies for UCL violations.  *See* Cal. Bus. & Prof. Code § 17203; *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1008 (9th Cir. 2008).

**F.      Liability of HSBC and Luminent Trust 2006-2**

Defendants HSBC and Luminent Trust 2006-2 contend that they cannot be held liable for claims arising from omissions in plaintiff's loan documents.

**i.      Luminent Trust 2006-2**

Defendants argue that Luminent Trust 2006-2 cannot be named as a defendant because a trust is not a legal entity under California law.  Generally, for parties other than individuals and corporations, "[c]apacity to sue or be sued is determined . . . by the law of the state where the court is located . . . ." Fed. R. Civ. Pro. 17(b).  In California, a trust is not a legal entity and has no capacity to sue or be sued. *See Galdjie v. Darwish*, 113 Cal. App. 4th 1331, 1343-45 (2003).

Here, plaintiff claims that as the nominal holder of plaintiff's loan, the Trust should be joined in this lawsuit as a necessary party to plaintiff's TILA claim for rescission.  Pl. Reply in Supp. of Mot. for Leave to Amend, at 9.  A party is necessary if, in that party's absence, "the court cannot accord complete relief among existing parties . . . ." Fed. R. Civ. Pro. 19(a)(1)(A).  All parties to a contract and "others having a substantial interest in it" should be joined in an action to rescind or set aside the contract.  Hon. William W. Schwarzer et al., *Federal Civil Procedure Before Trial* § 7:114 (citing *Virginia Sur. Co. v. Northrop Grumman Corp.*, 144 F.3d 1243, 1248 (9th Cir. 1998)).  Plaintiff does not dispute that the Trust cannot be named as a defendant in this case; defendants do not dispute that the Trust is nonetheless a necessary party in this action.  Accordingly, the Court GRANTS the defendants motion for summary judgment on liability as to the Trust but does not dismiss this party from the lawsuit.

**ii.      HSBC**

HSBC argues that it cannot be held liable for any of plaintiff's claims.  Plaintiff's remaining claims are: (1) a TILA claim for rescission based on defendants' alleged failure to adequately disclose the APR for plaintiff's loan, (2) violation of the UCL, and (3) fraud.

Plaintiff argues that HSBC can be held liable for the TILA violation because HSBC accepted assignment of plaintiff's loan.  TILA provides that "any civil action . . . which may be brought against a creditor may be maintained against any assignee of such creditor only if the violation for which such

20

United States District Court
For the Northern District of California

action or proceeding is brought is apparent on the face of the disclosure statement . . . ." 15 U.S.C. § 1641(a). "[A] violation is apparent on the face of the disclosure statement if . . . the disclosure can be determined to be incomplete or inaccurate by a comparison among the disclosure statement, any itemization of the amount financed, the note, or any other disclosure of disbursement . . . ." 15 U.S.C. § 1641(e)(2)(A). As trustee of Luminent Trust 2006-2, HSBC is the nominal assignee of plaintiff's Note. Acebedo Decl. ¶ 19. Plaintiff's TILA claim is based on statements regarding the APR that were apparent through comparison of the disclosure statement and the Note. Accordingly, the Court agrees with plaintiff that he may maintain an action against HSBC for the alleged TILA violation.

Plaintiff argues that because of its status as assignee of plaintiff's loan, HSBC can also be held liable for the UCL violation. Because the UCL incorporates other laws and treats violations of those laws as unlawful business practices independently actionable under California law, *see Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1058 (9th Cir. 2000), it stands to reason that HSBC may be held liable as an assignee under the UCL to the same extent that it may be held liable under TILA. *See Cazares v. Pacific Shore Funding*, 2006 WL 149106 *7 (C.D. Cal. Jan. 3, 2006) ("Being an assignee in violation of TILA . . . *is* an unlawful practice" for purposes of the UCL) (emphasis in original); *see also Plascencia II*, 583 F. Supp. 2d at 1098 (reasoning that assignee's "profiting from loans featuring oppressive terms that were not fully disclosed in compliance with TILA could itself be an unfair business practice under the UCL").[10]

Accordingly, the Court DENIES HSBC's motion for summary judgment on the issue of liability for the TILA and UCL violations.

Plaintiff's claim that HSBC may be held liable for the alleged fraud is more problematic. HSBC claims that it had no involvement whatsoever in plaintiff's loan transaction. Its connection to this case is as Trustee of Luminent Trust 2006-2, which is the mortgage backed securities trust pool that includes

---

[10] HSBC's reliance on this Court's decisions in *Hernandez v. Hilltop Fin. Mortg., Inc.*, 2007 WL 3101250 *7 (N.D. Cal. Oct. 22, 2007) and *Marks v. Ocwen Loan Servicing*, 2008 WL 344210 *7 (N.D. Cal. Feb. 6, 2008) is misplaced. Both of those decisions concerned the issue of whether an assignee's connection with the original transaction was so close that the assignee could be viewed as the original creditor and therefore liable for fraud committed by the loan originator. Neither case held that in order for an assignee to be held liable under the UCL, the plaintiff must always demonstrate that the assignee can be viewed as the original creditor.

**United States District Court**
For the Northern District of California

plaintiff's loan. Acebedo Decl. ¶ 8. Paul Financial originated plaintiff's loan in January 2006; the Trust was formed on February 1, 2006, pursuant to the "Pooling and Servicing Agreement" ("PSA").[11] *Id.* ¶ 7. It is undisputed that the Trust was not established and HSBC was not appointed Trustee at the time plaintiff's loan was originated.

Plaintiff does not cite any evidence demonstrating that HSBC was involved in plaintiff's loan transaction. Instead, he argues that HSBC can be held liable because of its role in securitizing plaintiff's loan. According to plaintiff, while Paul Financial did not have sufficient capital to originate a large number of loans, it was able engage in this line of business by investing its own capital for only a short period of time and securitizing the loans it originated; HSBC perpetuated this scheme by accepting the assignment of plaintiff's loan. *See* Christopher L. Peterson, *Predatory Structured Finance,* 28 Cardozo L. Rev. 2185, 2220 (2007). Plaintiff contends that because it accepted the assignment of plaintiff's loan, HSBC can be held liable as a joint venturer with Paul Financial or as an aider and abettor of Paul Financial.

Plaintiff's joint venture theory of liability fails. "A joint venture is an undertaking by two or more persons jointly to carry out a single business enterprise for profit. Like partners, joint venturers are fiduciaries with a duty of disclosure and liability to account for profits." *Weiner v. Fleischman*, 54 Cal. 3d 476, 482 (1991) (citations omitted). There is no evidence that Paul Financial and HSBC had any interaction whatsoever, much less that they formed an agreement to carry out a single business enterprise. Plaintiff's reliance on *Short v. Wells Fargo Bank Minnesota, N.A.*, 401 F. Supp. 2d 549 (S.D.W. Va. 2005) is misplaced. *Short* held that a pooling and servicing agreement constituted evidence of a joint venture between the seller of the mortgage loans, the servicer of the loans, and the trustee. 401 F. Supp. 2d at 565. The analogous parties in this case are MAIA Mortgage Finance Statutory Trust (the seller of plaintiff's loan), Wells Fargo Bank (the master servicer of the loans in the Trust), and HSBC (the Trustee). *See* PSA; Acebedo Decl. ¶¶ 6, 7. *Short* did not suggest that a pooling and servicing agreement can be evidence of a joint venture when the entity in question was not a party to that agreement.

---

[11] The Pooling and Servicing Agreement is available at http://www.sec.gov/Archives/edgar/data/1352978/000114420406009679/v037458_ex4-1.htm (last accessed June 26, 2009).

United States District Court
For the Northern District of California

1    Plaintiff's theory of aider and abettor liability is similarly unavailing. In California, "liability may

2    be imposed on one who aids and abets the commission of an intentional tort if the person knows the

3    other's conduct constitutes a breach of a duty and gives substantial assistance or encouragement to the

4    other to so act." *In re First Alliance Mortg. Co.*, 471 F.3d 977, 993 (9th Cir. 2006) (citing *Casey v. U.S.*

5    *Bank Nat'l Assn.*, 127 Cal. App. 4th 1138, 1144 (2005) (ellipses omitted)).  A creditor can be liable as

6    an aider and abettor if, for example, it learns of a loan originator's fraudulent practices through its own

7    investigation and  knows "that [the loan originator's] financial difficulties stemmed directly and

8    indirectly from litigation over its dubious lending practices" but nonetheless satisfies all of the loan

9    originator's financing needs.  *Id.* at 995.  There is no evidence that HSBC gave any support to Paul

10   Financial, much less the substantial assistance that is necessary to sustain aider and abettor liability.

11   Plaintiff argues that if given an opportunity to conduct further discovery, he would be able to

12   locate evidence that at the time plaintiff negotiated his loan, Paul Financial had an agreement with HSBC

13   for HSBC to take a financial interest in the loans at some point after the loan was consummated.  *See*

14   Decl. of Lee A. Weiss in Supp. of Pl. Mot. to Continue Def. Summ. J. ¶ 2.  [Docket No. 156]  The Court

15   agrees with plaintiff that if such evidence existed, it could support plaintiff's claim that HSBC acted as

16   an aider and abettor in Paul Financial's scheme to originate loans based on false and misleading

17   disclosures.  In light of the manner in which litigation of this case has proceeded,[12] the Court finds that

18   plaintiff's request for further time to conduct discovery is reasonable.  Accordingly, the Court DENIES

19   HSBC's motion for summary judgment on this issue without prejudice to HSBC renewing its motion

20   after plaintiff has been given an opportunity to conduct further discovery.

21

22   **G.    Evidentiary Objections**

23   Plaintiff objects to and moves to strike portions of the declarations of Russell Ng, Dennis Tussey,

24

25   _____

     [12] In specific, prior to December of last year, discovery in this case focused on class certification

26   issues.  *See* Docket No. 58.  Defendants filed the instant motion for summary judgment on December
     30, 2008 – the same date they filed their opposition to plaintiff's motion for class certification.  The

27   Court recognizes that it previously granted in part and denied in part plaintiff's motion to continue
     defendants' summary judgment motion.  *See* Docket No. 164.  Nonetheless, this Court is determined

28   to decide this case on its merits.  Under all of the circumstances of this case, the Court finds that plaintiff
     should have an opportunity to fully develop his case.

and Fernando Acebedo, filed by defendants in support of the instant motion.  The Court finds that, as executive vice president of Paul Financial, Dennis Tussey can be inferred to have personal knowledge of such matters as Paul Financial's sale of plaintiff's loan and Paul Financial's business practices.  As a corporate trust administrator at HSBC, Fernando Acebedo can also be inferred to have personal knowledge of HSBC's business practices and transactions regarding plaintiff's loan.

Plaintiff argues that the Acebedo declaration is improperly based on documents that are not attached to the declaration.  The majority of Acebedo's testimony is based on the PSA, which, as noted in this order, is publically available on the internet through the SEC.

Finally, plaintiff objects that Acebedo failed to complete the date on his declaration.  The Court finds that there is sufficient evidence in the record to support a finding that the declaration was signed in the latter part of December 2008.

Accordingly, plaintiff's objections based on these issues are overruled.  The Court need not decide plaintiff's other objections as the Court did not rely on this evidence for any of the purposes to which plaintiff objects.

**2.**     **Plaintiff's Motion for Leave to File a Third Amended Complaint**

Plaintiff seeks leave to file a third amended complaint.  The named plaintiff in the SAC is Gregory Jordan.  Plaintiff's proposed Third Amended Complaint ("TAC") adds two new plaintiffs, Eli and Josephina Goldhaber, who allege that Paul Financial is the mortgage lender for their option ARM loan.  Plaintiff's counsel has clarified in a letter to the Court, *see* Docket No. 175, that the Goldhabers do not allege any claims against the other three defendants and that the subsequent purchasers and/or assignees of the Goldhabers' loan are unknown.  The Goldhabers' loan appears to contain terms that are substantially similar to the terms of Jordan's loan.

Federal Rule of Civil Procedure 15 governs amendment of the pleadings.  It states that if a responsive pleading has already been filed, the party seeking amendment "may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a).  This rule reflects an underlying policy that disputes should be determined on their merits, and not on the technicalities of pleading rules. *See Foman v. Davis*, 371

U.S. 178, 181-82 (1962).  Accordingly, the Court must grant leave to amend liberally.  *See Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990) (leave to amend granted with "extreme liberality"); *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989).

However, there are several accepted reasons to deny leave to amend, including the presence of bad faith on the part of the plaintiff, undue delay, prejudice to the defendant, futility of amendment, and that the plaintiff has previously amended the complaint.  *See Ascon Properties*, 866 F.2d at 1160; *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 809 (9th Cir. 1988).  Courts do not ordinarily consider the validity of a proposed amended pleading in deciding whether to grant leave to amend, but leave may be denied if the proposed amendment is futile or would be subject to dismissal.  *See Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991).

Defendants argue that leave to amend should not be granted because amendment would force defendants to relitigate issues that have already been decided by this Court.  *See Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1388 (9th Cir. 1990) (leave to amend properly denied when amendment would require defendants to relitigate claims under new theories).  The Court disagrees.  As the Goldhabers do not allege any claims against HSBC and the Trust, these entities will not be forced to relitigate any claims.  As for Paul Financial, plaintiff seeks to add new plaintiffs, not to introduce new legal theories.

Defendants also argue that amendment would cause undue delay in the resolution of this matter.  It is undeniable that the addition of new plaintiffs will likely prolong the litigation of this matter while the Goldhabers locate the subsequent purchasers and assignees of their loan.  Nonetheless, the Court finds that the delay will not be prejudicial to defendants as litigation should be able to progress smoothly once this information is identified.

Finally, defendants argue that amendment would be futile.  Again, the Court disagrees.  The foregoing discussion on defendants' summary judgment motion established that Jordan has three viable claims.  At oral argument, plaintiff's counsel conceded that the Goldhabers' TILA claims for damages are barred by the statute of limitations.[13]  Thus, the Goldhabers appear to have the same potential claims as Jordan.  Thus, amendment of the complaint to allow the Goldhabers to make the same claims as Jordan

---

[13]  The Goldhabers' loan was consummated on July 28, 2005; this action was not filed until August 20, 2007.

United States District Court
For the Northern District of California

1   would not be futile.

2       Accordingly, plaintiff's motion for leave to file a third amended complaint is GRANTED to the

3   extent the amended complaint is consistent with this Court's summary judgment rulings.  That is,

4   plaintiff may not reallege any claims on which this Court has granted defendants' motion for summary

5   judgment.

6

7                                    **CONCLUSION**

8       For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART AND

9   DENIES IN PART defendants' motion for summary judgment and GRANTS IN PART AND DENIES

10  IN PART plaintiff's motion for leave to file an amended complaint.

11      **IT IS SO ORDERED.**

12

13  Dated: July 1, 2009                    _____

14                                         SUSAN ILLSTON
                                           United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California