1  **SMOGER & ASSOCIATES**
Gerson H. Smoger (SBN 79196)
2  Gerson@texasinjurylaw.com
Steven M. Bronson (SBN 246751)
3  steven.bronson@gmail.com
3175 Monterey Blvd
4  Oakland, CA, 94602-3560
Tel:   (510) 531-4529
5  Fax:  (510) 531-4377

6  **BROWNE WOODS GEORGE LLP**           **ARBOGAST & BERNS LLP**
Lee A. Weiss (Admitted *Pro Hac Vice*)      David M. Arbogast (SBN 167571)
7  lweiss@bwgfirm.com                      darbogast@law111.com
Rebecca Tingey (Admitted *Pro Hac Vice*)   Jeffrey K. Berns, Esq. (SBN 131351)
8  rtingey@bwgfirm.com                     jberns@law111.com
49 West 37th Street                     19510 Ventura Boulevard, Suite 200
9  New York, New York 10018               Tarzana, California 91356
Phone: (212) 354-4901                   Phone: (818) 961-2000
10  Fax:   (212) 354-4904                   Fax:    (818) 654-5988

11  [*Additional counsel listed on signature page*]
Attorneys for Plaintiffs and all others similarly situated
12

13              **UNITED STATES DISTRICT COURT**

14      **NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION**

15

16  GREGORY M. JORDAN, ELI GOLDHABER    )   **CASE NO. 3:07-cv-04496-SI**
and JOSEPHINA GOLDHABER, individually )
17  and on behalf of all others similarly situated, )   **THIRD AMENDED CLASS ACTION**
)   **COMPLAINT FOR:**
18              Plaintiffs,             )
)   **(1)    Violations of the Truth in Lending Act, 15**
19                                      )        **U.S.C. §1601, *et seq*;**
v.                      )
20                                      )   **(2)    Fraudulent Omissions; and**
)
21  PAUL FINANCIAL, LLC, LUMINENT       )   **(3)    Violation of Bus. & Prof. Code §17200, *et***
MORTGAGE CAPITAL, INC., HSBC BANK )        ***seq*. – "Unlawful," "Unfair" and**
22  USA, N.A., AS TRUSTEE OF LUMINENT    )        **"Fraudulent" Business Practices;**
MORTGAGE TRUST 2006-2, and DOES 1 )
23  through 10 inclusive,                )
)
24                                      )
Defendants.             )
25                                      )   **JURY TRIAL DEMANDED**
)
26  _____ )

27

28

_____
*Third Amended Class Action Complaint - 3:07-cv-04496-SI*

Plaintiffs GREGORY M. JORDAN, ELI GOLDHABER and JOSEPHINA GOLDHABER, individually and on behalf of all others similarly situated alleges as follows:

## I.

## INTRODUCTION

1.     This is an action pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C. §§1601, *et seq.,* California's Unfair Competition Law (the "UCL"), Bus. & Prof. Code §§ 17200, *et seq.,* and other statutory and common law.  Plaintiffs GREGORY M. JORDAN, ELI GOLDHABER and JOSEPHINA GOLDHABER, individually, and on behalf of all others similarly situated, bring this action against PAUL FINANCIAL, LLC,  LUMINENT MORTGAGE CAPITAL, INC.,[1] HSBC BANK USA, N.A., AS TRUSTEE OF LUMINENT MORTGAGE TRUST 2006-2, and DOES 1-10 (collectively, "Defendants"), based upon Defendants' failure to clearly, unambiguously and conspicuously disclose to Plaintiffs and the Class Members, in Defendants' Option Adjustable Rate Mortgage ("Option ARM") loan documents, and in the accompanying required disclosure statements:   (i) the actual interest rate on the note(s) (12 C.F.R. § 226.17);  (ii) that the initial interest rate disclosed in the Note would last only one month, was discounted, and was substantially lower than the actual interest that Plaintiffs and Class Members would be charged on the Notes; (iii) that the amount of monthly payments provided for in the Note and for the first 3-5 years in the Truth in Lending Disclosure Statement ("TILDS") was based entirely on the "teaser" rate; and (iv) after one month, would not be sufficient to even pay the interest being charged, let alone amortize the loan, so that each month the principal balance would increase even if the payments were made as scheduled (12 C.F.R. § 226.19).  (Hereinafter, (i) through (iv) shall be referred to as "The Material Omissions").

/ / /

/ / /

/ / /

---

[1]  LUMINENT MORTGAGE CAPITAL, INC. filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Maryland on September 5, 2008.  As LUMINENT MORTGAGE CAPITAL, INC. remains in bankruptcy, Plaintiffs' action against LUMINENT MORTGAGE CAPITAL, INC. is currently stayed.

Third Amended Class Action Complaint - 3:07-cv-04496-SI

## II.

## <u>THE PARTIES</u>

2.      Plaintiff GREGORY M. JORDAN is, and at all times relevant to this Complaint was, an individual residing in Discovery Bay, California.  On or about December 30, 2005, Plaintiff Jordan refinanced his existing home loan and entered into an Option ARM loan agreement with PAUL FINANCIAL which was secured by Mr. Jordan's primary residence.  Attached hereto as <u>Exhibit 1</u> is a true and correct copy of the Note and Truth and Lending Disclosure Statement ("TILDS") (collectively, the "Loan Documents") pertinent to this action.  PAUL FINANCIAL, LLC sold Mr. Jordan's loan to LUMINENT MORTGAGE CAPITAL, INC. on January 24, 2006.   The loan is currently held in a mortgage-backed securities pool, the LUMINENT MORTGAGE TRUST 2006-2 ("LUMINENT TRUST").  Defendant HSBC BANK USA, N.A. is the trustee of the pool.[2]

3.      Plaintiffs ELI GOLDHABER and JOSEPHINA GOLDHABER are, and at all times relevant to this Complaint were, individuals residing in Valencia, California.  On or about July 28, 2005, Mr. and Mrs. Goldhaber refinanced their existing home loan and entered into an Option ARM loan agreement with Defendant PAUL FINANCIAL, LLC.  Attached hereto as <u>Exhibit 2</u> is a true and correct copy of the Loan Documents pertinent to this action.

4.      Defendant PAUL FINANCIAL, LLC ("PAUL FINANCIAL") is a California corporation licensed to do, and is doing business in California, with its principle place of business located at 1401 Los Gamos Drive, San Rafael, California.  At all relevant times hereto PAUL FINANCIAL was engaged in the business of originating and selling the Option ARM loans that are the subject of this Complaint.  PAUL FINANCIAL transacts business in Alameda County, California and at all relevant times originated and sold Option ARM loans throughout the United States, including Alameda County, California.  PAUL FINANCIAL has significant contacts with Alameda County, California, and the activities complained of herein occurred, in whole or in part, in Alameda County, California.

/ / /

---

[2] All claims against LUMINENT MORTGAGE CAPITAL (currently stayed) and HSBC BANK USA, N.A. are brought solely by Plaintiff GREGORY JORDAN, individually, and on behalf of all similarly situated Class Members.

5. From its headquarters in San Rafael, California, PAUL FINANCIAL created, approved and sold the Option ARM loans that are the subject of this complaint. PAUL FINANCIAL sold a significant number of the subject Option ARM loans to California residents. Plaintiffs are informed and believe and thereon allege that PAUL FINANCIAL's employees and/or agents responsible for the creation, approval and selling of the subject Option ARM loans are located in California and/or the decisions concerning approval of the loan forms and/or approval of the Plaintiffs and the Class Members loans where authorized and/or approved by PAUL FINANCIAL's corporate officers, executives and employees located in California.

6. Defendant LUMINENT MORTGAGE CAPITAL, INC. ("LUMINENT CAPITAL") is a Maryland Corporation, headquartered at One Market Street, Spear Tower, 30th Floor, San Francisco, CA, 94105. Plaintiffs are informed, believe, and thereon allege that on January 24, 2006, PAUL FINANCIAL sold Plaintiff JORDAN's Option ARM loan that is the subject of this action to Defendant LUMINENT CAPITAL. Plaintiffs are further informed, believe, and thereon allege that:

(a) LUMINENT CAPITAL is, and or was, in the business of, among other things, securitizing home mortgage loans by packaging those loans into trusts or other vehicles so that it could sell bonds to investors based on the income to be derived from those loans. LUMINENT TRUST and HSBC BANK USA, N.A. are critical and necessary participants in that securitization process, as LUMINENT TRUST is one of the trusts LUMINENT CAPITAL used to hold the mortgage loans it securitized and HSBC BANK USA acts as the trustee for numerous trusts LUMINENT CAPITAL created during the liability period;

(b) LUMINENT CAPITAL agreed to purchase and did purchase numerous Option ARM mortgages originated by PAUL FINANCIAL. Through that arrangement, PAUL FINANCIAL collected fees from the homeowners to whom it sold the Option ARM loans as well as from LUMINENT CAPITAL, while LUMINENT CAPITAL collected revenues through the securitization process; and

(c) LUMINENT CAPITAL's agreement to purchase the Option ARM loans sold by PAUL FINANCIAL was critical to PAUL FINANCIAL's ability to market and

1    sell those loans to Plaintiffs and other homeowners, since PAUL FINANCIAL

2    lacked the financial resources to continue to issue the Option ARM loans here at

3    issue unless it was able to sell them to investors such as LUMINENT CAPITAL.

4    7.    Defendant HSBC BANK USA, N.A. ("HSBC BANK USA" or the "Trustee"), AS

5    TRUSTEE OF LUMINENT MORTGAGE TRUST 2006-2, is a national banking association

6    headquartered in Wilmington, Delaware, licensed to do business and is doing business in California.

7    The LUMINENT TRUST presently owns and or owned some or all of the Option ARM loans that are

8    the subject of this Complaint, including Plaintiff JORDAN's Option ARM loan and other Option ARM

9    loans originated, recorded and held in Alameda County.   The LUMINENT TRUST has significant

10   contacts with Alameda County, California, and the activities complained of herein occurred, in whole or

11   in part, in Alameda County, California.  At all times relevant, LUMINENT TRUST is and was a critical

12   and necessary participant in the securitization process described above, as the LUMINENT TRUST is

13   one of the trusts LUMINENT CAPITAL used to hold the mortgage loans it securitized.  HSBC BANK

14   USA is a critical and necessary participant in the securitization process described above, as HSBC

15   BANK USA has acted as the trustee for LUMINENT TRUST at issue and, upon information and belief,

16   numerous of the trusts LUMINENT CAPITAL and others created.

17   8.    While providing that stream of financing to PAUL FINANCIAL, Defendants

18   LUMINENT CAPITAL and the LUMINENT TRUST were aware of the Material Omissions.

19   9.    At all times mentioned herein, Defendants were engaged in the business of originating,

20   selling, servicing, and/or owning, and/or are or were the assignees of the Option ARM loans that are the

21   subject of this Complaint, throughout the United States, including in Alameda County, California.

22   10.    Plaintiffs are informed, believe, and thereon allege, that each of the aforementioned

23   Defendants is responsible in some manner, either by act or omission, strict liability, fraud, deceit,

24   fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise, for the

25   occurrences herein alleged, and that Plaintiffs' injuries, as herein alleged, were proximately caused by

26   the conduct of Defendants.

27   11.    Plaintiffs are informed, believe, and thereon allege, that at all times material hereto and

28   mentioned herein, each of the Defendants sued herein was the agent, servant, employer, joint venturer,

1  partner, division, owner, subsidiary, alias, assignee and/or alter-ego of each of the remaining Defendants

2  and was at all times acting within the purpose and scope of such agency, servitude, joint venture,

3  division, ownership, subsidiary, alias, assignment, alter-ego, partnership or employment and with the

4  authority, consent, approval and ratification of each remaining Defendant.

5       12.     Plaintiffs are informed, believe, and thereon allege, that at all times herein mentioned,

6  each Defendant was acting in concert or participation with each other, or were joint participants and

7  collaborators in the acts complained of, and was the agent or employee of the others in doing the acts

8  complained of herein, each and all of them acting within the course and scope of said agency and/or

9  employment by the others, each and all of them acting in concert one with the other and all together.

10 Each Defendant was the co-conspirator, agent, servant, employee, assignee and/or joint venturer of each

11 of the other Defendants and was acting within the course and scope of said conspiracy, agency,

12 employment, assignment and/or joint venture and with the permission and consent of each of the other

13 Defendants.

14      13.     Plaintiffs are informed, believe, and thereon allege, that DOES 1 through 10, inclusive,

15 are securitized trusts, equity funds, collateralized debt obligations (CDO), CDO underwriters, CDO

16 trustees, hedge funds or other entities that acted as additional lenders, loan originators and/or are

17 assignees to the loans which are the subject of this action.  Plaintiffs will seek leave of Court to replace

18 the fictitious names of these entities with their true names when they are discovered.

19      14.     The true names and capacities, whether individual, corporate, associate or otherwise, of

20 Defendants DOES 1 through 10, inclusive, and each of them, are unknown to Plaintiffs at this time, and

21 Plaintiffs therefore sue said Defendants by such fictitious names.  Plaintiffs allege, on information and

22 belief, that each Doe defendant is responsible for the actions herein alleged.  Plaintiffs will seek leave of

23 Court to amend this Complaint when the names of said DOE defendants have been ascertained.

24      15.     Pursuant to California Civil Code § 1459 and Code of Civil Procedure § 368, Defendants

25 LUMINENT CAPITAL, HSBC BANK USA, as trustee of the LUMINENT TRUST, and DOES 1-10

26 are subsequent purchasers and/or assignees of Plaintiffs' and the Class Members loans.  At all times

27 relevant, Defendants LUMINENT CAPITAL, HSBC BANK USA, as trustee of the LUMINENT

28 TRUST, and DOES 1-10 are and/or were sophisticated and knowledgeable entities whose businesses

1  included purchasing, packaging, securitizing and selling interests in the subject Option ARM loans.  The

2  subject PAUL FINANCIAL Option ARM loans at issue are non-negotiable instruments within the

3  meaning of Civil Code § 1459 and at all times relevant, Defendants LUMINENT CAPITAL, HSBC

4  BANK USA, as trustee of the LUMINENT TRUST, and DOES 1-10 purchased, packaged, securitized

5  and/or sold the subject Option ARM loans with full knowledge of the failures to disclose and material

6  omissions as alleged herein.   Defendants LUMINENT CAPITAL, HSBC BANK USA, as trustee of the

7  LUMINENT TRUST, and DOES 1-10 therefore "stand in the shoes" of the assignor PAUL

8  FINANCIAL, taking their rights and remedies, subject to any defenses that the obligor (Plaintiffs and

9  Class Members) has against the assignor (PAUL FINANCIAL) prior to notice of the assignment.  15

10  U.S.C. § 1641 provides that assignees are liable for violations that are apparent on the face of disclosure

11  documents and other assigned loan documents.

12

13                                                   **III.**

14                                **JURISDICTION AND VENUE**

15          16.     This Court has subject matter jurisdiction pursuant to 15 U.S.C §§ 1601 *et seq.* and 28

16  U.S.C. §§  1331 and 1367(a).

17          17.     This Court has personal jurisdiction over the parties in this action, because Defendants

18  are either individuals who reside in this District within California or are corporations duly licensed to do

19  business in California.

20          18.     Venue is proper within this District and Division pursuant to 28 U.S.C. §1391(b),

21  because a substantial part of the events and omissions giving rise to the claims occurred in this district,

22  and because there is personal jurisdiction in this District over the named Defendants because they

23  regularly conduct business in this judicial district.

24

25                                                   **IV.**

26                           **FACTS COMMON TO ALL CAUSES OF ACTION**

27          19.     The Option ARM loans that are the subject of this Complaint are the loans sold by

28  PAUL FINANCIAL with the following common characteristics: (i) the Monthly Payment Amount

Third Amended Class Action Complaint - 3:07-cv-04496-SI

1    stated in the Note is based upon a low "teaser" interest rate which ranges from 1% to 3%; (ii) the

2    payment schedule listed in the TILDS, for the first 3-5 years of the Note, is based upon a fully

3    amortizing payment at the "teaser" interest rate; (iii) the interest rate "adjusts" after only one month to a

4    rate which is the sum of the "index" and the "margin"; and (iv) after the first 3-5 years, the amount of

5    monthly payments increases .

6          20.    At all times material hereto, for Plaintiffs' and Class Members' Option ARM loans, the

7    sum of the index and the margin would necessarily result in an interest rate that always exceeded the

8    "teaser" rate by several percentage points.  As a result, after only one month, the interest accruing on the

9    note more than doubled  from an amount which was usually below 2%  to an amount of at least 4%, and

10   in some cases up to 8%.  Because of this dramatic interest rate adjustment after only one month, the

11   monthly payment, which was calculated based on a fully amortizing payment at the low teaser rate, was

12   no longer sufficient to even pay the interest which accrued on the note, and the balance owed increases

13   even if the payments are made as scheduled on the Note and the TILDS.  This process is known as

14   negative amortization, and Defendants knew it was certain to occur because of the large spread between

15   the teaser rate and the combined index and margin.  Indeed the margin alone was consistently higher

16   than the "teaser" rate.  Even if the index went down to zero, the combined total of the margin and index

17   would never be close to the "teaser" rate, and thus the Option ARM loans at issue would always, and

18   were designed to, cause negative amortization.  Defendants never disclosed to Plaintiffs and Class

19   Members this material information.  Had Defendants disclosed this material information, Plaintiffs and

20   Class Members would not have purchased the subject Option ARM loans.

21         21.    Because of the way Defendants structured these Option ARM loans, it was certain that,

22   as scheduled payments were made each month, each Class Member would owe more money than he or

23   she did at the start of the loan, and have less time to pay it back.  Indeed, every time Plaintiffs and Class

24   Members made a payment in the amount reflected in the TILDS, the principal balance on their loan

25   increased.  To make matters worse, this "deferred interest" was added to the principal balance and, in

26   turn accrued more interest – in effect using compound interest to increase the balance owed by each

27   borrower.

28   / / /

7

22.     Although the Defendants knew that negative amortization was certain to occur, they never disclosed this to Plaintiffs or Class Members, who refinanced their homes and entered into these loans without ever receiving this material information.  Had Defendants disclosed this material information, Plaintiffs and Class Members would not have purchased the subject Option ARM loans.

23.     The two most important pieces of information in any mortgage loan are the interest rate and the amount of the monthly payments.  On the Defendants' Option ARM loans, the disclosures of both pieces of this information were misleading and omitted material facts.  Defendants disclosed a teaser interest rate, but they did not disclose that this rate would sharply increase after only one month. Defendants disclosed a low monthly payment for the first 3-5 years of the loan, which was based on the teaser rate, but this did not reflect the actual amount of interest being charged or the amount Plaintiffs and Class Members actually owed each month.

24.     Plaintiffs and Class Members were not informed of the sharp increase in the interest rate, and the fact that their monthly payments were not enough to pay the interest accruing on the loan, until they had made at least several payments following the closing of the loan, at which time they would receive a statement showing that the principal balance had increased with each month that had passed since the loan closed, despite the fact that the borrower had made all payments as scheduled.

25.     By the time this material information was disclosed to Plaintiffs and Class Members, they were "locked" into the loan by a draconian prepayment penalty consisting of a prepayment charge equal to the interest rate that would accrue during a six-month period of the amount prepaid (if the prepayment amount was greater than 20% of the original principal amount stated in the Note), which was calculated at the rate of interest in effect under the terms of the Note at the time of the prepayment for a prepayment occurring during the first two to three years of the loan.  This draconian provision was designed by Defendants to deter anyone from refinancing the loan during the applicable time period.

26.     Before committing themselves to these Option ARM loans, Plaintiffs and Class Members were never told the amount by which their loan balances would increase over either the first two or three years of the loan, even though Defendants actually performed this calculation internally.  This increase in the loan balance is material information to any consumer entering into these loans, because it effectively strips the homeowners of equity in their homes, while greatly impairing their ability to

refinance these loans once they recast to substantially higher monthly payments.  Thus, the loans were structured so that once borrowers were given or discovered the material information that their loans were negatively amortizing, Plaintiffs and Class Members could only get out of the loans if they incurred a substantial prepayment penalty, or waited two to three years, in which case they would have to refinance a substantially larger principal amount.  Had Defendants disclosed this material information, Plaintiffs and Class Members would not have purchased the subject Option ARM loans.

27.   Each subject Option ARM loan has so-called payment caps, which provide that, even after the monthly payment increases, it will not increase by more than 7.5% per year.  These payment caps are, however, subject to an overall cap on principal of 110% of the original loan amount.  Once the loan principal reaches this 110% cap, the 7.5% limitation on payment increases no longer applies, and the payment generally will  increase by more than that amount.  This built-in "payment shock" is more than many Class Members can afford, designed to put them at  risk of losing their homes to foreclosure.

28.   However, the most that Defendants' loan documents said about negative amortization was that it "may" occur.  This was ambiguous, misleading and deceptive, because it implies that negative amortization was subject to some future contingency, such as an increase in the index on which the adjustable rate was purportedly based, when, in fact, it was *guaranteed* to occur after only one month, even if the index stayed the same or went down.

29.   The undisclosed fact that negative amortization is certain to occur on the subject loans and information regarding the interest rate to be charged on the loan was information that Plaintiffs and Class Members would have found material when deciding whether to purchase the subject Option ARM loans.  Despite this, Defendants never disclosed to Plaintiffs and Class Members this material information.  Had Defendants disclosed this material information, Plaintiffs and Class Members would not have purchased the subject Option ARM loans.

30.   The failure of Defendants to disclose this material information in the loan documents violated TILA, state consumer protection statutes, and common law, as more fully set forth below.

31.   The loan characteristics described above were true of the named Plaintiffs' loans, which used Paul Financial loan form numbers: 3601 1/01, 3602 1/01, 3602 1/01 (PF0093), 3602 1/01 (PF 0131) and loan form number 3620 1/01 (PF 1311).   These were also common characteristics of the

above-referenced loan forms used by Defendant Paul Financial during the liability period.  It is these loan forms that are the subject of this Complaint.

# V.

## CLASS ACTION ALLEGATIONS

32.    Plaintiffs bring this action on behalf of themselves, and on behalf of all others similarly situated, pursuant to Federal Rule of Civil Procedure, Rules 23(a), and 23(b).  The classes that Plaintiffs seek to represent are defined as follows:

> All individuals who, within the four-year period preceding the filing of
> Plaintiffs' original complaint through the date that notice is mailed to
> potential Class Members, obtained a PAUL FINANCIAL, LCC Option
> ARM loan on Loan Form Version Nos.: Form 3601 1/01; Form 3602 1/01;
> Form 3602 1/01 (PF0093); Form 3602 1/01 (PF 0131); or Form 3620 1/01
> (PF 1311) on their home located in the State of California or on their
> home located outside the State of California where the loan was approved
> in or disseminated from California.  Excluded from the California Class
> are Defendants' employees, officers, directors, agents, representatives, and
> their family members, as well as the Court and its officers, employees, and
> relatives.

Plaintiffs reserve the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time, or to propose or eliminate sub-Classes in response to facts learned through discovery or legal arguments advanced by Defendants or otherwise.

33.    Numerosity:  The classes and subclasses are so numerous that the individual joinder of all members thereof  is impracticable under the circumstances of this case.  While the exact number of class members is unknown at this time, Plaintiffs are informed and believe that the entire Class or Classes consist of approximately tens of thousands of members.

34.    Commonality:  Common questions of law or fact are shared by Class Members.  This action is suitable for class treatment, because these common questions of fact and law predominate over

any individual issues.  Such common questions include, but are not limited to, the following questions including questions related to the Paul Financial loan document forms:  Form 3601 1/01; Form 3602 1/01; Form 3602 1/01 (PF0093); Form 3602 1/01 (PF 0131); and  Form 3620 1/01 (PF 1311) (hereinafter referred to as "The Loan Documents"):

        (a)     Whether The Loan Documents violated TILA;

        (b)     Whether The Loan Documents violated 12 C.F.R. § 226.17;

        (c)     Whether The Loan Documents violated 12 C.F.R. § 226.19;

        (d)     Whether Defendants engaged in unfair business practices likely to deceive Plaintiffs and Class Members before and during the loan application process;

        (e)     Whether Defendants concealed, omitted and/or otherwise failed to disclose information they were mandated to disclose under TILA, state consumer protection statutes, and/or the common law;

        (f)     Whether Defendants failed to disclose to Plaintiffs and Class Members, before they entered into the subject Option ARM loans, that negative amortization was certain to occur;

        (g)     Whether LUMINENT CAPITAL, HSBC BANK USA, as trustee of the LUMINENT TRUST, and other subsequent purchasers and/or assignees are liable for PAUL FINANCIAL's violations of TILA as alleged herein;

        (h)     Whether The Loan Documents are non-negotiable instruments;

        (i)     Whether Defendants' failures to disclose material information, as alleged herein, are apparent on the face of the Loan Documents;

        (j)     Whether LUMINENT CAPITAL, HSBC BANK USA, as trustee of the LUMINENT TRUST, and other subsequent purchasers and/or assignees are liable for PAUL FINANCIAL's fraudulent omissions and UCL violations as alleged;

        (k)     Whether LUMINENT CAPITAL, HSBC BANK USA, as trustee of the LUMINENT TRUST, and other subsequent purchasers and/or assignees knowingly assisted and aided and abetted PAUL FINANCIAL in its scheme to sell Option ARM loans to Plaintiffs and Class Members without disclosing the

1    material information described herein;

2    (l)    Whether Plaintiffs and Class Members are entitled to damages;

3    (m)   Whether Plaintiffs and Class Members are entitled to punitive damages; and

4    (n)    Whether Defendants' affirmative defenses, if any, raise common issues of fact or

5    law as to Plaintiff and Class Members as a whole.

6    35.    Typicality:  Plaintiffs' claims are typical of the claims of absent Class Members.

7    Plaintiffs and the other Class Members were subjected to the same kind of unlawful conduct and the

8    claims of Plaintiffs and the other Class Members are based on the same legal theories.

9    36.    Adequacy:  Plaintiffs are adequate representatives of the Class, because their interests do

10   not conflict with the interests of the other members of the Class Plaintiffs seek to represent.  Plaintiffs

11   have retained counsel competent and experienced in complex class action litigation and Plaintiffs intend

12   on prosecuting this action vigorously.   The interests of members of the Class will be fairly and

13   adequately protected by Plaintiffs and their counsel.

14   37.    Ascertainable Class:  The proposed classes are ascertainable in that the members can be

15   identified and located using information contained in Defendants' mortgage lending records.

16   38.    This case is brought and can be maintained as a class action under Rule 23(b)(1),

17   23(b)(2), and 23(b)(3):

18   (a)    Injunctive and/or Declaratory Relief to the Class is Appropriate:  Defendants, and each of

19   them, have acted or refused to act on grounds generally applicable to each class, thereby

20   making final injunctive relief or corresponding declaratory relief with respect to each

21   class as a whole appropriate; and

22   (b)    Predominant Questions of Law or Fact:  Questions of law or fact common to all Class

23   Members, including those identified above, predominate over questions affecting only

24   individual Class Members (if any), and a class action is superior to other available

25   methods for the fair and efficient adjudication of the controversy.  Class action treatment

26   will allow a large number of similarly situated consumers to prosecute their common

27   claims in a single forum, simultaneously, efficiently, and without the unnecessary

28   duplication of effort and expense that numerous individual actions would require.

Moreover, absent class treatment of this controversy, the amount of individual Class Members' losses in comparison to the enormous cost of litigation makes it almost certain that few Class Members would ever be able to even seek, let alone obtain, redress for their injuries.

## VI.

### FIRST CAUSE OF ACTION

**Violations of Truth in Lending Laws, 15 U.S.C. §1601, *et seq.***

**(Against All Defendants)**

39.     Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

40.     Defendants violated TILA through The Material Omissions by:  (1) failing to disclose that negative amortization was certain to occur; (2) establishing a payment schedule that was not based on the annual percentage rate (APR), but rather an interest rate that applied for at most only 30 days; (3) listing in the TILDS an APR having no relation to the monthly payment listed for the first three to five years; (4) failing to disclose that the initial interest rate listed in the Note was discounted; and (5) failing to disclose the certainty of negative amortization in the Loan Documents provided to Plaintiffs and Class Members before they entered into subject Option ARM loans.

41.     12 C.F.R. § 226.19 sets forth additional specific disclosure requirements for residential home loans, stating as follows:

> 226.19.  Certain residential mortgage and variable-rate transactions. . . .
> (b) Certain variable-rate transactions.  If the annual percentage rate may increase after consummation in a transaction secured by the consumer's principal dwelling with a term greater than one year, the following disclosures must be provided at the time an application form is provided or the consumer pays a non-refundable fee, whichever is earlier. . .
> (vii) *Any rules relating to changes in the index, interest rate, payment amount, and outstanding loan balance including, for example, an explanation of interest rate or payment limitations, negative amortization, and interest rate carryover*. (Emphasis added.)

42.     In 1995, and continuing each time new Official Staff Commentary was issued, the Federal Reserve Board ("FRB") made clear that when a loan was a variable rate loan with payment caps, such as those that are the subject of this lawsuit, the disclosure requires a definitive statement

Third Amended Class Action Complaint - 3:07-cv-04496-SI

about negative amortization:

> 12 CFR Part 226
> [Regulation Z; Docket No. R-0863]
> Monday, April 3, 1995
> AGENCY: Board of Governors of the Federal Reserve System.
> ACTION: Final rule; official staff interpretation.
> If a consumer is given the option to cap monthly payments
> that may result in negative amortization, the creditor must
> fully disclose the rules relating to the option, including the
> effects of exercising the option (*such as negative
> amortization will occur and the principal balance will
> increase*)… (Found at 12 C.F.R. Pt. 226, Supp. I,
> 19(b)(2)(vii)-2 (emphasis added).

43.     At all times relevant, statutory and common law in effect make it unlawful for a lender, such as Defendants, to fail to comply with the Federal Reserve Board's Official Staff Commentary as well as Regulation Z and TILA.

44.     Defendants, and all assignees who purchased the loan from Defendant PAUL FINANCIAL, were aware, or should have been aware, that this loan product had a variable rate with payment caps and that the Loan Documents omitted The Material Facts, including that negative amortization was a certainty.  On information and belief, Defendants were aware of the guaranteed negative amortization, because they accrued the negative amortization as income for accounting and/or tax purposes.  Defendants were also aware the negative amortization was certain to occur, because, in computing the total finance charge payable over the full life of the loan for purposes of compiling the TILDS, they included the interest on "deferred interest" which would accrue because the scheduled payments were insufficient to pay all interest due on the loan.  The TILDS, however, did not disclose the fact negative amortization was a certainty, or the amount of the total finance charge that resulted from this negative amortization.

45.     The only places in the Notes that even inferentially reference negative amortization suggest that negative amortization is only a mere possibility, rather than an absolute certainty.  For instance, PAUL FINANCIAL's statement in the Notes, at ¶ 3(E) stated that the borrower's "monthly payment ***could*** be less than the amount of the interest portion of the monthly payment"(emphasis added), which was a half-truth, because it did not state that the payment schedule provided by PAUL FINANCIAL would absolutely guarantee that negative amortization was going to occur on these loans.

46.     Had Defendants disclosed to Plaintiffs and Class Members that negative amortization was certain to occur if the payment schedule in the TILDS was followed, Plaintiffs and Class Members would not have entered into the loan.

47.     Additionally, 12 C.F.R. §§ 226.17 and 226.19 require the lender to make disclosures concerning the payments in a clear and conspicuous manner.  A misleading disclosure is as much a violation of TILA as a failure to disclose at all.

48.     The scheduled payment amounts and APR listed in the Note and TILDS for each of the subject loans are unclear, because the payment amounts for the first three to five years are not based on the APR listed in the TILDS, but, instead, were based upon an APR listed in the Note that Defendants knew would exist for only thirty (30) days.  At all times relevant, Defendants failed to disclose that even if Plaintiffs and Class Members made payments according to the payment schedule set forth in the TILDS, negative amortization was an absolute certainty.  Had Defendants clearly and conspicuously disclosed the payment amount sufficient to cover both principal and interest based upon the index and margin that would be used to calculate the payments after the first month, the payment amounts would have been approximately double the payment amounts listed.

49.     Official Staff Commentary to 12 C.F.R. § 226.17(a)(1) states:  "This standard requires that disclosures be in a reasonably understandable form.  For example, while the regulation requires no mathematical progression or format, the disclosures must be presented in a way that does not obscure the relationship of the terms to each other…"

50.     At all times relevant, the Loan Documents violated 12 C.F.R. § 226.17(a)(1) in that the relationship between the payments, for up to the first five years of the loans, bear no relationship to the APR listed in the TILDS.  Therefore, the form of disclosure used by Defendants obscured the relationship between the APR listed in the Note(s) and the APR listed in the TILDS and the monthly payments listed in the payment schedule.

51.     Next, 12 C.F.R. § 226.17(c)(1) requires that "[t]he disclosures shall reflect the terms of the legal obligation between the parties."  Official binding staff commentary on 12 C.F.R. § 226.17(c)(1) requires that "[t]he disclosures shall reflect the credit terms to which the parties are legally bound as of the outset of the transaction.  In the case of disclosures required under § 226.20©, the

disclosures shall reflect the credit terms to which the parties are legally bound when the disclosures are provided." The official binding staff commentary further states, at 12 C.F.R. § 226.17(c)(1)(2), that "[t]he legal obligation normally is presumed to be contained in the note or contract that evidences the agreement." Official staff commentary to 12 C.F.R. § 226.17(c)(1) states that "[i]f a loan contains a rate or payment cap that would prevent the initial rate or payment, at the time of the first adjustment, from changing to the rate determined by the index or formula at consummation, the effect of that rate or payment cap should be reflected in the disclosures."

52.     At all times relevant during the liability period, the Loan Documents violated 12 C.F.R. § 226.17(c) in that the Notes and TILDS did not disclose that the liability that Plaintiffs and Class Members were incurring was substantially greater than the amount of their scheduled payments. Further, Defendants failed to disclose to Plaintiffs and Class Members that the initial interest rate was discounted, and that it was absolutely certain to substantially increase after only one month, even when the index did not rise. To the extent that Defendants did in any way provide a disclosure that stated that the initial payment was not based on the index, they failed to do so in a manner that was clear and conspicuous, and that did not obscure its importance, or that was designed to be reasonably understood by the ordinary consumer. Rather than disclose that the interest rate would increase after only one month, the Loan Documents stated that the initial payment was based on a "yearly rate" of 1-3%. The Loan Documents did not clearly and unambiguously disclose that this initial rate was discounted, and would only last for one month.

53.     PAUL FINANCIAL also failed to disclose to Plaintiffs and Class Members before they entered into the subject Option ARM loans all of the ways by which the interest rate applicable to the subject loans could increase, in violation of TILA.

54.     The foregoing violated 15 U.S.C. § 1638(a)(4), which requires lenders to disclose only one APR and not an additional APR that is only applicable for the first 30 days of a loan.

55.     It also violates FRB Commentary to 12 C.F.R § 226.(17)(C)-6 which requires that the APR must "reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation."

56.     It violates 15 U.S.C. § 1638(a)(8) and 12 C.F.R § 226.18(e), which requires lenders to provide a descriptive explanation of the APR, which is defined as the cost of credit expressed as a yearly rate.

57.     It violates 12 C.F.R. § 226.17 (and the commentary thereto) and 12 C.F.R. § 226.19, which, together, require lenders to make disclosures concerning the APR in a clear and conspicuous manner; and a misleading disclosure is as much a violation of TILA as a failure to disclose at all.

58.     At all times relevant during the liability period, Defendants provided Plaintiffs and Class Members with Notes that state:   "I will pay interest at a yearly rate of [1.000% - 3.000%]."  However, in the TILDS, the box entitled "ANNUAL PERCENTAGE RATE" describes the APR as "[t]he cost of your credit as a yearly rate" and then lists a much higher APR than the APR listed in the Notes.  For instance, in the case of Plaintiff JORDAN, it listed an APR of "6.990."

59.     Thus, the listed APR would actually conflict with the APR stated in the TILDS.  For instance, in the case of Plaintiff Jordan  the "1.000%" APR stated in the Note contradicts the "6.990" APR that PAUL FINANCIAL stated in the TILDS.  And for the Goldhaber's, the TILDS lists an APR of "6.619 %", but the Note lists an APR of "1.375%."  Thus, the "1.375%" APR stated in the Note contradicts the "6.619%" APR that PAUL FINANCIAL stated in the TILDS.

60.     At all times relevant during the liability period, Defendants failed to clearly and conspicuously explain in the Note or TILDS that the low APR (the same APR upon which Defendants base the written payment schedule provided to Plaintiffs) was offered only for the first thirty (30) days of the loan.

61.     Defendants also failed to disclose to Plaintiffs and Class Members that the APR listed in the TILDS was not the APR used to determine the first five years of payments listed in the very same TILDS, and that the listed payment amounts for the first five years of the loan were based on the interest rate stated in the Note, an interest rate which  was correct for no more than thirty days.

62.     The FRB's commentary to 12 C.F.R § 226.17(C)-6 requires that the APR must "reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation."  Additionally,

in a variable-rate transaction with a...discounted or premium rate, disclosures should not be based solely on the initial terms.  In those transactions, the disclosed annual percentage rate should be a composite rate based on the rate in effect during the initial period and the rate that is the basis of the variable-rate feature for the remainder of the term.

63.     The reason for this requirement is clear.  Consumers cannot make an informed decision when they cannot compare the cost of credit to other proposals.  It therefore was incumbent upon Defendants to disclose to Plaintiffs and the Class Members before they entered into the subject Option ARM loans the composite interest rate, and the amount of payments based thereon, so that these borrowers could understand exactly what they would be paying for the loan.

64.     For Defendants who are in the business of making, purchasing and securitizing loans, the violations of TILA and Regulation Z described in this Complaint are objectively and  reasonably apparent on the face of the documents provided to Plaintiffs and Class Members, because the disclosures provided can be determined to be incomplete and inaccurate by a comparison among the TILDS, the other disclosure statements, and the Note described herein.

65.     As a direct and proximate result of Defendants' violations of TILA and its implementing regulations, Plaintiffs and Class Members have suffered injury in an amount to be determined at time of trial.

66.     WHEREFORE, Plaintiffs are entitled to an order declaring that the Loan Documents violated TILA, 15 U.S.C. §1601, et seq., that Plaintiffs have the right to rescind pursuant to 15 U.S.C. § 1635 and 12 C.F.R. § 226.23, attorneys' fees, litigation costs and expenses and costs of suit, and for an order rescinding Plaintiffs' individual mortgages and for an order awarding other relief as the Court deems just and proper.

## VII.

## SECOND CAUSE OF ACTION

### Fraudulent Omissions

### (Against All Defendants)

67.     Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

68.     As alleged above, under TILA, Defendants had a duty to clearly and conspicuously

18

1 disclose to Plaintiffs and each Class Member before they entered into the subject Option ARM loans: (I)

2 the payment schedule for the first three to five years was not based upon the APR listed on the TILDS,

3 (ii) that negative amortization would occur and that the "principal balance will increase"; (iii) that the

4 initial interest rate on the note was discounted; and (iv) the applicable annual percentage rate ("APR").

5      69.    Under common law, Defendants further had a duty to disclose to Plaintiffs, and Class

6 Members that: (I) the promised low interest rate was only available for thirty days if at all; (ii) the

7 payment rate for the first three to five years provided to Plaintiffs and Class Members on the TILDS was

8 insufficient to pay both principal and interest; (iii) negative amortization was absolutely certain to occur

9 if Plaintiffs and Class Members made payments according to the payment schedule provided by

10 Defendants; and that (iv) loss of equity and/or loss of Plaintiffs' and Class Members' residences was

11 certain to occur if Plaintiffs and Class Members made payments according to the payment schedule

12 provided by Defendants.

13      70.    PAUL FINANCIAL is liable under this Cause of Action because it was the originator of

14 some of the Plaintiffs' loans and provided the deficient loan documents and disclosures to Plaintiffs and

15 Class Members while concealing and omitting material information as alleged herein.  LUMINENT

16 CAPITAL, HSBC BANK USA, as trustee of the LUMINENT TRUST, and other subsequent purchasers

17 and/or assignee are liable under this Cause of Action (1)  as a result of their participation in a scheme

18 wherein they provided PAUL FINANCIAL with the deficient loan documents and disclosures, and

19 directed PAUL FINANCIAL to use those disclosures, despite the Material Omissions, (2)  to the degree

20 they provided the deficient loan documents and disclosures to Plaintiffs and Class Members directly,

21 and (3) because they are also responsible as purchasers and assignees of Plaintiffs' and Class Members'

22 loans.

23      71.    Each of The Loan Documents at issue states: "I will pay ***principal and interest*** by

24 making a payment every month." (Emphasis added).  The Loan Documents then state under

25 "BORROWERS FAILURE TO PAY AS REQUIRED," that "[t]he amount of the charge will ... of ***my***

26 ***overdue payment of Principal and Interest***." (Emphasis added).  These partial representations failed to

27 disclose that the payment amounts prescribed in the Loan Documents were certain to result in negative

28 amortization.

72.   The Notes further state that "my Minimum Payment **could be less** than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal." (Emphasis added).  However, the Loan Documents fail to disclose the material fact that the payment schedules provided by Defendants in the TILDS could not possibly cover the amount of interest due under *any* conceivable index rate plus the margin after the first 30 days.   To be accurate and complete, the Notes should have disclosed that if the borrowers followed the payment schedules set forth by Defendants, the Monthly Payments *would not* cover the amount of interest due and negative amortization *would in fact* occur.

73.   The Notes list an interest rate and a payment amount based on that initial interest rate. However, the TILDS that Defendants gave to Plaintiffs and Class Members before they entered into the subject loans included a schedule of payments (including that initial payment rate) but disclosed a different, much higher interest rate.  By stating the low teaser rate and associated monthly payment in the Note, and stating the much higher interest rate in the TILDS accompanied by a payment schedule based on the low teaser rate, Defendants failed to disclose the actual interest costs that borrowers were going to accrue on their loans.

74.   The Notes further state, under "Amount of My Initial Monthly Payments" that "Each of my initial monthly payments will be ...." and then it states "My monthly payment **may** change..." (Emphasis added).  However, under the terms of the subject Option ARM loan, Plaintiffs' and Class Members' loan "payment" was *absolutely guaranteed to go up the very next month.*   In particular, Defendants' Loan Documents failed to disclose and omitted the material fact that while the initial monthly payment amount would remain constant, the actual amount to pay for the loan was absolutely guaranteed to go up.

75.   Defendants purposefully and intentionally devised this Option ARM loan scheme of stating only partially true facts and omitting important material information in order to deceive consumers into believing that these loans would provide a low-interest rate loan for the first two (2) to five (5) years of the Note and that if they made their payments according to the payment schedule provided by Defendants their payments would be sufficient to pay both principal and interest.

/ / /

76.     Defendants designed, created, supplied, or were aware of the TILDS which set forth low payments for the first two to five years of the loan.   Defendants further knew, but did not clearly disclose, that these listed low payments in the TILDS were predicated on an interest rate which would not, in fact, exist after the first thirty days.  Defendants knew, but did not disclose, that negative amortization was *guaranteed* if borrowers made these listed low payments.   Defendants further knew, but did not disclose, that the listed payments set forth in the TILDS were calculated such that, if the payments were made, borrowers actually would be paying off 110% of the original principal balance. This information was material to any reasonable borrower, and the omission of such material information would cause a reasonable borrower to believe that the fully amortizing payments shown on the TILDS were in fact those payments necessary to pay off the balance of the original amount financed (i.e., the original principal balance less principal payments made on account of that balance), rather than110% of the amount financed.   Defendants could have easily disclosed, and should have accurately and clearly disclosed, that if borrowers paid the remaining payments listed on the TILDS they would in fact be paying 110% of the balance of the original financed amount, rather than merely the balance of the original amount financed.   But Defendants chose not to do so in furtherance of their scheme as alleged herein.

77.     At all times relevant, Defendants had exclusive knowledge of these materials facts, but actively concealed the material facts from Plaintiff and Class Members.

78.     The omitted information, as alleged herein, was objectively material to both the interest rate and the amount of payments, which are the two most important features of any mortgage loan.  Had Defendants disclosed this information, Plaintiffs and Class Members would not have purchased the loan products.

79.     As a direct and proximate result of Defendants' failures to disclose and omission of material facts, as alleged herein, Plaintiffs and Class Members have suffered damages, which include, but are not limited to the loss of equity Plaintiffs and each Class Member had in their homes prior to entering these loans.

80.     The wrongful conduct of Defendants, as alleged herein, including Defendants' placing of their corporate and/or individual profits over the rights of others, was willful, oppressive, immoral,

1  unethical, unscrupulous, substantially injurious, malicious and in conscious disregard for the well being

2  of Plaintiffs and Class Members, and particularly vile, base, contemptible, and wretched.  Such acts

3  and/or omissions were performed on the part of officers, directors, and/or managing agents of each

4  corporate defendant and/or taken with the advance knowledge of the officers, directors, and/or

5  managing agents who authorized and/or ratified said acts and/or omissions.  Defendants thereby acted

6  with malice and complete indifference to and/or conscious disregard for the rights and safety of others,

7  including Plaintiffs and the general public.  Accordingly, Plaintiffs and Class Members are entitled to an

8  award of punitive damages against Defendants in an amount to deter them from similar conduct in the

9  future.

10          81.     WHEREFORE, Plaintiffs and Class Members are entitled to all legal and equitable

11  remedies provided by law, including but not limited to actual damages, exemplary damages,

12  prejudgment interest and costs.

13

14                                              **VIII.**

15                               **THIRD CAUSE OF ACTION**

16      **Violation of California's Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et. seq.***

17           **"Unlawful," "Unfair" and "Fraudulent" Business Acts or Practices**

18                                  **(Against All Defendants)**

19          82.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

20          83.     Plaintiffs bring this cause of action on behalf of themselves, on behalf of Class Members,

21  and in their capacity as private attorneys general against all Defendants for their unlawful, unfair,

22  fraudulent and/or deceptive business acts and/or practices pursuant to the California Business &

23  Professions Code section 17200 *et seq.* ("UCL") which prohibits all unlawful, unfair and/or fraudulent

24  business acts and/or practices.

25          84.     Plaintiffs assert these claims as they are representatives of an aggrieved group and as

26  private attorneys general on behalf of the general public and other persons who have expended funds

27  that the Defendants should be required to pay or reimburse under the restitutionary remedy provided by

28  California Business & Professions Code §§ 17200, *et seq.*

85.     The instant claim is predicated on the generally applicable duty of any contracting party to not omit material facts, and on the duty to refrain from unlawful, unfair and deceptive business practices.  Plaintiffs and Class Members hereby seek to enforce a general proscription of unfair business practices and the requirement to refrain from deceptive conduct.  The instant claim is predicated on duties that govern anyone engaged in any business and anyone contracting with anyone else.

86.     Plaintiffs and Class Members were consumers who applied for a mortgage loan through Defendants.  During the loan application process, in each case, Defendants uniformly failed to disclose and omitted material information that was known only to Defendants and that could not reasonably have been discovered by Plaintiffs and Class Members as set forth in the preceding causes of action.

87.     Based on The Material Omissions and Defendants' other partially true statements and failures to disclose as alleged herein, Plaintiffs and Class Members agreed to finance their homes through the subject Option ARM loans, and have been actually harmed.

88.     Defendants intended that Plaintiffs and Class Members would be misled into believing that, if they made payments based on the payment schedules provided to them before they entered into the subject loan, the principal balance would be reduced with each payment when it actually increased with each payment.  The Loan Documents were designed and used for this purpose.

89.     Defendants designed, created, supplied, or were aware of the TILDS which set forth low payments for the first two to five years of the loan.   Defendants further knew, but did not clearly disclose, that these listed low payments in the TILDS were predicated on an interest rate which would not, in fact, exist after the first thirty days.  Defendants knew, but did not disclose, that negative amortization was *guaranteed* if borrowers made these listed low payments.   Defendants further knew, but did not disclose, that the listed payments set forth in the TILDS were calculated such that, if the payments were made, borrowers actually would be paying off 110% of the original principal balance. This information was material to any reasonable borrower, and the omission of such material information would cause a reasonable borrower to believe that the fully amortizing payments shown on the TILDS were in fact those payments necessary to pay off the balance of the original amount financed (i.e., the original principal balance less principal payments made on account of that balance), rather than110% of the amount financed.  Defendants could have easily disclosed, and should have accurately

and clearly disclosed, that if borrowers paid the remaining payments listed on the TILDS they would in fact be paying 110% of the balance of the original financed amount, rather than merely the balance of the original amount financed.   But Defendants chose not to do so in furtherance of their unfair and misleading scheme.

90.     By engaging in the above-described acts and practices, Defendants, and each of them, have committed one or more acts of unfair competition within the meaning of California Business & Professions Code §§ 17200, *et seq*.

91.     Defendants' misconduct, as alleged herein, gave them an unfair competitive advantage over their competitors.

92.     <u>Unlawful</u>:  The unlawful acts and practices of Defendants alleged above constitute unlawful business acts and/or practices within the meaning of California Business & Professions Code §§ 17200, *et seq*.  Defendants' unlawful business acts and/or practices as alleged herein have violated numerous laws and/or regulations - federal and/or state, statutory and/or common law - and said predicate acts are therefore *per se* violations of §17200, *et seq*.  These predicate unlawful business acts and/or practices include, but are not limited to, the following:  TILA, 15 U.S.C. §1601, *et seq*. as alleged in § II above;  Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 41-58, California Civil Code §§ 1572 (Actual Fraud - Omissions), 1573 (Constructive Fraud by Omission), and 1710 (Deceit).

93.     <u>Unfair</u>: Defendants' omissions and misconduct as alleged in this action constitutes negligence and other tortious conduct and this misconduct gave Defendants an unfair competitive advantage over their competitors.

94.     Defendants' misconduct as alleged in The Material Omissions and otherwise alleged herein was unfair because (I) it caused Plaintiffs and Class Members substantial injury by, among other things, causing them to lose equity in their homes, (ii) there were absolutely no countervailing benefits to consumers or to competition that could possibly outweigh this substantial injury, and (iii) this injury could not have been avoided or even discovered by the consumers, because it resulted from Defendants' failure to disclose and/or omission of material information that only the Defendants knew or should have known.

/ / /

95.     The Material Omissions and other misconduct of Defendants alleged herein is and was likely to deceive the public, and in fact did deceive the public, and violated the public policy of the State of California.

96.     The harm to Plaintiffs, members of the general public and Class Members outweighs the utility of Defendants' policies, acts and/or practices, and consequently Defendants' conduct herein constitutes an unfair business act or practice within the meaning of California Business & Professions Code §§ 17200, *et seq.*  Defendants' misconduct as alleged herein gave also Defendants an unfair competitive advantage over Defendants' competitors that did not engage in similar conduct.

97.     <u>Fraudulent</u>: Through their omissions and/or acts, practices and non-disclosures as alleged herein, Defendants designed The Loan Documents in order to deceive the public through the Material Omissions  leading to consumer confusion, including, but not limited to the fact that, for the first two to five years, the loans were negatively amortizing loans.  Said omissions, acts, practices and non-disclosures as alleged herein therefore constitute fraudulent business acts and/or practices within the meaning of California Business & Professions Code §§ 17200, *et seq.*

98.     Defendants' conduct, as fully described above, was designed to and was therefore likely to deceive members of the consuming public, and at all times, Defendants' failures to disclose and their omission of material facts have been and continue to be unfair, fraudulent, untrue and/or deceptive.

99.     As a direct and proximate result of the aforementioned omissions, acts and practices, Defendants, and each of them, received monies and continue to hold the monies expended by Plaintiffs and Class Members similarly situated who purchased the ARM loans as described herein.

100.     The unfair, deceptive and/or fraudulent business practices of Defendants, as fully described herein, present a continuing threat to members of the public to be mislead and/or deceived by Defendants' loan forms at issue, as described herein.  Plaintiffs and other members of the general public have no other remedy of law that will prevent Defendants' misconduct as alleged herein from occurring and/or reoccurring in the future.

101.     As a direct and proximate result of Defendants' unfair and/or fraudulent conduct alleged herein, Plaintiffs and Class Members have lost hundreds of thousands if not millions of dollars of equity in their homes.  Plaintiffs and Class Members are direct victims of the Defendants' unlawful conduct,

1  and each has suffered injury in fact, and has lost money or property as a result of Defendants' unfair

2  competition.

3      102.    WHEREFORE, Plaintiffs and Class Members are entitled to equitable relief, including

4  restitution, restitutionary disgorgement of all profits accruing to Defendants because of their unfair,

5  fraudulent, and deceptive acts and/or practices, attorney's fees and costs, declaratory relief, and a

6  permanent injunction enjoining Defendants from their unfair, fraudulent and deceitful activity.

7

8                                    **XII.**

9                          **PRAYER FOR RELIEF**

10     WHEREFORE, Plaintiffs and all Class Members pray for judgment against each Defendant,

11 jointly and severally, as follows:

12     A.    An order certifying this case as a class action and appointing Plaintiffs and their counsel

13           to represent each Class and sub-Class;

14     B.    For actual damages according to proof;

15     C.    For compensatory damages as permitted by law;

16     D.    For consequential damages as permitted by law;

17     E.    For punitive damages as permitted by law;

18     F.    For rescission for Plaintiffs GREGORY JORDAN, ELI GOLDHABER and JOSEPHINA

19           GOLDHABER;

20     G.    For equitable relief, including restitution;

21     H.    For restitutionary disgorgement of all profits Defendants obtained as a result of their

22           unfair competition;

23     I.    For interest as permitted by law;

24     J.    For Declaratory Relief;

25     K.    For a mandatory injunction requiring Defendants to comply with their disclosure

26           obligations under TILA and the regulations adopted pursuant thereto;

27     L.    For reasonable attorneys' fees and costs; and

28 / / /

Third Amended Class Action Complaint - 3:07-cv-04496-SI

1        M.      For such other relief as is just and proper.

2   DATED: July 24, 2009                    **SMOGER & ASSOCIATES, PC**

3

4                                    By:    */s/ Gerson H. Smoger*
                                           Gerson H. Smoger, Esq.
5                                          Steven M. Bronson, Esq.
                                           3175 Monterey Blvd
6                                          Oakland, CA  94602
                                           Phone:  (510) 531-4529
7                                          Fax:      (510) 531-4377

8                                          Lee A. Weiss (*Admitted Pro Hac Vice*)
                                           Rebecca Tingey (*Admitted Pro Hac Vice*)
9                                          **BROWNE WOODS GEORGE LLP**
                                           49 West 37th Street
10                                         New York, New York 10018
                                           Phone: (212) 354-4901
11                                         Fax:      (212) 354-4904

12                                         Michael A. Bowse (SBN 189659)
                                           **BROWNE WOODS GEORGE LLP**
13                                         2121 Avenue of the Stars, Suite 2400
                                           Los Angeles, CA 90067
14                                         Phone: (310) 274-7100
                                           Fax:      (310) 275-5697

15                                         David M. Arbogast, Esq.
                                           Jeffrey K. Berns, Esq.
16                                         **ARBOGAST & BERNS LLP**
                                           19510 Ventura Boulevard, Suite 200
17                                         Tarzana, California 91356
                                           Phone: (818) 961-2000
18                                         Fax:      (310) 861-1775

19                                         Christopher A. Seeger, Esq.
                                           **SEEGER WEISS LLP**
20                                         One William Street
                                           New York, NY 10004
21                                         Phone: (212) 584-0700

22                                         Jonathan Shub (SBN 237708)
                                           **SEEGER WEISS LLP**
23                                         1515 Market Street, Suite 1380
                                           Philadelphia, PA 19107
24                                         Phone: (215) 564-2300
                                           Fax      (215) 851-8029

25                                         Attorneys for Plaintiffs GREGORY M. JORDAN, ELI
26                                         GOLDHABER and JOSEPHINA GOLDHABER and
                                           all others Similarly Situated.

27

28   / / /

27

Third Amended Class Action Complaint - 3:07-cv-04496-SI

1

## DEMAND FOR JURY TRIAL

2

Plaintiffs hereby demands a trial by jury to the full extent permitted by law.

3

DATED: July 24, 2009                **SMOGER & ASSOCIATES, PC**

4

5

By:   _/s/ Gerson H. Smoger_
Gerson H. Smoger, Esq.
Steven M. Bronson, Esq.
3175 Monterey Blvd
Oakland, CA  94602
Phone:  (510) 531-4529
Fax:      (510) 531-4377

6

7

8

Lee A. Weiss (*Admitted Pro Hac Vice*)
Rebecca Tingey (*Admitted Pro Hac Vice*)
**BROWNE WOODS GEORGE LLP**
49 West 37th Street
New York, New York 10018
Phone: (212) 354-4901
Fax:      (212) 354-4904

9

10

11

12

Michael A. Bowse (SBN 189659)
**BROWNE WOODS GEORGE LLP**
2121 Avenue of the Stars, Suite 2400
Los Angeles, CA 90067
Phone: (310) 274-7100
Fax:      (310) 275-5697

13

14

15

16

David M. Arbogast, Esq.
Jeffrey K. Berns, Esq.
**ARBOGAST & BERNS LLP**
19510 Ventura Boulevard, Suite 200
Tarzana, California 91356
Phone: (818) 961-2000
Fax:      (310) 861-1775

17

18

19

20

Christopher A. Seeger, Esq.
**SEEGER WEISS LLP**
One William Street
New York, NY 10004
Phone: (212) 584-0700

21

22

23

Jonathan Shub (SBN 237708)
**SEEGER WEISS LLP**
1515 Market Street, Suite 1380
Philadelphia, PA 19107
Phone: (215) 564-2300
Fax      (215) 851-8029

24

25

26

Attorneys for Plaintiffs GREGORY M. JORDAN, ELI
GOLDHABER and JOSEPHINA GOLDHABER and
all others Similarly Situated.

27

28

Third Amended Class Action Complaint - 3:07-cv-04496-SI

# EXHIBIT NO. 1

EXHIBIT 1

# ADJUSTABLE RATE NOTE
### (Monthly Treasury Average - Payment and Rate Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATE IN THIS NOTE.**

| | | |
|---|---|---|
| **December 30, 2005** | **San Francisco** | **California** |
| [Date] | [City] | [State] |

**314 Oroville Court, Discovery Bay, CA  94514** /

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ **544,000.00**                    (this amount is called "Principal"), plus interest, to the order of the Lender.  The Lender is **Paul Financial, LLC**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

**(A) Interest Rate**

Interest will be charged on unpaid principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of         **1.000 %**.  The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

*WE HEREBY CERTIFY THIS TO BE A TRUE*

**(B) Interest Change Dates**

The interest rate I will pay may change on the first day of **February, 2006**                    , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date."

The new rate of interest will become effective on each Interest Change Date.

**(C) Interest Rate Limit**

My interest rate will never be greater than        **12.500 %**.

**(D) The Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index.  The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields").  The "Twelve Month Average" is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.  The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon the comparable information. The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **Three and 525/1000**                    percentage points (        **3.525 %**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the rounded amount will be my new interest rate until the next Interest Change Date.

0000471201

Form 3602 1/01

-840N (0005) Modified for Monthly Treasury Average (MTA)

VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 5          Initials:

ALTA-NEG-40YR-1/1-09          PF0131

PF_COLLATERAL_NOTE

          PF-Jordan000092

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **February 01, 2006**              .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  **January 01, 2046**                        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. Box 7867, Santa Rosa, CA  954070867**

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $**1,375.54**                         . This amount may change.

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the               1st               day of February, 2007                 , and on that day every 12th month thereafter.  Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay the Full Payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." The Note Holder will then calculate the amount of my monthly payment due the month preceding the Payment Change Date multiplied by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, I may choose to pay the Limited Payment.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder will also add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to one hundred ten percent (               110% ) of the Principal amount I originally borrowed. My unpaid principal could exceed that maximum amount due to the Limited Payments and interest rate increases. If so, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount which would be sufficient to repay my then unpaid principal in full on the Maturity Date at my current interest rate in substantially equal payments.

**(G) Required Full Payment**

On the 5th Payment Change Date and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I will also begin paying the Full Payment as my monthly payment on the final Payment Change Date.

0000471201

Form 3602 1/01
Initials:

**840N** (0005)  Modified for Monthly Treasury Average (MTA)        Page 2 of 5
ALTA-NEG-40YR-1/1-09                             —

PFB0332

PF-Jordan000093

## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will contain the interest rate or rates applicable to my loan for each month since the prior notice or, for the first notice, since the date of this Note. The notice will also include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 6.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by

0000471201

-840N (0005)   Modified for Monthly Treasury Average (MTA)     Page 3 of 5
ALTA-NEG-40YR-1/1-09

Form 3699 1/01
Initials

PF0131

PF-Jordan000094

delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

0000471201

-840N (0005)  Modified for Monthly Treasury Average (MTA)    Page 4 of 5

ALTA-NEG-40YR-1/1-09

Form 3602
Initials:
PF0131

                    PF-Jordan000095

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
Gregory M. Jordan              -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                               -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                               -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                               -Borrower                                      -Borrower

*[Sign Original Only]*

0000471201

-840N (0005)  Modified for Monthly Treasury Average (MTA)    Page 5 of 5        Form 3602 1/01
ALTA-NEG-40YR-1/1-09                                                                  PF0131

CONFIDENTIAL                                    PF-Jordan000096

Lender: Paul Financial, LLC
Address: 1401 Los Gamos Drive
City, State Zip:  San Rafael, CA  94903

_____ [ Space Above This Line For Recording Data ] _____

# PREPAYMENT PENALTY RIDER

This Prepayment Penalty Rider is made this        30th        day of              December, 2005
and is incorporated into and shall be deemed to amend and supplement the Mortgage Deed of Trust, or Security
Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note
(the "Note") to

Paul Financial, LLC
("Lender") of the same date and covering the property described in the Security Instrument and located at:

314 Oroville Court, Discovery Bay, CA  94514
[ Property Address ]

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

Borrower may make a full prepayment or a partial prepayment of principal at any time.  However, if within the
first      2      years after the date Borrower executes the Note, Borrower will pay a prepayment charge on the
aggregate prepayments made within any consecutive twelve month period which exceed 20% of the original
principal amount stated in the Note (the "Excess Principal").  The prepayment charge will equal the interest rate that
would accrue during a six month period of the Excess Principal calculated at the rate of interest in effect under the
terms of the note at the time of the prepayment.

No prepayment penalty will be assessed for any prepayment made after the Penalty Period.

The Note Holder's failure to collect a prepayment penalty at the time a prepayment is received shall not be deemed
a waiver of such penalty and any such penalty calculated in accordance with this section shall be payable on
demand.

PF0103 (H - 12/03) Prepayment Penalty Rider

Initials _____

Page 1 of 2

ALTA-NEG-40YR-1/1-09

0000471201

PF-Jordan000087

If a law, which applies to this loan and which sets a maximum prepayment charge or prohibits prepayment charges, is finally interpreted so that the prepayment charge to be collected in connection with this loan exceeds the permitted limits, then (i) any such prepayment charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, or (ii) if the prepayment charge is prohibited, no prepayment charge will be assessed or collected.

**DO NOT SIGN THE PREPAYMENT PENALTY RIDER BEFORE YOU READ IT. THIS PREPAYMENT PENALTY RIDER PROVIDES FOR THE PAYMENT OF A CHARGE IF YOU WISH TO REPAY THE LOAN PRIOR TO THE DATE PROVIDED FOR REPAYMENT.**

By signing below, Borrower accepts and agrees to the terms and covenants contained in the Prepayment Note Addendum.

_____(Seal)       _____(Seal)
Gregory M Jordan              -Borrower                                    -Borrower

_____(Seal)       _____(Seal)
                              -Borrower                                    -Borrower

_____(Seal)       _____(Seal)
                              -Borrower                                    -Borrower

_____(Seal)       _____(Seal)
                              -Borrower                                    -Borrower

PF0103    (H - 12/03)    Prepayment Penalty Rider

Page 2 of 2

ALTA-NEG-40YR-1/1-09                                                      0000471201

CONFIDENTIAL                                        PF-Jordan000088

☐ INITIAL   ☒ FINAL

# FEDERAL TRUTH-IN-LENDING DISCLOSURE

Creditor   **Paul Financial, LLC**
1401 Los Gamos Drive

San Rafael, CA 94903

**Borrower(s)**  Gregory M Jordan

Loan No.   **0000471201**
Processor
Date of Disclosure   **12/30/2005**
Est. Settlement Date (Date of Closing)   **01/06/2006**

Mailing   **314 Oroville Court**
Address   **Discovery Bay, CA 94514**

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | AMOUNT FINANCED<br>The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| **6.990** % | $ **1,208,798.29** | $ **542,414.50** | $ **1,751,212.79** |

Your  MONTHLY   PAYMENT SCHEDULE will be:

| # Payments | $ Payment | Beginning On | * | # Payments | $ Payment | Beginning On | * | # Payments | $ Payment | Beginning On | * |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12 | $1,375.54 | 2/1/2006 | | | | | | | | | |
| 12 | $1,478.71 | 2/1/2007 | | | | | | | | | |
| 6 | $1,589.62 | 2/1/2008 | | | | | | | | | |
| 6 | $3,756.14 | 8/1/2008 | | | | | | | | | |
| 12 | $3,474.43 | 2/1/2009 | | | | | | | | | |
| 11 | $3,213.85 | 2/1/2010 | | | | | | | | | |
| 420 | $3,819.12 | 1/1/2011 | | | | | | | | | |
| 1 | $3,811.32 | 1/1/2046 | | | | | | | | | |

* Private Mortgage Insurance (PMI) premiums, if shown, are included in the amount of the periodic payments.

☐ REQUIRED DEPOSIT: The annual percentage rate does not take into account any required deposit.
☐ DEMAND FEATURE: This obligation has a demand feature.
☒ VARIABLE RATE MORTGAGE: Variable Rate Mortgage Program disclosures have been provided earlier which discuss this and other variable rate features of your loan.

☒ ASSUMPTION: Someone buying your property
   ☐ may, subject to conditions   ☒ cannot   assume the remainder of your loan on the original terms.
PROPERTY INSURANCE: Property insurance is required in this transaction. You may obtain such insurance from anyone that is acceptable to the creditor. If you purchase from the creditor you will pay                for a           month term.
SECURITY: You are giving a security interest in:
   ☐ The goods or property being purchased
   ☒ Real property you own located at **314 Oroville Court, Discovery Bay, CA, 94514**
   ☐ Other Collateral
   Collateral securing other loans with us (or an assignee) may also secure this loan.

FILING FEES AND TAXES:  $
LATE CHARGE: If a payment is **15**  days late, you will be charged **6.000**  % of Principal and Interest Payment
PREPAYMENT: If you pay off early, you
   ☒ may   ☐ will not   have to pay a penalty.
   ☐ may   ☒ will not   be entitled to a refund of part of the finance charge.

See your actual contract documents for any additional information about nonpayment, default, or any required repayment in full before the scheduled date as well as prepayment refunds and penalties.

☒ All dates and numerical disclosures, except the late payment disclosure, are **ESTIMATES.**

Borrower(s) understand that delivery of this disclosure is not a commitment by the creditor to make this loan, and that signing this disclosure does not obligate Borrower(s) to accept the loan.

| _Gregory M Jordan (signature)_   12/30/05 | |
|---|---|
| Borrower    Gregory M Jordan    Date | Borrower    Date |

| | |
|---|---|
| Borrower    Date | Borrower    Date |

Copyright Gallagher Financial Systems, 2002.

GFS Form 0029 (0C28)

DATE:        December 30, 2005
BORROWER: Gregory M Jordan

LOAN #:      0000471201

PROPERTY ADDRESS:  314 Oroville Court, Discovery Bay, CA  94514

### ADJUSTABLE RATE MORTGAGE LOAN PROGRAM DISCLOSURE
### MONTHLY TREASURY AVERAGE - PAYMENT CAPS

This disclosure describes the features of an Adjustable Rate Mortgage (ARM) program you are considering. Information about our other ARM programs will be provided upon request.

## HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED:

- Your interest rate will be based on an index rate plus a margin. Please ask us for our current interest rate and margins.
- The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The "Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index.
- Your initial interest rate is not based on the index used to make later adjustments. Please ask us for the amounts of our current interest rate discounts.
- Your payment will be based on the interest rate, loan balance, and remaining loan term.

## HOW YOUR INTEREST RATE AND PAYMENT CAN CHANGE:

- Your interest rate can change on the first day of the month in which the February, 2006 monthly payment is due, and monthly thereafter.
- Each time your interest rate changes, the new interest rate will equal the sum of the index plus the margin, subject to the following limits:
  - Your interest rate will be rounded to the nearest 1/8 percent.
  - Your interest rate will never exceed the maximum set forth in your loan documents. The maximum rate will not be more than 12.500 . Please ask us for our current maximum rate.

- Your payment can change every year and can increase or decrease substantially based on changes in the interest rate.

- Beginning with the 13th payment and every 12 months thereafter, we will calculate two amounts, the full payment and the limited payment. The full payment will be the amount sufficient to pay the unpaid balance in full by the maturity date at the interest rate effective during the month preceding the payment change date. The limited payment will be your payment for the month preceding the payment change date increased by 7.50%. You will then have the choice each month of paying the lesser of the two, and if the limited payment is less than the full payment, you can choose to pay more than the limited payment up to and including the full payment for your monthly payment. If you pay anything less than the Full Payment, which would not be sufficient to cover the interest due, the difference will be added to your loan amount. This means the balance of your loan could increase.

ARM LIBOR PayOption Disclosure FE-4275

**ALTA-NEG-40YR-1/I-09**

**PF0196**

*PF_DISCLOSURE*

PF-Jordan000190

- At every 5th scheduled payment adjustment, you will need to pay the Full Payment until the next payment adjustment date.
- Whether you pay the full payment or whether you pay the partial payment amount, the unpaid principal balance of your loan can never exceed 110% of the original amount borrowed. If that limit is reached, your monthly payment amount will be changed to an amount sufficient to pay off the unpaid principal balance over the remaining life of the loan.
- For example:
  Loan with a premium interest rate: On a $10,000, 40-year loan with an initial interest rate of 7.000% in effect in December, 2005 the maximum amount that the interest rate can rise under this program is 5.500% percentage points, to 12.500%, and the monthly payment can rise from a first-year payment of $62.14 to a maximum of $104.89 in the second year. To see what your payment would be, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount. (For example, the monthly payment for a mortgage amount of $60,000 would be: $60,000 / $10,000 = 6; 6 x $ 62.14 = $372.84 per month.)
- You will be notified in writing at least 25, but no more than 120 days, before the due date of a payment at a new level. This notice will contain information about the index, your interest rates, payment amount, and loan balance.

**I (WE) HEREBY ACKNOWLEDGE RECEIVING AND READING A COPY OF THIS DISCLOSURE AND RECEIVING A COPY OF THE CONSUMER HANDBOOK ON ADJUSTABLE RATE MORTGAGES.**

_Gregory M. Jordan_     12/30/05

Gregory M Jordan       Date                    Date

_____ Date       _____ Date

_____ Date       _____ Date

_____ Date       _____ Date

ARM LIBOR PayOption Disclosure FE-4275             **PF0196**

# EXHIBIT NO. 2

EXHIBIT 2

# ADJUSTABLE RATE NOTE

### (Monthly Treasury Average - Payment and Rate Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATE IN THIS NOTE.**

July 28, 2005                      Santa Clarita                         California
[Date]                              [City]                               [State]

24658 Montevista Circle, Valencia, CA, 91354

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 409,500.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Paul Financial, LLC

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 1.375 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Change Dates

The interest rate I will pay may change on the first day of September, 2005 , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date."

The new rate of interest will become effective on each Interest Change Date.

### (C) Interest Rate Limit

My interest rate will never be greater than 12.500 %.

### (D) The Index

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The "Twelve Month Average" is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon the comparable information. The Note Holder will give me notice of this choice.

### (E) Calculation of Interest Rate Changes

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding Three and 825/1000 percentage points ( 3.825 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the rounded amount will be my new interest rate until the next Interest Change Date.

0000413211

Form 3602 1/01

VMP -840N (0005)  Modified for Monthly Treasury Average (MTA)

VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 5                 Initials: _____

ALTA-NEGAM-1/1-03

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **September 01, 2005**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **August 01, 2035**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. Box 7867, Santa Rosa, CA, 954070867**

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $**1,388.84**. This amount may change.

### (C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the       1st       day of September, 2006       , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay the Full Payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

### (D) Calculation of Monthly Payment Changes

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." The Note Holder will then calculate the amount of my monthly payment due the month preceding the Payment Change Date multiplied by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, I may choose to pay the Limited Payment.

### (E) Additions to My Unpaid Principal

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder will also add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid principal can never exceed a maximum amount equal to one hundred ten percent (       110% ) of the Principal amount I originally borrowed. My unpaid principal could exceed that maximum amount due to the Limited Payments and interest rate increases. If so, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount which would be sufficient to repay my then unpaid principal in full on the Maturity Date at my current interest rate in substantially equal payments.

### (G) Required Full Payment

On the 5th Payment Change Date and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I will also begin paying the Full Payment as my monthly payment on the final Payment Change Date.

0000413211

**4. NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will contain the interest rate or rates applicable to my loan for each month since the prior notice or, for the first notice, since the date of this Note. The notice will also include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **6.000**% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by

ALTA-NEGAM-1/1-                                                                                              0000413211

Form 3602 1/01

-840N (0005)                                    Page 3 of 5                               Initials: _____

ALTA-NEGAM-1/1-03

PF01313

delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

ALTA-NEGAM-1/1-

0000413211

-840N (0005)

Page 4 of 5

Form 3602 1/01
Initials: _____

ALTA-NEGAM-1/1-03

PF01314

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
Josephine   Goldhaber           -Borrower        Eli   Goldhaber                -Borrower


_____ (Seal)          _____ (Seal)
                                -Borrower                                        -Borrower


_____ (Seal)          _____ (Seal)
                                -Borrower                                        -Borrower


_____ (Seal)          _____ (Seal)
                                -Borrower                                        -Borrower


                                                 *[Sign Original Only]*


ALTA-NEGAM-1/1-                                                   0000413211

VMP -840N (0005)              Page 5 of 5                    Form 3602 1/01
ALTA-NEGAM-1/1-03

                                                                 PF01315

Date:          July 28, 2005
Borrower(s):   Josephine  Goldhaber and Eli  Goldhaber

Loan #:        0000413211
Property Address:  24658 Montevista Circle, Valencia, CA, 91354

## PREPAYMENT PENALTY ADDENDUM TO NOTE

THIS PREPAYMENT PENALTY ADDENDUM TO NOTE IS MADE THIS   28th                                day of
July, 2005                                    and is incorporated into and shall be deemed to amend
and supplement the Note made by the undersigned ("Borrower") in favor of
                                  Paul Financial, LLC
("Lender") and dated the same date as this Addendum (the "Note"). The Note is secured by a security instrument,
as modified or amended, in favor of Lender dated the   28th
day of    July, 2005                                                    (the "Security Instrument").

**ADDITIONAL COVENANTS:**  In addition to the covenants and agreements made in the Note, this Addendum
amends and restates Section 5 of the Note in its entirety as follows:

I have the right to make payments of Principal at any time before they are due. A payment of Principal only
is known as a "prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.

Subject to the Prepayment Penalty specified below, I may make a full Prepayment or partial Prepayments
of my obligation. The Note Holder will use all of my Prepayments to reduce the amount of Principal that I owe
under this Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my
monthly payment unless the Note Holder agrees in writing to those changes.

If within the first   36                         months after the execution of the Note, I make any prepayment(s)
within any 12-month period, the total of which exceeds twenty (20) percent of the original principal amount of this
loan, I will pay a prepayment penalty in an amount equal to the payment of six (6) months' advance interest on the
amount by which the total of my prepayment(s) within that 12-month period exceeds twenty (20) percent of the
original principal amount of the loan.

All other terms and conditions of the Note remain in full force and effect.

If a law, which applies to this loan and which sets a maximum prepayment charge or prohibits prepayment charges,
is finally interpreted so that the prepayment charge to be collected in connection with this loan exceeds the permitted
limits, then (i) any such prepayment charge shall be reduced by the amount necessary to reduce the charge to the
permitted limit, or (ii) if the prepayment charge is prohibited, no prepayment charge will be assessed or collected.

**ADDITIONAL NOTICE:**
**Notice to Borrower:  Do not sign this loan agreement before you read it.  This loan agreement
provides for the payment of a penalty if you wish to repay the loan prior to the date provided for
the repayment in the loan agreement.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Prepayment
Penalty Addendum to Note.

_____                _____(Seal)
Date                                           Borrower   Josephine  Goldhaber

_____                _____(Seal)
Date                                           Borrower   Eli  Goldhaber

_____                _____(Seal)
Date                                           Borrower

_____                _____(Seal)
Date                                           Borrower

ARM Multistate Prepayment Penalty Addendum
(ARM Plans 2 & 4 and Fixed Period ARMs)  6/2002

ALTA-NEGAM-1/1-03                                              PF0104 - (H - 12/03)

☐ INITIAL    ☒ FINAL

# FEDERAL TRUTH-IN-LENDING DISCLOSURE

Creditor    **Paul Financial, LLC**
**1401 Los Gamos Drive**

**San Rafael, CA 94903**

Borrower(s)   **Josephine  Goldhaber**
**Eli  Goldhaber**

Loan No.    **0000413211**
Processor                                                    Mailing         **24621 Garland**
Date of Disclosure        **07/28/2005**                Address        **Valencia, CA 91355**
Est. Settlement Date (Date of Closing)    **08/03/2005**

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| **6.619        %** | **$  606,703.28** | **$  402,230.86** | **$  1,008,934.14** |

Your  MONTHLY        PAYMENT SCHEDULE will be:

| # Payments | $ Payment | Beginning On | * | # Payments | $ Payment | Beginning On | * | # Payments | $ Payment | Beginning On | * |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12 | $1,388.84 | 9/1/2005 | | | | | | | | | |
| 12 | $1,493.01 | 9/1/2006 | | | | | | | | | |
| 12 | $1,604.99 | 9/1/2007 | | | | | | | | | |
| 12 | $1,725.37 | 9/1/2008 | | | | | | | | | |
| 11 | $1,854.78 | 9/1/2009 | | | | | | | | | |
| 300 | $3,036.51 | 8/1/2010 | | | | | | | | | |
| 1 | $3,032.04 | 8/1/2035 | | | | | | | | | |

* Private Mortgage Insurance (PMI) premiums, if shown, are included in the amount of the periodic payments.

☐   REQUIRED DEPOSIT: The annual percentage rate does not take into account any required deposit.
☐   DEMAND FEATURE: This obligation has a demand feature.
☒   VARIABLE RATE MORTGAGE: Variable Rate Mortgage Program disclosures have been provided earlier which discuss this and other variable rate features of your loan.

☒   ASSUMPTION: Someone buying your property
☐ may, subject to conditions     ☒ cannot        assume the remainder of your loan on the original terms.
PROPERTY INSURANCE: Property insurance is required in this transaction. You may obtain such insurance from anyone that is acceptable to the creditor. If you purchase from the creditor you will pay                            for a            month term.
SECURITY: You are giving a security interest in:
☒ The goods or property being purchased    **24658 Montevista Circle, Valencia, CA, 91354**
☐ Real property you own located at
☐ Other Collateral
Collateral securing other loans with us (or an assignee) may also secure this loan.

FILING FEES AND TAXES:  $
LATE CHARGE: If a payment is  **15**  days late, you will be charged  **6.000** % of  Principal and Interest Payment
PREPAYMENT: If you pay off early, you
☒ may            ☐ will not        have to pay a penalty.
☐ may            ☒ will not        be entitled to a refund of part of the finance charge.

See your actual contract documents for any additional information about nonpayment, default, or any required repayment in full before the scheduled date as well as prepayment refunds and penalties.

☒    All dates and numerical disclosures, except the late payment disclosure, are  **ESTIMATES.**

Borrower(s) understand that delivery of this disclosure is not a commitment by the creditor to make this loan, and that signing this disclosure does not obligate Borrower(s) to accept the loan.

| Borrower     **Josephine  Goldhaber**                    /          Date | Borrower     **Eli  Goldhaber**                    /          Date |
|---|---|
| Borrower                    /          Date | Borrower                    /          Date |

Copyright Gallagher Financial Systems, 2002.

**GFS Form 0029 (0C28)**

# ADJUSTABLE RATE RIDER
### (Monthly Treasury Average - Payment and Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 28th day of July, 2005 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Paul Financial, LLC

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

24658 Montevista Circle, Valencia, CA, 91354

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE BORROWER'S MONTHLY PAYMENT INCREASES MAY BE LIMITED AND THE INTEREST RATE INCREASES ARE LIMITED.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

## 2. INTEREST
### (A) Interest Rate
Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of 1.375 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**ALTA-NEGAM-1/1-03**                                                                    0000413211

-840R (0008)     **Form 3112 1/01**    Modified for Monthly Treasury Average (MTA)
Page 1 of 5         Initials: _____
VMP MORTGAGE FORMS - (800)521-7291                                                PF0133

**(B) Interest Change Dates**

The interest rate I will pay may change on the first day of **September, 2005**, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date." The new rate of interest will become effective on each Interest Change Date.

**(C) Interest Rate Limit**

My interest rate will never be greater than **12.500** %.

**(D) The Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The "Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **Three and 825/1000** percentage points ( **3.825** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the rounded amount will be my new interest rate until the next Interest Change Date.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making payments every month.

I will make my monthly payments on the first day of each month beginning on **September 01, 2005**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on **August 01, 2035**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. Box 7867, Santa Rosa, CA, 954070867**

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ **1,388.84**. This amount may change.

0000413211

Initials:_____

-840R (0008)                          Page 2 of 5                          Form 3112 1/01

Modified for Monthly Treasury Average (MTA)

ALTA-NEGAM-1/I-03                                                          PF0133

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the             1st day of        September, 2006        , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay the Full Payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." The Note Holder will then calculate the amount of my monthly payment due the month preceding the Payment Change Date multiplied by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, I may choose to pay the Limited Payment.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder will also add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to principal will be the rate required by Section 2 above.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to one hundred ten percent ( 110 %) of the principal amount I originally borrowed. My unpaid principal could exceed that maximum amount due to the Limited Payments and interest rate increases. If so, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount which would be sufficient to repay my then unpaid principal in full on the maturity date at my current interest rate in substantially equal payments.

0000413211

Initials: _____

VMP-840R (0008)
Modified for Monthly Treasury Average (MTA)

Page 3 of 5

Form 3112 1/01

ALTA-NEGAM-1/1-03

PF0133

**(G) Required Full Payment**

On the 5th Payment Change Date and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I will also begin paying the Full Payment as my monthly payment on the final Payment Change Date.

**4. NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will contain the interest rate or rates applicable to my loan for each month since the prior notice or, for the first notice, since the date of this Note. The notice will also include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

0000413211

Initials: _____

**VMP**®-840R (0008)          Page 4 of 5          Form 3112 1/01

Modified for Monthly Treasury Average (MTA)

**ALTA-NEGAM-1/1-03**                                    **PF0133**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)        _____ (Seal)
**Josephine  Goldhaber**          -Borrower     **Eli   Goldhaber**              -Borrower

_____ (Seal)        _____ (Seal)
                                  -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                                  -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                                  -Borrower                                      -Borrower

*[Sign Original Only]*

**0000413211**

**-840R** (0008)                 Page 5 of 5                 Form 3112 1/01
® Modified for Monthly Treasury Average (MTA)

ALTA-NEGAM-1/1-03                                            PF0133