IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY M. JORDAN, ELI GOLDHABER, and JOSEPHINA GOLDHABER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PAUL FINANCIAL, LLC, LUMINENT MORTGAGE CAPITAL, INC., HSBC BANK USA, N.A., AS TRUSTEE OF LUMINENT MORTGAGE TRUST 2006-2, RBS FINANCIAL PRODUCTS, INC., and DOES 2 through 10 inclusive,<br><br>Defendants.<br>_____/ | No. C 07-04496 SI<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT RBS' MOTION TO DISMISS** |

Defendant RBS Financial Products, Inc. Has moved to dismiss plaintiffs' Fourth Amended Complaint. As set forth below and for good cause shown, the Court GRANTS in part and DENIES in part defendant's motion to dismiss.

**BACKGROUND**

Plaintiffs filed a class action complaint against Paul Financial, LLC ("Paul Financial") and Does 1-10 on August 30, 2007. The complaint was amended four times to add plaintiffs Eli Goldhaber and Josephina Goldhaber, as well as add defendants Luminent Mortgage Capital, Inc, Luminent Mortgage Trust 2006-2, HSBC National Association ("HSBC"), and RBS Financial Products, Inc. ("RBS"). The

operative complaint is now the Fourth Amended Complaint ("FAC"), filed on October 13, 2009.[1]

## I.    The Parties

Plaintiff Gregory Jordan was an individual residing in Discovery Bay, California who on or about December 30, 2005 refinanced his home loan with a payment-option adjustable rate mortgage ("Option ARM") from Paul Financial. FAC, ¶ 2. Plaintiffs Eli Goldhaber and Josephina Goldhaber at all times relevant to this complaint were individuals residing in Valencia, California. Mr. and Mrs. Goldhaber entered into an Option ARM agreement with Paul Financial to refinance their home on July 28, 2005. FAC, ¶ 3.

Defendant Paul Financial is a California corporation which at all times relevant to this action engaged in the business of originating, underwriting, funding and servicing Option ARM loans. FAC, ¶ 4. While Paul Financial provided these loans directly to the public, the company re-sold approximately 75% of its loans to third party investors, and then sold the servicing rights of those loans to other investors.[2] Decl. of Dennis Tussey ("Tussey Decl.") ¶ 4, 26.

On January 24, 2006 Jordan's loan was sold to defendant Luminent Mortgage Capital, Inc. ("Luminent Capital"), a Maryland corporation, which at all times relevant to this action was in the business of securitizing home mortgage loans and packaging those loans into trusts to be sold as bonds to investors. FAC, ¶ 6. Jordan's loan was pooled by Luminent Capital with other Option ARM loans and put into a mortgage-backed securities trust called Luminent Mortgage Trust 2006-2, a defendant in this case. FAC, ¶ 11. HSBC Bank USA, N.A, a national banking association, is the trustee of Luminent Mortgage Trust 2006-2 and also a defendant in this case. FAC, ¶ 11.

Similarly, Paul Financial sold Mr. and Mrs. Goldhaber's mortgage to Greenwich Capital Financial Products, Inc., a Delaware corporation, on August 4, 2005. FAC, ¶ 7. Greenwich Capital Financial Products, Inc. changed its name to RBS and is in the business of packaging loans into

---

[1] General case background is incorporated by reference from the July 1, 2009 Summary Judgment Order (Docket No. 207).

[2] As of December 22, 2008, Paul Financial had not declared bankruptcy but had less than $1000 in assets. Tussey Decl., ¶ 3.

2

mortgage trusts or other financial products to be sold as bonds to investors. *Id.* Plaintiffs filed the FAC in order to add RBS as a defendant. According to the complaint, RBS had a "Master Loan Purchase and Interim Servicing Agreement" ("MLPA") with Paul Financial wherein both parties agreed that Paul Financial would originate loans and sell them to RBS, and RBS agreed to purchase those loans. FAC ¶ 38.

**II.    The Loans**

The loans Paul Financial provided to plaintiffs were option adjustable rate mortgages[3] which pegged their interest rate at 3.525% above a variable[4] index for Jordan, and 3.825% above the index for the Goldhabers. Tussey Decl., ex. 18, ¶ 2(D), (E). The Annual Percentage Rate ("APR") stated in the Truth in Lending Disclosure Statement (TILDS) was 6.990% for Jordan, and 6.619% for the Goldhabers. Ex. 1, at 47. Ex. 2, at 52. However, the initial "teaser" interest rate was a promotional rate of 1% in the case of Jordan's loan and 1.375% in the case of the Goldhabers' loan. FAC, ¶ 74. This promotional rate was only offered for a brief period before the higher variable rate, which could change each month, took effect. Tussey Decl., ex. 18, ¶ 2(B). The TILDS Paul Financial gave to plaintiffs did disclose the actual APR listed on plaintiffs' loans. However, when Paul Financial gave plaintiffs their payment schedule outlining the first five years of the loan, the stated payments were calculated based upon the promotional rate and not the much higher APR which took effect soon after closing. The loan agreement specifically provided that monthly payments could only be increased once per year, and such increases were capped at an increase of 7.5%. Tussey Decl., ex. 18 ¶¶ 2(A), 3(D).

Additionally, because the payment schedule was based upon a low "teaser" interest rate and not the substantially higher APR, the minimum monthly payments for the first year would not cover the

---

[3] The minimum monthly payment of these loans could only be changed once a year, and increases could not exceed 7.5%. See Tussey Decl., ex. 18 ¶ 3(c).

[4] This index is published by the Federal Reserve Board and is a twelve-month average of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year.

3

interest charged for the remaining months of the payment schedule, which was based upon the APR.[5] Thus, if plaintiffs paid only the monthly payment listed on the payment schedule, the outstanding interest would add to the principal owed on the loan. This process is known as negative amortization, and the borrower actually loses equity in the home with each monthly payment which fails to cover the interest due on the mortgage. The loan agreement referred to the possibility that negative amortization "could" occur:

> **E. Additions to my Unpaid Principal**
>
> My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder will also add interest on the amount of this difference to my unpaid principal each month.

Tussey Decl., ex. 18. at 92. Another provision stated that "my unpaid principal can never exceed a maximum amount equal to one hundred ten percent (110%) of the principal amount I originally borrowed." *Id*.

Plaintiffs allege that these aspects of the loan agreement constituted a violation of TILA, California's Unfair Competition Law ("UCL"), and amounted to a fraudulent omission under common law. On December 3, 2009, defendant RBS filed a motion to dismiss plaintiff's FAC on several grounds, including that the TILA claims against RBS are time-barred, that the state and common law claims are preempted by TILA, and that plaintiffs fail to state a claim in any event.

---

[5] The loan agreement alluded to out the distinction between the initial interest rate and the interest rate tied to the federal reserve index:

> Your interest rate will be based on an index rate plus a margin. Please ask us for our current interest rate and margins.
> . . .
> Your initial interest rate is not based on the index used to make later adjustments. Please ask us for the amounts of our current interest rate discounts. Your payments will be based on the interest rate, loan balance, and remaining loan term.

Tussey Decl., ex. 11.

4

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 544, 555.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

**DISCUSSION**

**I.      Plaintiffs' TILA Claim Against RBS**

Plaintiffs contend that RBS is liable for Paul Financial's alleged TILA violations related to the mortgage Paul Financial sold to Plaintiff Goldhaber because RBS provided financing to Paul Financial, and RBS now has ownership of the loan as an assignee. Plaintiffs argue that Paul Financial's loan

5

documents did not adequately disclose the risk of negative amortization to plaintiffs and thus failed to make a material disclosure under TILA. Additionally, plaintiffs assert that "[b]y stating the lower teaser rate and associated monthly payment in the Note, and stating the much higher interest rate in the TILDS accompanied by a payment schedule based on the low teaser rate, the Loan Documents failed to disclose the actual interest costs that borrowers would accrue on their loans." Opp. at p.7. Lastly, they contend that Paul Financial's failure to disclose "the material fact that under the terms of Plaintiffs' loan, their loan 'payment'. . . was guaranteed to increase the very next month" triggers TILA's rescission provisions.[6] *Id*.

TILA permits borrowers to rescind a mortgage agreement within three years of the transaction if the lender fails to make a material disclosure.[7] *See* 15 U.S.C. § 1635. Absent a failure to make a material disclosure, consumers only have three days to rescind the loan. 12 C.F.R. § 226.23(a)(3). Material disclosures are defined by the Federal Reserve's Regulation Z as: "the annual percentage rate, the finance charge, the amount financed, the total payments, the payment schedule, and the disclosures and limitations referred to in § 226.32(c) and (d)." 12 C.F.R. § 226.23(a)(3) n.48.[8]

This Court has previously held that failure to adequately disclose the risk of negative

---

[6] The complaint cites the official staff interpretation of Regulation Z to support the view that Regulation Z establishes a duty to disclose. The provision states:

> If a consumer is given the option to cap monthly payments that *may* result in negative amortization, the creditor must fully disclose the rules relating to the option, including the effects of exercising the option (such as negative amortization *will* occur and the principal loan balance *will* increase); however, the disclosure in § 226.19(b)(2)(viii) need not be provided.

12 C.F.R. pt 226, Supp I., 19(b)(2)(vii)-2 (emphasis added); FAC ¶ 57.

[7] Rescission is "a right created by TILA (not by the agreement of the parties) according to which the lender was to return money to the consumer and cancel the security interest before the consumer tendered the mortgage principal." Jo Carillo & Paul Kofoed, *The Sound of Silence: The Continuing Legal Debate Over Class Action Rescission Under TILA*, 6 Hastings Bus. L.J. 1, 6 (2010) [hereinafter *Sound of Silence*]; *see also* 15 U.S.C. 1635(b).

[8] Pursuant to 15 U.S.C. section 1635(f), the federal reserve has authority to promulgate regulations which interpret the TILA and this Court is guided by that interpretation unless it plainly conflicts with the statute. Federal Reserve Regulation Z specifies that "If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first." 12 C.F.R. § 226.23(a)(3).

6

amortization does not constitute a material violation that may extend the statute of limitations for rescission of the loan. *See* Order on Motion for Summary Judgment, July 1, 2009, at 9 [Docket No. 207] ("July 1 Order").[9] This Court also determined that APR was a material disclosure that could extend TILA's statute of limitations for rescission, and held that if plaintiffs prevailed on the merits of their TILA claim they were entitled to rescission against defendants Paul Financial, Luminent Mortgage Capital, Inc., and HSBC. *Id*. However, any TILA rescission claims have been extinguished by the statute of limitations against RBS. Plaintiffs Mr. and Mrs. Goldhaber entered into an agreement with Paul Financial on July 28, 2005. Under the plain language of the statute and Regulation Z, the latest date plaintiffs could exercise their rescission claim was July 28, 2008 . The Goldhabers were added to this complaint on July 24, 2009 – almost a full year after this period had elapsed – and RBS was not named as a defendant until October 13, 2009, more than fourteen months after the expiration of the statute of limitations.

Plaintiffs' assertion that the initial class action complaint related to Jordan's loan, filed on August 30, 2007, "tolled the statute of limitations for the Goldhabers and all other putative Class members" is unpersuasive in this case. Plaintiffs rely on *Demarest v. Quick Loan Funding, Inc*., No. 09-1687, 2009 WL 940377, at *7 (C.D. Cal. Apr. 6, 2009) to argue that "service of [the original] complaint upon Paul Financial renders the Goldhabers' rescission claim timely as to RBS." However, *Demarest* only held that a rescission request to the loan originator is equally effective against an assignee. *Id*. RBS is an assignee of the Goldhabers' loan, but not of Jordan's loan; therefore, RBS could not be put on notice that it would be subject to this suit until plaintiffs Mr. and Mrs. Goldhaber joined the suit on July 24, 2009.

---

[9] The Court noted that the Commentary on Regulation Z states that only one of the required disclosures regarding variable-rate loans – that the transaction contains a variable-rate feature – is considered "material" such that it triggers the extended rescission period:

> Footnote 48 sets forth the material disclosures that must be provided before the rescission period can begin to run. Failure to provide information regarding the annual percentage rate also includes failure to inform the consumer of the *existence* of a variable rate feature. Failure to give the other required disclosures does not prevent the running of the rescission period, although that failure may result in civil liability or administrative sanctions.

12 C.F.R. Pt. 226, Supp. I ¶ 23(a)(3)-2 (emphasis added).

7

Plaintiffs cite *American Pipe & Construction Company v. Utah*, 414 U.S. 538 (1974) ("*American Pipe*") to suggest that the filing of the initial complaint tolled the statute of limitations for all class members. However, *American Pipe* is not on point. *American Pipe* related to the addition of class members who might subsequently participate in a suit in addition to the named plaintiffs. *Id.* at 551. The Supreme Court reasoned that requiring new class members to file a separate lawsuit which individually meets timeliness requirements would frustrate the purpose of Federal Rule of Civil Procedure 23. *Id.* at 550. This is substantially different from plaintiffs' suggestion that the filing of an initial complaint tolled the statute of limitations for all possible class members *against any and all potential defendants* which might be implicated by the addition of new class members.

Under Federal Rule of Civil Procedure 15(c)(1)(B), plaintiffs can use the relation-back doctrine to amend a complaint to include allegations that "arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." An amendment may change the party or name of party "against whom a claim is asserted if Rule 15(c)(1)(B) is satisfied, and if within the period specified by Rule 4(m) for serving the summons and complaint, the party to be brought in by the amendment: (I) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C). Rule 4(m) specifies 120 days to amend unless "plaintiff shows good cause for the failure." Here, the 120 days specified in Rule 4(m) have elapsed by a considerable margin, and plaintiffs do not plead good cause for failing to meet this requirement.

Although plaintiffs asserted at oral argument that the Master Loan Purchase and Interim Servicing Agreement between Paul Financial and RBS was sufficient to toll the statute of limitations against RBS, the complaint does not allege facts which support this contention.[10] Plaintiffs do not allege in the FAC that the MLPA required Paul Financial to give notice to RBS if a representation or warranty

---

[10]The complaint states that defendants "actively and knowingly participated in [a] systematic scheme and otherwise conspired to sell the subject Option ARM loans as alleged herein." FAC ¶ 37. Further, plaintiffs allege that each of the defendants "actively participated in creating, designing and formulating the Loan Documents and/or dictated the terms of the Option ARM loans sold to Plaintiffs and Class Members." *Id*. However, the complaint does not state that RBS participated in drafting of the loan agreement at issue in Jordan's loan.

8

1 was breached in connection with a loan not affecting the financial interest of RBS. The complaint 2 states only that "[t]he MLPA requires that upon discovery by either PAUL FINANCIAL or RBS of a 3 breach of any representation or warranty in the MLPA *which materially and adversely affects the value* 4 *of the mortgage loans or the interest of RBS*, the party discovering such breach shall give prompt written 5 notice to the other." *Id*. ¶ 45 (emphasis added). Thus, the MLPA controlling the relationship between 6 RBS and Paul Financial does not provide a basis to relate the addition of RBS back to the date of the 7 filing of the original complaint that named only Jordan as a plaintiff.

8 Accordingly, plaintiffs' TILA rescission claims have expired as they relate to RBS and RBS' 9 motion to dismiss the rescission claims is GRANTED with prejudice.

## II. Fraudulent Omission Claim

Plaintiffs next contend that RBS violated its duty under common law to disclose material facts. Opp. at 8. In particular, plaintiffs cite provisions in the loan agreement which they allege are misleading, such as the portion of the loan which states that "my monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal." FAC, Ex. 2 ¶ 3(E). Plaintiffs allege that under the terms of the loan it was not a possibility but a certainty that the monthly payment would be insufficient to repay the unpaid principal and interest because of the teaser rate. Moreover, plaintiffs allege that in basing the payment schedule on the low teaser rate while simultaneously disclosing a higher APR, defendants "failed to disclose the actual interest costs that borrows were going to incur on their loans." Opp at 9; FAC ¶ 88.[11] Citing common law, plaintiffs assert that these partial representations and the omission of material facts violated defendants' duty to disclose material facts.

### A. Preemption

Defendant contends that any state law fraudulent omissions claim is preempted by TILA. The

---

[11] Plaintiffs also allege that by stating "Each of my initial monthly payments will be in the amount of U.S. $ 1,388.84. This amount may change," defendants failed to disclose that the interest rate was guaranteed to change because the initial monthly payment was based on a teaser rate, and payment should be defined as how much each plaintiff owed on the loan.

9

Supreme Court has identified three instances under which state laws are preempted by federal law governing the same subject matter: 1) express preemption, 2) implied conflict preemption and 3) field preemption. *Hillsborough County Fla. v. Automated Med. Labs.*, Inc., 471 U.S. 707, 713 (1985). Citing *Silvas v. E*Trade Mortgages*, 514 F.3d 1001, 1007 (9th Cir. 2008), RBS argues that TILA occupies the whole field of disclosures in connection with credit transactions. Mtn. to dismiss, at 19. The plaintiff in *Silvas* was attempting to bring a time-barred TILA claim for damages under the "unlawful" prong of the UCL. 514 F.3d at 1007. ("An attempt by Appellants to go outside the congressionally enacted limitation period of TILA is an attempt to enforce a state regulation in an area expressly preempted by federal law."). The court did not determine that state claims for deceptive, fraudulent, or unfair conduct were categorically preempted by TILA..

Where a statute has an express preemption clause, "the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). TILA's preemption provision states:

> Except as provided in subsection (e) of this section, this part and parts B and C of this subchapter do not annul, alter, or affect the laws of any State relating to the disclosure of information in connection with credit transactions, *except to the extent that those laws are inconsistent with the provisions of this subchapter* and then only to the extent of the inconsistency. Upon its own motion or upon the request of any creditor, State or other interested party which is submitted in accordance with procedures prescribed in regulations of the Board, the Board shall determine whether any such inconsistency exists. If the Board determines that a State-required disclosure is inconsistent, creditors located in that State may not make disclosures using the inconsistent term or form, and shall incur no liability under the law of that State for failure to use such term or form, notwithstanding that such determination is subsequently amended, rescinded, or determined by judicial or other authority to be invalid for any reason.

15 U.S.C. § 1610(a)(1) (emphasis added). Under the plain language of the provision, TILA preempts all state law provisions to the extent "that the 'terms and forms' mandated by the state are 'inconsistent' with those required by TILA." *Newbeck v. Wash. Mut. Bank*, No. 09-1599, 2010 WL 291821, *3 (N.D. Cal., Jan. 19, 2010). Additionally, Regulation Z provides some examples of inconsistent state laws and concludes that "[a] state law is inconsistent if it requires a creditor to make disclosures or take actions that contradict the requirements of the federal law." 12 C.F.R. § 226.28(a)(1).

However, TILA's preemption provision preserves state laws "relating to the disclosure of

10

information in connection with credit transactions" which are not inconsistent with TILA. 15 U.S.C. § 1610(a)(1). The Commentary on Regulation Z provides that "[s]tate law requirements that call for the disclosure of items of information not covered by the Federal law, or that require more detailed disclosures, do not contradict the Federal requirements." 12 C.F.R. Pt. 226, Supp. I, 28(a)(3).[12] Thus, TILA preempts state law only to the extent state disclosure requirements are explicitly inconsistent with federal law.

Additionally, while TILA protects creditors from inconsistent state disclosure requirements, it does not protect creditors from state statutes prohibiting unfair or deceptive practices. *See Therrien v. Resource Fin. Group, Inc*., 704 F.Supp. 322, 329 (D.N.H. 1989) ("TILA and Regulation Z specify only the required disclosures by a creditor. They do not permit or otherwise regulate the particulars of a loan agreement. Conduct that complies with the federal disclosure requirements still could constitute an unfair or deceptive practice."); *People ex rel. Spitzer v. Applied Card Sys., Inc*., 805 N.Y.S.2d 175, 179 (2005) (allegations which pertain to unfair or deceptive acts are not preempted). Therefore, to the extent plaintiffs' claim is based upon a claim of deceptive or unfair conduct, it is not preempted by TILA.

### B.  Fraud Claim

A claim for fraud under California law requires that a plaintiff plead "'(a) misrepresentation, (b) knowledge of falsity (or scienter), (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting in damage.'" *In re Napster, Inc. Copyright Litig.,* 479 F.3d 1078, 1096 (9th Cir. 2007) (quoting *Small v. Fritz Cos., Inc*., 65 P.3d 1255, 1258 (2003)); *see generally* Cal. Civ. Code §§ 1709-10. California Civil Code section 1710 defines deceit related to the omission of a material fact as the "suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."

Under Federal Rule of Civil Procedure 9(b), an allegation of fraud must be averred with enough

---

[12]The legislative history of this provision states that, in 1981, the test for preemption under TILA changed from preempting any state requirements which were "different" from TILA, to preempting only state requirements which "conflicted" with TILA. 12 C.F.R. Pt. 226, Supp. I, at 201. Under 12 C.F.R. § 226.28(a)(1), creditors may request a determination by the Board to determine if state requirements are inconsistent with federal regulations.

11

particularity to give specific notice to defendants of misconduct so that they can adequately defend against the charge and not simply offer a general denial. Fed. R. Civ. P. 9(b); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). Plaintiffs may satisfy this heightened requirement by providing "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). Additionally, "[i]n the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, identify the role of each defendant in the alleged fraudulent scheme." *Id.* at 765. (quotation omitted) (citing *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir. 1989)).

Here, plaintiffs' evidence is the mortgage instrument, which provides the specific content of the allegedly false representations related to negative amortization, as well as the date and place of the alleged fraud. While the precise identities of the employees responsible at Paul Financial are not specified in the loan instrument, defendants possess the superior knowledge of who was responsible for crafting these loan documents. The nature of the claim is apparent and sufficient to put defendants on notice of the claims against them. *See Vess*, 317 F.3d at 1106 (Rule 9(b) requires that allegations of fraud "be 'specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.'" (citations omitted)); *see also* Fed. R. Civ. P. 8(f) ("all pleadings shall be construed so as to do substantial justice"). Additionally, plaintiffs have sufficiently alleged reliance by stating that they would have behaved differently had they known about the certainty of negative amortization. *See Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993) (reliance for a fraudulent omission can be shown where a plaintiff proves that "had the omitted information been disclosed, one would have been aware of it and behaved differently"). Therefore, plaintiffs have alleged with sufficient particularity a case for fraudulent omissions against Paul Financial.

### 1. Aiding and Abetting Theory

Plaintiffs assert that RBS is liable for fraudulent omissions in the loan documents under a theory of aiding and abetting. FAC ¶ 85; Opp. at 11. Liability in California for aiding and abetting "may be imposed on one who aids and abets the commission of an intentional tort if the person knows the other's

12

conduct constitutes a breach of a duty and gives substantial assistance or encouragement to the other to so act." *In re First Alliance Mortg. Co.*, 471 F.3d 977, 993 (9th Cir. 2006) (citing *Casey v. U.S. Bank Nat'l Ass'n.*, 127 Cal.App. 4th 1138, 1144 (2005) (ellipses omitted)). This Court previously stated that if plaintiffs could present evidence that HSBC had an agreement "to take a financial interest in the loans at some point after the loan was consummated," such evidence "could support plaintiff's claim that HSBC acted as an aider and abettor in Paul Financial's scheme to originate loans based on false and misleading disclosures." July 1 Order, at 23.

Plaintiff now alleges that such an agreement existed between Paul Financial and RBS. Plaintiffs allege that Paul Financial and RBS had a MLPA which specified an ongoing business enterprise arising from the sale of loans like those sold to plaintiffs. FAC ¶¶ 38-45. Plaintiffs also allege that defendant RBS "actively participated in creating, designing and formulating the Loan Documents and/or dictated the terms of the Option ARM loans sold to Plaintiffs" FAC ¶ 38.[13] Plaintiffs also allege that RBS reviewed loan portfolios "for issues including, but not limited to, credit, documentation, litigation, default and servicing related concerns as well as a thorough compliance review with loan level testing." FAC ¶ 40. According to plaintiffs, the MLPA also provided a right to RBS to underwrite the loans and review the mortgage files at issue here. FAC ¶ 44. The question of whether RBS had "actual knowledge" of the alleged misrepresentations in the loan documents here is a question of fact. *See In Re First Alliance Mortg. Co.*, 471 F.3d at 994. At this stage, however, plaintiffs have sufficiently stated a claim for aiding and abetting by alleging that RBS provided substantial assistance to Paul Financial to carry out its financial scheme. Accordingly, plaintiffs are entitled to pursue a theory of aiding and abetting against RBS.

### 2. Joint Venture Liability

Plaintiffs also assert that a joint venture theory of liability can be applied to RBS. FAC ¶ 85; Opp. at 13. A joint venture theory requires plaintiffs to allege that two or more persons who are

---

[13]In particular, plaintiffs allege that the securitization process "permitted Paul Financial to engage in a large volume of loan originations with minimal capital outlay, because it quickly assigned its loans after originating them. Thus, Paul Financial was only invested in each loan for a short time and then could use proceeds from each loan sale to make future loans." Opp. at 6.

13

fiduciaries that have "a duty of disclosure and liability to account for profits" acted "to carry out a single business enterprise for profit." *Weiner v. Fleschman*, 54 Cal. 3d 476, 482 (1991); *see also Short v. Wells Fargo Bank Minnesota, N.A.*, 401 F. Supp. 2d 549 (S.D.W. Va. 2005). This Court previously stated that plaintiffs supplied "no evidence that HSBC and Paul Financial had any interaction whatsoever, much less that they formed an agreement to create a single business enterprise." July 1 Order, at 22. In their FAC, plaintiffs have now adequately alleged that RBS and Paul Financial were engaged in a single business enterprise by alleging a MLPA existed between the parties. The MLPA specifies an ongoing business relationship between the parties which allegedly provided the "stream of funding" that enabled Paul Financial to sell loans to plaintiffs. Thus, plaintiffs are entitled to pursue a theory of joint venture liability against RBS.[14]

Accordingly, this Court DENIES RBS's motion to dismiss plaintiffs' fraudulent omissions claim.

### III. Unfair Competition Law Claims

#### A. Preemption

Plaintiffs assert that Paul Financial engaged in unfair, unlawful, and fraudulent business practices in violation of California's Unfair Competition Law ("UCL"). Defendants argue that any UCL claim is also preempted by TILA. As stated above, this Court agrees that Congress intended to preempt any state laws which are inconsistent with TILA. To the extent that plaintiffs seek to "plead around" TILA's one-year statute of limitations for damages by using the UCL, their claim is preempted by TILA. Therefore, any claim under the "unlawful" prong of the UCL cannot use TILA as the predicate violation if the claim is time-barred.

However, the "[t]he UCL does not, on its face, relate to the disclosure of information in connection with credit transactions, let alone impose disclosure requirements that are different than

---

[14] Plaintiffs also assert that defendant RBS is liable as an assignee of the Goldhabers' loan because an assignee "stands in the shoes" of the assignor. Opp. at 9. Because the Court concludes that plaintiffs are entitled to pursue a fraudulent omissions claim against RBS under a theory of aiding and abetting and joint venture liability, the Court does not decide whether RBS may be liable as an assignee.

14

TILA's in any way." *Plascencia v. Lending 1st Mortgage*, 583 F. Supp. 2d 1090, 1099 (N.D. Cal. 2008). Moreover, as previously stated, TILA does not categorically preempt state regulation of unfair or deceptive practices. Thus, the "unfair" prong of the UCL does not set forth a disclosure requirement inconsistent with TILA, but rather imposes liability for the allegedly unfair business practice of minimizing the likelihood of negative amortization.

### B. Unlawful Prong

Plaintiffs' first UCL claim arises under the statute's "unlawful" prong. This prong of the UCL incorporates other laws to make them actionable. Generally, "violation of almost any law may serve as a basis for a UCL claim." *Plascencia v. Lending 1st Mortg.*, 259 F.R.D. 437, 448 (N.D. Cal. 2009). However, as this Court has previously stated, if plaintiffs' UCL claims are predicated on a TILA violation which is time-barred, that TILA violation may not form the predicate violation for a UCL claim. Having concluded that plaintiffs' TILA claims against RBS are now time-barred, the Court also finds that any UCL claims flowing from the TILA claims are not actionable under the UCL's "unlawful" prong."

Nevertheless, plaintiffs argue that even if defendants' conduct did not violate TILA, it violated the FTC Act, 15 U.S.C. § 45(a)(1), which proscribes "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive practices in or affecting commerce." Plaintiffs do not bring a separate FTC Act claim because that statute does not provide for a private cause of action. *See Dreisbach v. Murphy,* 658 F.2d 720, 730 (9th Cir. 1981). They assert instead that the FTC Act provisions can serve as a predicate for a UCL claim. If so, however, Plaintiffs' FTC Act claim is predicated on allegations of deceptive conduct subject to Rule 9(b)'s heightened pleading requirements. The FAC does no more than mention the FTC Act; it makes no effort to tie the FTC Act claim to any of the facts in the complaint. Accordingly, the Court GRANTS RBS's motion to dismiss plaintiffs' claims under the UCL's "unlawful" prong, with leave to amend.

### C. Fraud Prong

Plaintiffs assert that RBS's conduct violated the UCL's "fraudulent" prong. Although fraud is

15

not an essential element of a UCL claim, because plaintiffs are proceeding in federal court, Rule 9(b)'s heightened pleading requirement applies. *See Vess*, 317 F.3d at 1106; *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). As previously stated, plaintiffs have sufficiently alleged a theory of fraud against RBS and Paul Financial with the requisite particularity under Rule 9(b).

Accordingly, the Court DENIES RBS's motion to dismiss plaintiffs' UCL fraud claim.

### D.  Unfair Prong

Plaintiffs' final claim is that defendants' conduct was unfair under the UCL because "the loan documents did not disclose [the certainty of negative amortization]," only its possibility. FAC, ¶ 25. Plaintiffs maintain that they only learned of the certainty of negative amortization after they were "'locked' into the loan by a draconian prepayment penalty . . . . designed to deter anyone from refinancing the loan during the applicable time period." *Id*., ¶ 30.

A business practice which is neither unlawful nor fraudulent may nevertheless be unfair under the UCL. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999) ("*Cel-Tech*"). However, a business practice which is specifically deemed lawful by the legislature cannot be "pled around" by "recasting the cause of action as one for unfair competition." *Id*. at 541. Where conduct is specifically permitted by statute, the statute forms a "safe harbor" for businesses which protects against claims under the "unfair" prong of the UCL. *Id*. A safe harbor exists only where conduct is expressly permitted, and not merely because conduct is not expressly prohibited. *Id*.

Here, no statute clearly permits the structure of defendants' loan nor the disclosures at issue, although neither has expressly been deemed unlawful. While this Court has determined that TILA does not consider defendants' omissions "material" for purposes of rescission, TILA does not expressly permit lenders to issue loan documents which omit the certainty of negative amortization and state only that it is possible. Therefore, defendants' omissions and alleged misrepresentations do not fall within a "safe harbor" that would preclude liability under the UCL.

To establish whether conduct is unfair under the UCL, courts look to jurisprudence arising under section 5 of the FTC Act. *Cel-Tech*, 973 P.2d at 565. The factors which define unfairness under section 5 are: "(1) the consumer injury must be substantial; (2) the injury must not be outweighed by any

16

countervailing benefits to the consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." *Zlotnik v. U.S. Bancorp*, No. 09-3855, 2009 WL 5178030, *5 (N.D. Cal. Dec. 22, 2009) (citing *Camacho*, 48 Cal. Rptr. 3d at 777)).

In *Zlotnik*, the plaintiff alleged that the defendant "encouraged consumers to obtain purchase money financing using complicated mortgage instruments that were difficult to understand. . . . emphasizing low initial monthly payments while misrepresenting the later increase in the monthly payments that would result at the expiration of the 'teaser' rate." *Id*. The court determined there was no evidence of any countervailing benefit to consumers, and plaintiffs purportedly could not have avoided an injury stemming from a misrepresented loan. *Id*. Therefore, the plaintiffs had a cause of action under the "unfair" prong of California's UCL.

Here, plaintiffs' complaint relies entirely on the face of the loan documents and does not allege that RBS made any affirmative misrepresentations.. Applying a section 5 analysis, there is no question that plaintiffs have alleged a substantial injury. Additionally, although the existence of a teaser rate and minimum monthly payment less than the amount owed on a variable loan could provide a theoretical benefit to consumers in a different economic climate, in practice the arrangement served to put plaintiffs' homes further and further into debt. On the face of the complaint and in a light most favorable to plaintiffs, the injuries created by this loan agreement outweighed any benefits to ordinary consumers.

The third element of a section 5 analysis is more complex. RBS correctly points out that the loan documents specify the terms of the loan and the possibility of negative amortization.[15] A sophisticated consumer might have been able to deduce from the loan documents that negative amortization was certain to occur because the minimum payments listed in the payment schedule were based upon a "teaser" rate rather than the APR, which was displayed in a box above the payment schedule. Thus, a consumer could have paid an amount greater than the minimum payments required in order to prevent

---

[15]Defendants contend that negative amortization was not "guaranteed." Mtn to dismiss, at 9. However, if the APR is pegged at 3.825% above the federal reserve index, and the teaser rate was 1.375%, then the federal reserve index would need to be -2.45% in order for the teaser rate and the interest rate to be the same during the period in which the minimum monthly payments were calculated based upon the teaser rate. Plaintiffs assertion that negative amortization was "certain" makes considerable mathematical sense.

17

1 negative amortization.[16] However, "the fact that Defendant may have provided a technically accurate disclosure does not excuse the potentially inadequate or misleading character of other disclosures it provided or lessen the resulting potential for confusion." *Amparan v. Plaza Home Mortgage, Inc.*, No. 07-4498, 2008 WL 5245497, at *9 (N.D. Cal. Dec. 17, 2008). Therefore, at issue is whether plaintiffs' allegations establish that they could have *reasonably avoided* the injury, not whether it was merely possible to avoid the injury.

Plaintiffs have sufficiently alleged that they did not discover the certainty of negative amortization until they were "locked in" with a harsh prepayment penalty under the terms of the agreement. They allege that the loan documents do not clearly specify the certainty of negative amortization. The provision in the loan documents detailing negative amortization states only that "[m]y monthly payment *could* be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe." Tussey Decl., ex 18. at 92 (emphasis added). Additionally, the payment schedule does not clearly indicate it is based upon the teaser rate rather than the APR listed on the top of the page. Thus, plaintiffs have sufficiently alleged that an ordinary consumer relying on the plain language of the loan agreement might not have been able to avoid the injury of negative amortization because they did not understand it was certain to occur. This is sufficient to allege a violation of the "unfair" prong of the UCL.

Accordingly, the Court DENIES RBS's motion to dismiss plaintiffs' claim under the UCL's "unfair" prong.

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS RBS's motion to dismiss plaintiffs' TILA claims with prejudice, DENIES RBS's motion to dismiss

---

[16]In *Andrews v. Chevy Chase Bank*, 545 F.3d 570, 571 (7th Cir. 2008), the Seventh Circuit considered the plaintiffs "experienced mortgagors" because they had "previously taken out many original and refinancing mortgage loans for various residential and investment properties." *See also Sound of Silence*, *supra*, note 123, at 23. Here, Mr. and Mrs. Goldhaber refinanced their home loan with Paul Financial and thus had previous experience with home mortgages. FAC, ¶ 3. However, this is insufficient to reach the conclusion that they were sophisticated enough to detect and understand negative amortization as a certainty in an Option ARM agreement which characterized it as a possibility, and thus avoid the injury by making a higher monthly payment than required.

plaintiffs' fraudulent omissions claim, and GRANTS in part and DENIES in part RBS's motion to dismiss plaintiffs' UCL claim. (Docket No. 253).

IT IS SO ORDERED.

Dated: September 30, 2010

_____
SUSAN ILLSTON
United States District Judge