**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GREGORY M. JORDAN, et al.,

        Plaintiffs,

  v.

PAUL FINANCIAL, LLC, et al.,

        Defendants.

                      /

No. C 07-04496 SI

**ORDER DENYING RBS FINANCIAL PRODUCTS INC.'S MOTION FOR SUMMARY JUDGMENT; GRANTING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Presently pending before the Court are a motion by defendant RBS Financial Products Inc. ("RBS") for summary judgment, and a motion by plaintiffs for class certification. Having considered the arguments of the parties, the papers submitted, and for good cause shown, defendant's motion is DENIED, and plaintiffs' motion is GRANTED.

**BACKGROUND**

**I.     The Loan**

In 2005, plaintiff Gregory Jordan ("Jordan") and plaintiffs Eli and Josephina Goldhaber ("the Goldhabers") entered into option adjustable rate mortgage loan agreements ("Option ARM loans") with defendant Paul Financial, LLC ("Paul Financial"). Fourth Amended Complaint ("4AC"), ¶¶ 2, 3. Like all adjustable rate loans, the interest rates on the plaintiffs' loans were pegged to a variable index and thus changed over time. *See, e.g., Plascencia v. Lending 1st Mortg.*, 259 F.R.D. 437, 440 (2009). The Paul Financial loans also contained a few idiosyncratic features, including an initial "teaser" rate. Jordan's loan from Paul Financial had an initial teaser interest rate of 1%, while the Goldhabers' loan had an initial rate of 1.375%. *Id.* at ¶ 74. These teaser rates were dubbed the "yearly rate" on the

plaintiffs' Promissory Notes (the "Notes"). *See* Weiss Decl., Ex. 1. Despite their name, however, these "yearly rates" lasted for only one month, after which the loan's interest rate substantially increased pursuant to the variable index rate. Id. at ¶ 25. This variable rate, disclosed in the Notes, was the sum of 3.825% plus the federal reserve index. As a result, after one month, the interest accruing on the loans more than quadrupled, from an amount near 1% to an amount between 4 and 8%. Id. at ¶ 25.

At the same time, the Truth in Lending Disclosure Statement ("TILDS") that Paul Financial provided plaintiffs along with the Note listed a payment schedule outlining the amount of plaintiffs' minimum monthly payments for the first five years. Id. at ¶ 28. The TILDS payment schedule was tethered to the teaser rate, while the actual interest rate after the first month was tethered to the far-higher variable rate. Therefore, the minimum monthly payments did not cover the interest incurred after the first month of the loan. Id. The interest left outstanding would be added to the principal of the loan and begin accumulating interest itself. Thus, if plaintiffs paid only the monthly payment listed on the payment schedule, the principal on the loan would increase, and plaintiffs would lose equity with each payment -- a process known as negative amortization.

One month after originating the Goldhabers' loan, Paul Financial sold it to Greenwich Capital Financial Products, Inc., now called RBS Financial Products, Inc. ("RBS"). *Id.* at ¶ 7. RBS purchased loans from Paul Financial pursuant to a January 1, 2004 Master Mortgage Loan Purchase and Interim Servicing Agreement ("MLPA"), which set forth the terms and conditions under which RBS would later purchase loans from Paul Financial. Jordan's loan was also sold less than one month after origination, though instead to Luminent Mortgage Trust 2006-2, the trustee of which is HSBC. Both HSBC and Luminent have been dismissed as defendants in this case. *See* Doc. 385. Therefore, only the Goldhabers' loan documents are at issue here.

The loan documents at issue are the Note, the Prepayment Penalty Addendum to Note (the "Addendum"), and the TILDS. The pertinent sections for the purposes of the two instant motions are as follows:

<u>The Note</u>

The Note is dated July 28, 2005, and sets forth plaintiffs' promise to pay a principal amount of $409,500. Weiss Decl., Ex. 1. The numbers that are specific to the Goldhabers' loan are emboldened

in the note.  Section 2 describes the interest to be paid on the loan:

**(A) Interest Rate**
       Interest will be charged on unpaid principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of **1.375%**.  The interest rate I will pay may change . . .

**(B) Interest Change Dates**
       The interest rate I will pay may change on the first day of **September, 2005**, and on that day every month thereafter.  Each date on which my interest rate could change is called an "Interest Change Date."  The new rate of interest will become effective on each Interest Change Date.

**(C) Interest Rate Limit**
       My interest rate will never be greater than **12.500%**.

**(D) The Index**
       Beginning with the first Interest Change Date, my interest rate will be based on  an index . . .

**(E) Calculation of Interest Rate Changes**
       Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **Three and 825/1000 percentage points (3.825%)** to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limit stated in section 2(c) above, the rounded amount will be new interest rate until the next Interest Change Date.

Section 3 describes the loan payments:

**(A) Time and Place of Payments**
       I will pay principal and interest by making a payment every month.
       I will make my monthly payments on the first day of each month beginning on **September 01, 2005**.  I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal.  If, on **August 01, 2035**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
. . .

(**B**) **Amount of My Initial Monthly Payments**
       Each of my initial monthly payments will be in the amount of **U.S.** $1,388.84. This amount may change.

**(C) Payment Change Dates**
       My monthly payment may change as required by Section 3(D) below beginning on the **1st** day of **September, 2006**, and on that day every 12th month thereafter.  Each of these dates is called a "Payment Change Date."  My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay the Full Payment.
       I will pay the amount of my new monthly payment each month beginning on each Payment Change Date . . .

**(D) Calculation of Monthly Payment Changes**
       At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date.  The result of this calculation is called the "Full Payment."  The Note Holder will then calculate the amount of my monthly payment due the month preceding the Payment Change Date multiplied by the number 1.075.  The result of this calculation is called the "Limited Payment."  Unless Section

3(F) or 3(G) below requires me to pay a different amount, I may choose to pay the Limited Payment.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder will also add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

The Prepayment Penalty Addendum to Note

The Addendum sets forth additional terms of the loan, including a "prepayment penalty" against the borrower:

**Additional Covenants**

In addition to the covenants and agreements made in the Note, this Addendum amends and restates Section 5 of the Note in its entirety as follows:

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.

Subject to the Prepayment Penalty specified below, I may make a full Prepayment or partial Prepayments of my obligation. The Note Holder will use all of my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

If within the first **36** months after the execution of the Note, I make any prepayment(s) within any 12-month period, the total of which exceeds twenty (20) percent of the original principal amount of this loan, I will pay a prepayment penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my prepayment(s) within that 12-month period exceeds twenty (20) percent of the original principal amount of the loan.

The TILDS

The TILDS discloses 6.619% as the Annual Percentage Rate ("APR") on the Goldhabers' loan. Weiss Decl., Ex. 2. The APR is placed prominently in a box explaining that the APR is "The cost of your credit as a yearly rate." *Id.* The TILDS also includes a payment schedule, as follows:

| # Payments | $ Payment | Beginning On |
|---|---|---|
| 12 | $1,388.84 | 9/1/2005 |
| 12 | $1,493.01 | 9/1/2006 |
| 12 | $1,604.99 | 9/1/2007 |

4

| 12 | $1,725.37 | 9/1/2008 |
| 11 | $1,854.78 | 9/1/2009 |
| 300 | $3,306.51 | 8/1/2010 |
| 1 | $3,032.04 | 8/1/2035 |

The TILDS also contains a Truth-in-Lending Recap ("TIL Recap"), which contains various data regarding the loan.

| No. Payments to 1st Rate Adjustment | 1 |
| No. Payments to Subsequent Rate Adjustment(s) | 1 |
| No. Payments to 1st Payment Adjustment | 12 |
| No. Payments to Subsequent Payment Adjustment(s) | 12 |
| Maximum Rate Increase at First Adjustment (s) | 11.125% |
| Maximum Rate Increase at Subsequent Adjustment(s) | 12.500% |
| Lifetime Rate Increase Cap | 12.500% |

| Number of Payments | 360 |
| Interest Rate | 1.375% |
| Odd Days Rate | 1.375% |
| Index | 2.737% |
| Margin | 3.825% |
| Fully Indexed Rate | 6.500% |

| A.P.R. | Finance Charge | Amount Financed | Total of Payments |
|---|---|---|---|
| 6.619% | $606,703.26 | $402,230.86 | $1,008,934.14 |

Plaintiffs allege that the loan documents they signed were misleading because they did not unambiguously disclose: 1) the "actual interest rate," 2) the fact that the interest rate would sharply increase after only one month; 3) the fact that the monthly payments were based on the teaser rate, and not the actual interest rate; and 4) that negative amortization was "guaranteed to occur after only one

5

month," and instead only acknowledged that it "may" occur.  Id. at ¶¶ 1, 28, 33.

On the basis of these allegations, Jordan filed a putative class action complaint against Paul Financial on August 30, 2007.  The complaint was amended to add the Goldhabers as plaintiffs and add Luminent Capital, Luminent Trust, HSBC, and RBS as defendants.  The operative complaint is now the Fourth Amended Complaint ("4AC"), filed on October 13, 2009, which states three causes of action: 1) violations of the Truth in Lending Act ("TILA"), 15 U.S.C. §1601, et seq.; 2) fraudulent omissions; and 3) unlawful, unfair, and fraudulent business practices in violation of California's Unfair Competition Law ("UCL"), Bus. & Prof Code §17200, et seq.  On January 27, 2009, the Court denied plaintiff's motion for class certification.  Doc. No. 152.  On September 30, 2010, the Court granted RBS's motion to dismiss the 4AC in part, dismissing plaintiffs' TILA claims as time barred, and dismissing the "unlawful" prong of plaintiffs' business practices claim with leave to amend.  Doc. No. 295.  On July 27, 2011, following the parties' joint request for dismissal, the Court ordered the dismissal of defendants Luminent Trust and HSBC.  Plaintiffs' surviving claims are for (1) fraudulent omissions and (2) unfair and fraudulent business practices in violation of the UCL, against defendant RBS only.

.

## II.     The Goldhabers' Bankruptcy

The Goldhabers filed a voluntary petition for Chapter 7 bankruptcy on March 18, 2010 (the "Bankruptcy Case").  *See In re Goldhaber*, No 2:10-BK-20052 (Bankr. C.D. Cal. Mar. 18, 2010).  The Goldhabers  did not list any interest in this litigation in their schedules or petition.  *Id.*  The Bankruptcy Case was closed on July 29, 2010.  In RBS' summary judgment motion ("MSJ"), it asserted a standing challenge due to the Goldhabers' failure to list their interest in this litigation.  MSJ at 11.  Plaintiffs then successfully petitioned the bankruptcy court to reopen the Bankruptcy Case, and filed amended schedules listing their claims against defendants.  Weiss Decl., Ex. 8.  While the Bankruptcy Case was open, plaintiffs also entered into a stipulation with the trustee of their estate, stating that "[d]ebtors are hereby delegated and granted authority and standing to prosecute, on behalf of the Debtor's Estate subject to exemption rights, the Debtor's claims as pleaded" in this case.  Weiss Decl., Ex. 9.

Following the bankruptcy judge's order approving the stipulation, RBS attempted to settle the Goldhabers' claims with the trustee of their estate.  *See In re Goldhaber*, No 2:10-BK-20052, Doc. 35.

United States District Court
For the Northern District of California

The trustee agreed to the settlement and filed a motion for approval with the bankruptcy court. *Id.*, Doc. 35. The Goldhabers opposed the settlement, arguing that the stipulation barred the trustee from entering into a settlement with RBS, and that RBS was attempting to "pick off" the putative class representative in this litigation. *Id.*, Doc. 36 at 8. The bankruptcy judge denied the motion for settlement, citing the stipulation. Doc. 42 at 2. The parties then proceeded to file oppositions and replies to the two respective motions at bar.

Presently before the Court are RBS' motion for summary judgment on all claims and plaintiffs' motion for class certification.

## LEGAL STANDARD

### I.    Motion for Summary Judgment

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325. Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Id.* at 324 (quoting then Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from

United States District Court
For the Northern District of California

the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)).

## II.    Class Certification

The decision as to whether to certify a class is committed to the discretion of the district court within the guidelines of Federal Rule of Civil Procedure 23. See Fed. R. Civ. P. 23; *see also Cummings v. Connell*, 316 F.3d 886, 895 (9th Cir. 2003). A court may certify a class if a plaintiff demonstrates that all of the prerequisites of Federal Rule of Civil Procedure 23(a) have been met, and that at least one of the requirements of Federal Rule of Civil Procedure 23(b) have been met. See Fed. R. Civ. P. 23; *see also Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

Rule 23(a) provides four prerequisites that must be satisfied for class certification: (1) the class must be so numerous that joinder of all members is impracticable, (2) questions of law or fact exist that are common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a).

A plaintiff must also establish that one or more of the grounds for maintaining the suit are met under Rule 23(b), including (1) that there is a risk of substantial prejudice from separate actions; (2) that declaratory or injunctive relief benefitting the class as a whole would be appropriate; or (3) that common questions of law or fact predominate and the class action is superior to other available methods of adjudication. See Fed. R. Civ. P. 23(b).

In determining the propriety of a class action, the question is not whether the plaintiffs have stated a cause of action or will prevail on the merits, but, rather, whether the requirements of Rule 23 are met. *See Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). The Court is obliged to accept as true the substantive allegations made in the complaint. *See In re Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1342 (9th Cir. 1982); *see also Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975). Therefore the class order is speculative

8

United States District Court
For the Northern District of California

1   in one sense because the plaintiff may not be able to later prove the allegations.  *See Blackie*, 524 F.2d

2   at 901 n.17.  However, although the Court may not require preliminary proof of the claim, it "need not

3   blindly rely on conclusory allegations which parrot Rule 23 requirements.  Courts may also consider

4   the legal and factual issues presented by plaintiff's complaint."  2 Alba Conte & Herbert B. Newberg,

5   Newberg on Class Actions, 7.26 (4th ed. 2005).  Sufficient information must be provided to form a

6   reasonable informed judgment on each of the requirements of Fed. R. Civ. P. 23.  *See Blackie*, 524 F.2d

7   at 901 n.17.  In order to safeguard due process interests and the judicial process, the Court conducts an

8   analysis that is as rigorous as necessary to determine whether class certification is appropriate.  *See*

9   *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 961 (9th Cir. 2005); *see also Gen. Tel. Co. of the Sw. v.*

10   *Falcon*, 457 U.S. 147, 161 (1982).

**DISCUSSION**

**I.      MOTION FOR SUMMARY JUDGMENT**

        RBS moves for summary judgment on the Goldhabers' remaining claims against RBS: common

law fraudulent omission, and violation of the California's UCL under its "fraud" and "unfair" prongs.

RBS contends that summary judgment is proper because: 1) the Goldhabers lost standing upon filing

for bankruptcy; 2) the loan documents were not misleading; 3) RBS is not liable for Paul Financial's

conduct; 4) plaintiffs' fraudulent omissions claim fails because the loan documents did not conceal a

material fact and there was no actual reliance; and 5) plaintiffs' UCL claim fails because plaintiffs lack

standing, RBS' conduct was not fraudulent or unfair, and plaintiffs do not seek remedies available under

the UCL.  The Court will address each of RBS' arguments in turn.

        **A.      Standing**

        RBS argues that the Goldhabers lack standing to bring their claims because (1) they filed for

Chapter 7 bankruptcy and (2) they failed to disclose their interest in this litigation in their bankruptcy

petition or schedules.  Motion for Summ. J. ("MSJ") at 11-12.  As noted above, in response to RBS'

initial standing challenge, the Goldhabers petitioned the bankruptcy court to reopen their case.  The

bankruptcy court approved a stipulation between the Goldhabers and the trustee of their estate, which

United States District Court
For the Northern District of California

"delegated and granted authority and standing [to the Goldhabers'] to prosecute, on behalf of the Debtors' Estate subject to exemption rights" this action.  Doc. No. 370 at 2.  RBS disputes that a trustee can delegate its standing, contending that the Goldhabers can have standing only if the trustee has abandoned the claims.  MSJ Reply at 2-3.

Rule 17(a) of the Federal Rules of Civil Procedure provides that "[e]very action shall be prosecuted in the name of the real party in interest."  Rule 17(a) "does not itself define real party in interest.  Instead, it allows a federal court to entertain a suit at the instance of any party to whom the relevant substantive law grants a cause of action."  *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1038 (9th Cir. 1986).  Furthermore, Rule 17(a) recognizes that a "court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest."  Fed. R. Civ. P. 17.  In *U-Haul*, the Ninth Circuit provided the plaintiff the opportunity to seek ratification from the other real parties in interest before it would consider finding that the plaintiff lacked standing.  793 F.2d at 1040.  There, the court further recognized that "[t]he modern function of [Rule 17] ... is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata."  *Id.* at 1039 (*citing* Note of Advisory Committee on 1966 Amendment to Fed. R. Civ. P. 17).

Here, the relevant substantive law grants plaintiffs a cause of action.  Although plaintiffs have transferred their interest in this action to their estate by declaring bankruptcy, such an assignment does not preclude the trustee from ratifying plaintiffs' continued pursuit of their cause of action.  According to the terms of the stipulation, the trustee granted plaintiffs the authority to prosecute the claims, thereby providing the necessary ratification.  *In re Goldhaber*, 10-BK-20052,  Order Approving Stipulation, at ¶ 2.  Furthermore, as the Supreme Court has recognized, "an assignee of a legal claim for money owed has standing to pursue that claim in federal court, even when the assignee has promised to remit the proceeds of the litigation to the assignor."  *Sprint Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269, 269 (2008).  Here, plaintiffs will remit the bulk of their proceeds if they prevail; yet they also

United States District Court
For the Northern District of California

retain exemption rights for $1,820.  Moreover, the underlying purpose of Rule 17(a) is served, because the stipulation protects "the defendant against a subsequent action by the party actually entitled to recover"; the stipulation bars the trustee from bringing any similar action against RBS.  Finally, the bankruptcy judge rejected the attempted settlement between RBS and the Trustee, finding that because of the stipulation, "RBS and its counsel may negotiate settlement of the claims the Debtors have against RBS and the below described class action lawsuit with counsel of record *for the Debtors*."  *In re Goldhaber*, 10-BK-20052, Doc. 42 at 2 (emphasis added).  The Court agrees with the bankruptcy court that the Goldhabers are now the proper party to pursue or dispose of their claims.

### B.    Loan documents

Defendant contends that summary judgment is appropriate because the loan documents were not misleading since (1) plaintiffs admit that the documents describe negative amortization and (2) the loan disclosures clearly compare the APR and the interest rate.  MSJ at 13, 14.

A jury finding for plaintiffs on its fraudulent omissions claim would require, *inter alia*, the finding of a misrepresentation or material omission.  *Small v. Fritz Companies, Inc.*, 30 Cal. 4th 167, 173 (2003).  Similarly, a jury finding for plaintiffs under the fraud prong of their UCL claim would also require, *inter alia*, the finding of a misrepresentation or material omission, because this claim is predicated upon the alleged fraudulent practices of defendants. 4AC, ¶ 112.  Thus, the Court interprets RBS' argument that the documents were not misleading as a challenge to the presence of a genuine issue of material fact as to the existence of a misrepresentation or material omission.

### 1.    Whether the Documents Accurately Describe Negative Amortization

RBS argues that the loan documents accurately describe negative amortization, and, further, that the plaintiffs themselves admit to understanding the concept.  MSJ at 13.  Regarding the former, defendants point to Section 3(E) of the Adjustable Rate Note, which states that:

> **(E) Additions to my Unpaid Principal:** My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments.  If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract

United States District Court
For the Northern District of California

1
2

> the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principle.  The Note Holder will also add interest on the amount of this difference to my unpaid principal each month.

3
4

Weiss Decl., Ex. 1.

5
6
7

Concerning plaintiffs' knowledge of the concept, defendants point out that the Goldhabers previously acquired a different option ARM mortgage that had, in fact, negatively amortized.  *See* E. Goldhaber Depo. 31:23-32:24, 65:25-68:16-16;  J. Goldhaber 79: 17-25 (explaining negative amortization as when "they take money out of your equity.")

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

The plaintiffs argue that defendants' misconstrue the thrust of their claims.  The issue here, plaintiffs argue, is not whether the documents adequately explained or the Goldhabers properly understood the general *concept* of negative amortization – though those are live questions of material fact – but whether the loan documents failed to disclose that *this* particular loan was *certain* to negatively amortize if payments were made pursuant to the payment schedule.  Plaintiffs point to the conditional language in the Note, such as the statement in above-quoted section 3(E) that "My payment *could be* less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date."  Weiss Decl., Ex. 1.  *See also* Note, ¶3(A) ("I will pay principal and interest by making a payment every month");  ¶3(E) ("If the minimum payment is not sufficient to cover the amount of the interest due then negative amortization will occur").  Such statements, plaintiffs argue, are misleading because payments made according to the schedule would *necessarily* be insufficient to pay down the interest.  Furthermore, plaintiffs argue, it was misleading not to state that the initial rate was a teaser rate "absolutely certain to double or triple after just 30 days."  Pl.'s Opp. at 9 (*citing* Eckes Dep. 73:17-75:13).

23
24
25
26
27

Plaintiffs also dispute the defendants' characterizations of the Goldhabers testimony regarding their understanding of the loan on the same grounds.  According to the plaintiffs, it is irrelevant (or at least non-dispositive) whether the Goldhabers understood the general concept of negative amortization.  What is important is what they understood about *this* loan.  And the testimony from the depositions, plaintiffs argue, proves that they were misled.  Eli Goldhaber testified:

28

> Q:            Did you think this was a negative amortization loan when you

|        |                                                                                         |
|--------|-----------------------------------------------------------------------------------------|
|        | entered into it?                                                                        |
| E.G.:  | No.                                                                                      |
| Q:     | If you thought it was a negative amortization loan before you signed the documents, would you have signed them? |
| E.G.:  | No, I haven't – no, I wouldn't.                                                          |

In Josephine Goldhaber's deposition, she similarly stated:

|             |                                                                                    |
|-------------|------------------------------------------------------------------------------------|
| Q:          | If this note - that it said "Adjustable Rate Negative Amortization Note," would you have signed this – entered into this loan? |
| Ms. Klubes: | Objection.                                                                          |
| J.G.:       | Of course not.                                                                     |

Plaintiffs therefore dispute defendants' contention that they understood the loan documents.

The Court finds that, as an initial matter, whether the Goldhabers understood that paying according to the provided payment schedule necessarily led to negative amortization is a genuine issue of material fact. It is material because it goes to their reliance on the documents, and it is genuine because the parties present contradicting characterizations of the Goldhabers' own testimony.

The harder question is whether a genuine issue of material fact remains about the nature of the negative amortization inherent to the Goldhabers' Loan. There is no genuine question as to whether the loans would certainly negatively amortize if the TILDS payment schedule was followed. The payment schedule listed in the TILDS, for at least the first 12 months of the loan, was pegged to the teaser rate of 1.375% -- a rate that lasted only 30 days. Therefore, after the interest rate jumped in the second month to the far higher index rate, payments according to the schedule would not cover the interest accruing on the principal. As this Court noted in finding plaintiffs' claims viable in the face of RBS' motion to dismiss:

> Defendants contend that negative amortization was not 'guaranteed.' However, if the APR is pegged at 3.825% above the federal reserve index, and the teaser rate was 1.375%, then the federal reserve index would need to be - 2.45% in order for the teaser rate and the interest rate to be the same during the period in which the minimum monthly payments were calculated based upon the teaser rate. Plaintiffs assertion that negative amortization was 'certain' makes considerable mathematical sense.

Dismissal Order at 17, fn. 15, Doc. 295. RBS now argues that negative amortization was not certain since a borrower was not prevented from paying *more* than the TILDS payment schedule. The question, therefore, is whether it is misleading to state in loan documents that something *may* occur when, following the offered (though optional) schedule within those documents, it is certain to occur.

Numerous courts in this District that have analyzed this precise question at the 12(b)(6) stage have found viable claims for fraud, both under TILA and the common law. *See., eg., Ralston v. Mortgage Investors Group, Inc.,* 2009 WL 688858 (N.D. Cal. Mar. 16, 2009)(Fogel, J.) ("A number of courts have recognized the viability of claims for failure clearly and conspicuously to disclose the certainty of negative amortization"); *Plasencia v. Lending 1st Mortg.*, 2008 WL 1902698 (N.D.Ca. Apr. 28, 2008) (Wilken, J.) ("Plaintiffs may be able to show that the Note's reference to negative amortization as a hypothetical event does not clearly and conspicuously disclose" required information.)

Neither party has cited to, nor has the Court been able to find, any cases that dispose of this issue at the summary judgment stage. After considering the issue, the Court finds that there remains a genuine issue of material fact as to the whether the loan statements constitute misrepresentations with respect to negative amortization. As the Court noted in its order denying dismissal of this claim, simply providing technically accurate disclosure does not excuse the potentially inadequate or misleading character of other disclosures, or lessen the resulting potential for confusion. Doc. 295 (*citing Amparan*, 2008 WL 5245497 at *9). It is of course possible that a buyer would pay more each month than the schedule provided for in the TILDS, thus avoiding negative amortization. But the Court will not turn a blind eye to the fact that the document at issue here is, as far as the Court can tell, designed to mislead. Nowhere in the TILDS, or the Note for that matter, is there any revelation of the fact that the interest rate is certain to sharply increase after just 30 days. Nor does the TILDS contain any indication that following the payment schedule provided will unquestionably lead to negative amortization. In fact, the TILDS does not even state what the payment schedule is based on -- the teaser rate, it turns out, not the actual interest rate. However, were one to follow the TILDS payment schedule, after 59 months of payment, the borrower would owe 110% of the original principal.[1]

Therefore, the Court finds that there remains a genuine issue of material fact as to whether an ordinary consumer would be misled by the Notes' explanation of the negative amortization inherent in the loan.

---

[1]The initial principal was $409,500.00. Following the payment schedule provided, after 59 months the borrower would have paid $94,949.10. Their estimated principal at that point would have raised to $449,550.00, payable over the next 25 years. Interest would also be calculated based on that elevated principal, not the initial amount.

## 2. Interest Rate Disclosures

The second dispute regarding the fraudulent nature of the loan documents is whether the interest rate disclosure is misleading. The first page of the Note states that "I will pay interest as a yearly rate of 1.375%. The interest rate I will pay may change." Weiss Decl, Ex. 1. The TILDS states the APR is 6.990%, and is "the cost of your credit at a yearly rate." Weiss, Decl., Ex. 2. Therefore, the same phrase -- "yearly rate" -- is used twice to define quite different rates.

The issue of whether or not a defendant is due summary judgment on this question was already decided by this Court in this case, in its earlier iteration against HSBC (involving plaintiff Jordan's nearly identical loan from Paul Financial). The Court held that "this Court adopts the reasoning in *Amparan* and *Andrews* and finds that there is a factual dispute as to whether reference in the loan documents to both the APR and the finance charge as 'yearly' rates of interest would have been confusing to an ordinary consumer." Doc. 207, at 12 (*citing Amparan v. Plaza Home Mortg., Inc.*, 2008 WL 5245497 *6 (N.D. Cal. Dec. 17 2008) (Fogel, J.) (holding that plaintiff had stated a claim under TILA when the TILDS represented that the APR was 7.136%, describing this figure as the "[t]he cost of your credit as a yearly rate," while the Note represented that "I will pay interest at a yearly rate of 1.500%."); *Andrews v. Chevy Chase Bank, FSB*, 240 F.R.D. 612, 618 (E.D. Wis. 2007) (same), *rev'd on other grounds*.

RBS argues that the Court should reverse its earlier decision because the Court did not have before it the now-submitted "TIL Recap" that was part of the loan documents. Defendants argue that because the TIL Recap states that "No. Payments to 1st Rate Adjustment" is 1, while "No. Payments to 1st Payment Adjustment" is 12, a person would know that the *interest* rate will adjust after the first payment, but the *payment* rate will not change until after the first year of payments.

RBS' argument that the TIL Recap saves the document is unavailing. First, it is unclear from the TIL Recap what the interest rate adjustment would actually be after the first month. One would have to turn to the Note to find out that "beginning with the first Interest Change Date, my interest rate will be based on an Index." Note, ¶ 2(D). The cited "Interest Change Date," in turn, references September 2005 as set forth in section 2(B); yet this is the very section that states, "[t]he interest rate I will pay *may* change on the first day of September, 2005." This leaves the borrower back at the beginning, unsure

as to the certainty of the rate change, and what that rate will be.  It is therefore difficult to reconcile the two documents, which obscure the actual interest scheme.  Second, the problem is not only the confusion as to when the payments and interest change, it is that the "yearly rate" described in the Note controls the *payment* rate set forth in the TILDS, while the "yearly rate" described in the TILDS sets forth the APR, i.e., the *interest* rate.  The use of the same term to describe different rates, which in turn affect different dollar quantities (payments owed versus actual balance owed), is also likely misleading. Adding to the confusion, the two rates are completely unrelated to one another.

Furthermore, the most conspicuous number set forth in the Note – clearly set off and emboldened on the front page – states that "I will pay interest at a yearly rate of **1.375%**."  Weiss Decl., Ex. 1.  Yet, as noted, this is only the actual interest rate for 30 days.  The Court cannot find, as a matter of law, that the Note is not misleading when its most prominent  number is a "yearly rate" that lasts for only 30 days, has no relationship to the "yearly rate" of the APR, and controls only the *payment rate* that, if followed, will certainly cause negative amortization.  In reality, after the first 30 days, the actual interest rate jumps to the current index plus 3.825%.  The TIL Recap defendants rely on to save the documents merely repeats the ruse that the "interest rate" is 1.375%, and provides no explanation as to how the monthly payments in the TILDS schedule were derived.  The TIL Recap therefore does not change the Court's earlier conclusion that summary judgment is inappropriate here.  *See* Doc. 207.

In sum, the Court finds that a genuine issue of material fact exists as to whether the documents misrepresent the nature of the negative amortization inherent to the loans and the loan's actual interest rates.

## C.      Aiding and abetting

Because RBS was not a party to the initial mortgage, plaintiffs must prove that RBS aided and abetted Paul Financial in order to hold them liable.  In California, "liability may be imposed on one who aids and abets the commission of an intentional tort if the person *knows* the other's criminal conduct constitutes a breach of a duty and gives substantial assistance or encouragement to the other to so act." *First Alliance Mortgage Company v. Lehman Commercial Paper*, 471 F.3d 977, 993 (9th Cir. 2006) (*citing Casey v. U.S. Bank National Assn.,* 127 Cal. App. 4th 1138 (2005)) (emphasis included).  In

other words, to demonstrate that RBS aided and abetted Paul Financial, plaintiffs must show that RBS had actual knowledge of the fraudulent omissions and UCL violations, and provided substantial assistance to further those ends.

### 1.    Actual Knowledge

RBS argues that summary judgment is proper here because "[p]laintiffs point to nothing to support their claim that RBS had actual knowledge of any supposed fraudulent conduct . . . [T]he record shows that RBS did not instruct Paul Financial in its business operations, including which loans to originate, nor did it 'approve' underwriting guidelines for their use by Paul Financial, as plaintiffs imply." Def.'s Mot. at 13. Plaintiffs, they contend, merely have unsupported and conclusory allegations of actual knowledge of a fraudulent intent. *Id.*

Plaintiffs respond that evidence in the record supports their claim that RBS was "well aware that Paul Financial was originating Option ARM Loans using misleading loan documents." Pl.'s Opp. at 24. They rely most heavily on the deposition of Craig Eckes, a managing director of RBS. Plaintiffs point to portions of Eckes' deposition that demonstrate that RBS was aware (I) that the Option ARM loans used "teaser rates" (citing Eckes Dep., 73:17-74:10); (ii) that the teaser rates would apply only for the first month of the loan (*id.*, and Ex. 2 (Underwriting Guidelines)); (iii) that Paul Financial calculated the minimum monthly payments for the first 5 years of the loan using the teaser rate, rather than the interest rate that it anticipated would actually apply (*id.*); and (iv) that the Option ARM loans were certain to cause negative amortization because, after one month, the monthly payment amounts listed in the TILDS were insufficient to repay the monthly interest.

Plaintiffs also provide the Court with the "Underwriting Guidelines" provided to commercial investors like RBS by Paul Financial. Berns Decl., Ex. 2. The Underwriting Guidelines, in a section entitled "Initial Note Rate," state that "The interest rate is based on the index plus margin rounded to the nearest 1/8%. The interest rate *will* change on the first payment date and monthly thereafter." Berns Decl., Ex. 2 (Underwriting Guidelines). Plaintiffs contrast the definitive statement of "will change" in outside investor documents with the statement in the plaintiffs' actual Note that the interest rate "may change" after the first month. Pl.'s Opp. at 5; Note ¶ 2(A).

United States District Court
For the Northern District of California

Plaintiffs also provide deposition testimony from John Glander, Paul Financial's former Vice President for Secondary Marketing.  The testimony provided by Glander suggests that RBS approved loan documents *before* purchasing Option ARM loans from Paul Financial. Glander Dep. 27:20-24 ("Can you describe the due diligence that [secondary market purchasers] perform?" Glander: "They would pull files, typically using a third party such as Clayton, in the case of Greenwich [now RBS], to review files to make sure they met our underwriting criteria and met all compliance.")  Craig Eckes of RBS also testified that RBS employed a document custodian that reviewed "the notes, mortgages, all of the underlying legal documentation that led to the loan."  Eckes Dep., 52:9:14.

The Court finds that there remains a genuine issue of material fact as to RBS' actual knowledge of fraudulent behavior.  RBS argues that in reviewing the loan documents it was simply engaged in typical due diligence.  However, as plaintiffs argue,  RBS' due diligence may well have imparted the knowledge required to establish aiding and abetting.   Nor does defendants' reliance on *First Alliance* save their claim.[2]  *See infra*, Section I.3.b.  There, the Ninth Circuit *upheld* the jury's finding that Lehman (the loan purchaser) had actual knowledge of First Alliance's (the loan originator's) mortgage fraud.  It is true that there may have been more evidence of knowledge – one Lehman officer noted his concern that if First Alliance "does not change its business practices, it will not survive scrutiny" – and that the Ninth Circuit found the evidence "not overwhelming."  471 F.3d at 994.  However, plaintiffs need not show "overwhelming evidence" at this stage; defendants are the movants here.  While RBS need not disprove elements that are plaintiffs' burden, they have failed to demonstrate to the Court, as they must, that there is an *absence* of evidence to support the plaintiffs' case.  *Celotex,* 477 U.S. at 325. Instead, the plaintiffs have provided numerous pieces of evidence, including deposition testimony and the underwriting guidelines, to support their claim.  A genuine issue of material fact remains as to RBS' actual knowledge of the alleged fraud.

---

[2] *First Alliance* is discussed more thoroughly *infra*, at Section I.3.b.  In *First Alliance*, Lehman provided First Alliance with a committed revolving line of credit and underwriting services, and eventually became First Alliance's sole source of warehouse funding and underwriting.  *Id.* at 986-87.  The Ninth Circuit upheld aiding and abetting liability against Lehman.  RBS contends that there was more evidence of actual knowledge in *First Alliance* than exists here.

United States District Court
For the Northern District of California

### 2. Substantial Assistance

In order to prove that RBS aided and abetted Paul Financial's fraudulent behavior, plaintiffs also must show that RBS provided "substantial assistance or encouragement" to Paul Financial to act. *First Alliance*, 471 F.3d at 993. In *First Alliance*, Lehman provided First Alliance with a committed revolving line of credit and underwriting services, and eventually became First Alliance's sole source of warehouse funding and underwriting. *Id.* at 986-87. RBS argues that the facts here are "plainly different," because "RBS was only one of several investors in Paul Financial's business; indeed, there is no evidence that suggests RBS's investment was irreplaceable or crucial to Paul Financial's ability to stay in business." Def. Reply at 10.

Plaintiffs contend that Paul Financial could not have originated loans without the help of lenders like RBS, and that RBS was a "significant purchaser" of Paul Financial's Option ARM loans. Paul Financial, they point out, did not use its own funds to originate Option ARM loans; instead, like many loan originators, it used funds obtained from warehouse lenders that provided massive credit lines. Plaintiffs contend that an RBS affiliate was Paul Financial's primary warehouse lender, providing $300 million credit lines. After loans were originated, they were sold in bulk to investors in the secondary market. The proceeds were then used to pay back the warehouse lenders.

RBS was one such secondary market investor, which purchased loans from Paul Financial pursuant to a Master Mortgage Loan Purchase and Interim Servicing Agreement ("MLPA").[3] In discovery, RBS revealed that it purchased 5,550 Option ARM loans secured by real property located in California from Paul Financial during the "liability period." Weiss Decl., Ex. 4, No. 2. Loans were sold by Paul Financial soon after closing; the Goldhabers' loan, for example, was sold approximately one month after origination. *See* RBS' Supp. Filing, Doc. 408. RBS Financial Products (the defendant here) would then sell the products either to other RBS entities for securitization, Eckes Dep., 11:21, or

---

[3]The MLPA set the purchase terms that applied to all of the mortgage loans covered by the agreement and enabled RBS to buy Option ARM loans from Paul Financial in bulk, eliminating the need to renegotiate the purchase terms on a per transaction basis. Eckes Dep., 89:20-92:16, 43:3-44:3.

19

to outside banks.[4]  RBS Securities (not a named defendant here) was the "arm that distributed the mortgage bonds that resulted in the securities of whole loans."  Eckes Dep., 11:24-12:2.  This meant, according to the plaintiffs, that "RBS issued and sold bonds securitized by future cash flows from the loans, *including the anticipated negative amortization."* Pl.'s Opp. at 5 (*citing* Eckes Dep. 11:10-12:2, 131:18-132:13) (emphasis included).  By purchasing loans quickly from Paul Financial, as Eckes admits, RBS "[made] sure that our clients could originate more loans."  Eckes Dep. 132:4-7.

The Court finds that plaintiffs have provided sufficient evidence that there is a genuine issue of material fact as to whether RBS provided substantial assistance to Paul Financial to participate in fraudulent behavior.  Defendant's contention that RBS was not the *only* investor, as Lehman was to First Alliance (eventually), is not dispositive.  The test is one of "substantial assistance," not essential assistance.  It is uncontroverted that RBS was one of Paul Financial's major secondary market purchasers, as well as the affiliate to a major warehouse lender.  Hundreds of millions of dollars, if not billions, flowed through Paul Financial because of RBS' involvement.  The Court therefore finds there remains a genuine issue of material fact as to whether RBS substantially assisted Paul Financial in originating the allegedly fraudulent loans.

### D.    Fraudulent omission claim

The Court has thus found that there remain genuine issues of material facts both as to whether the loan documents contained misrepresentations, and as to whether RBS aided and abetted Paul Financial.  Under California law, in order to prevail on their fraudulent omission claim, plaintiffs must show that: (1) the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff;  (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.  *Hahn v. Mirda*,

---

[4]Following the hearing on this motion, RBS provided a supplemental brief stating that the Goldhabers' loan was not securitized by RBS, but rather was sold to Treasury Bank in a pool of loans.  McLaughlin Decl., ¶ 4.

United States District Court
For the Northern District of California

147 Cal. App. 4th 740, 748 (2007). While defendants generally dispute all elements of the claim, *see* Def.'s Reply at 11, fn. 14, they focus their attack on two prongs: that the defendant concealed a material fact, and that the plaintiff relied on it. The Court has already found that there remains a genuine issue as to whether the defendant concealed a material fact, so will turn to defendant's latter contention: that plaintiffs did not rely on defendant's alleged fraud.

For fraudulent misrepresentation claims, "it is not . . . necessary that [a plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor influencing his conduct . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." *In re: Tobacco II Cases,* 46 Cal. 4th 298, 326 (2009). Reliance on a fraudulent omission can be shown where a plaintiff proves that "had the omitted information been disclosed, [he] would have been aware of it and behaved differently." *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993).

Defendants argue that plaintiffs could not have relied on omissions in the loan documents because (1) they understood how negative amortization and adjustable interest loans operated, and (2) plaintiffs' testimony indicates that Plaintiffs relied on contradictory information from their independent broker rather than on the documents. Def.'s Reply at 11.

Regarding the first contention, as discussed above, the Court finds that the Goldhabers' general knowledge of the concept of negative amortization does not necessarily evince an understanding of *this* loan, particularly considering the confusing (and potentially misleading) nature of the loan documents. *See* Section I.B. There is no evidence, for example, that the Goldhabers understood that following the payment schedule provided in the TILDS would necessarily lead to negative amortization. RBS therefore cannot rely on an assertion that the Goldhabers understood the machinations of loans in general to demonstrate a lack of reliance on the representations made in this loan.

Regarding RBS' second contention, that the Goldhabers actually relied on an independent broker's statements instead of the loan documents, there is a dispute between the parties as to whether the broker that spoke with Mrs. Goldhaber was a representative of Paul Financial or an independent third-party retailer. *See* Pl.'s Opp. at 14; Def.'s Reply at 11. However, even if the broker was unaffiliated with Paul Financial, there remains a triable issue of material fact regarding the plaintiffs'

reliance on the loan documents.  As noted above, the Goldhabers repeatedly stated at deposition that had the omitted information been provided *in the loan documents*, they would have acted differently.  E. Goldhaber Dep., 87:19-88:22, 127:25-127:8; J. Goldhaber Dep., 133:23-134:2, 134-7-14 ("If this note said [that] 'If I make payments according to the payment amount stated in this note, my loan - - this loan will cause my principal balance to increase,' otherwise negative amortization, would you have entered into the loan?" "No.")  Moreover, there are factual questions about whether the broker even discussed the terms of the loan.  *See* J. Goldhaber Dep., 77:3-5 ("Did [the broker] tell you anything about what the terms of the loan were going to be?" "No. He says to me, 'We going to send the documents. You have all the time in the world to read them.' And we did.")  The Court finds the evidence credible that the Goldhabers relied on the loan documents; at the very least, they have set forth specific facts showing a genuine issue for trial.  *See Celotex*, 477 U.S. at 324.

The Court finds that defendants have not met their burden for summary judgment with respect to any of the five elements of common law fraud.  Therefore, the Court DENIES defendants' motion for summary judgment with respect to the fraud claim.

**E.      UCL Claims**

Plaintiffs also bring claims against RBS pursuant to California's UCL, under the "unfair" and "fraudulent" prongs of that statute (excluding the "unlawful" prong, as the Court found their TILA claims barred by the statute of limitations).  RBS argues that plaintiffs' UCL claims fail for three reasons independent of the common law fraud claim: (a) Plaintiffs lack standing under the UCL because they have not suffered an injury in fact that is a result of the defendant's unfair competition; (b) the loan documents were not fraudulent or unfair; and (c) plaintiffs' requested relief is not permitted under the UCL.  MSJ at 21-24.

**1.      UCL Standing Requirements**

RBS argues that plaintiffs have failed to prove standing under the UCL, because they have not

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

shown that they have "suffered injury in fact."[5]  MSJ at 21 (*citing Sevidal v. Target Corp.*, 189 Cal. App. 4th 905, 923-24 (2010)).  According to RBS, plaintiffs have failed to prove any injury – including lost equity - because they "achieved their objectives" and "received the benefit of the bargain – in this case, to purchase the subject investment property and create a stream of rental income."  *Id.* at 22 (*citing Birdsong v. Apple, Inc.*, 590 F.3d 955, 961-62 (9th Cir. 2009)).

Plaintiffs contend that this argument is a red herring because plaintiffs "plainly did not bargain for a loan with guaranteed negative amortization" and, therefore, their "objectives" are irrelevant. Pl.'s Opp. at 18.  More importantly, RBS' "deceptions here resulted in plaintiffs' loss of equity in their home." *Id.*

The Court finds that plaintiffs have met the threshold standing requirements under the UCL. The Ninth Circuit case RBS relies on, *Birdson*g, is inapposite.  There, the plaintiffs claimed that the iPods they purchased suffered diminution in value because there was an inherent risk of hearing loss if listened to at high volumes.  590 F.3d at 961.  The Ninth Circuit found that the plaintiffs failed to allege "that Apple made any representations that iPod users could safely listen to music at high volumes for extended periods of time. In fact, the plaintiffs admit that Apple provided a warning against listening to music at loud volumes." *Id.*  The alleged injury in fact – that their iPods were worth less because of the supposed defect – was premised on the loss of a safety benefit that was not part of the bargain to begin with.

Here, however, the Court has found that representations were made, and were potentially misleading.  Unlike the plaintiffs in *Birdsong*, the plaintiffs have shown that the documents at issue may contain misrepresentations that caused them to obtain a loan that, following the attached payment schedule, led to lost equity in their home.  *See* Section I.(2).  The deleterious effects of guaranteed negative amortization as well as the additional interest owed on a ballooning principal balance constitute injury in fact.

---

[5]RBS also contends that plaintiffs lack standing because they have not demonstrated injury *caused* by RBS, as RBS was not party to the mortgage, the documents were not fraudulent and, in any case, the plaintiffs did not rely on them. MSJ 21-23.  The Court has already disposed of these arguments *supra*, Sections I.(2) through (4).

United States District Court
For the Northern District of California

### 2.      "Fraudulent" and "Unfair" Prongs of the UCL

The term "fraudulent" as used in § 17200 requires only a showing that members of the public are likely to be deceived.  *See Blakemore v. Superior Court*, 129 Cal. App. 4th 36, 49 (2005).  RBS argues that "because RBS is not liable for any alleged material omission in the loan documents, as discussed above in Sections II through IV, neither plaintiffs nor any purported class member can prevail under the 'fraudulent' prong of the UCL."  MSJ at 23.  As the Court has already found that RBS may be held liable under an aiding and abetting theory, *see* Section I.3, the Court need not re-address that argument here.

Conduct is "unfair" under the UCL if: (1) it causes substantial injury, (2) the injury is one that consumers themselves could not reasonably have avoided, and (3) the injury is not outweighed by any countervailing benefits to consumers.  *See, e.g., Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1394, 1400-03 (2006).  RBS' arguments here are similar to the arguments elsewhere in its motion -- that RBS was not itself liable for Paul Financial's loan documents, that the TIL Recap differentiates between the interest rate and the APR, and that plaintiffs were "experienced real estate investors" who could have avoided origination in the first place.  MSJ at 24.  The Court has already address and rejected these arguments, *supra*.  To the extent that RBS presents a new argument here that plaintiffs could have made "full payment" (i.e., an amortizing payment), the Court reiterates its finding that the crux of the complaint is that following the only listed payment schedule - the TILDS - necessarily led to negative amortization.  The possibility that one could have escaped this inevitability does not absolve of the loan of liability under the unfair prong of the UCL.

### 3.      Whether Plaintiffs' Requested Relief Is Permitted

The UCL limits a prevailing party to injunctive relief and restitution.  The  plaintiffs' asserted damages are the loss of home equity, and their prayer for relief includes "restitution, restitutionary disgorgement of all profits accruing to Defendants because of their unfair, fraudulent and deceptive acts and/or practices, attorney's fees and costs."  4AC ¶ 116, 117.

The plaintiffs have presented a number of theories under which they claim restitution, to which RBS has provided a number of defenses.  Responding to the 4AC, RBS initially argued that loss of

1    home equity cannot be cured through restitution from a subsequent purchaser of loans.  MSJ at 24

2    (*citing First Alliance*, 471 F.3d at 995-98).  Plaintiffs did not respond to this argument.  Instead, in their

3    opposition, plaintiffs argued that they are owed restitution because, "when it securitized Plaintiffs' loan,

4    RBS received payments that were directly related and attributable to Plaintiffs' payments of principal

5    and interest."  Pl.'s Opp. at 21.  In reply, RBS pointed out that it had never securitized plaintiffs' loan;

6    instead, it had simply sold it to an unaffiliated bank.  Plaintiffs then argued, at the motion hearing, that

7    the proceeds RBS received from the subsequent loan purchaser could itself be the basis for a

8    restitutionary claim, because those proceeds represent payments that the Goldhabers were scheduled to

9    make, regardless of to whom they were directly paid.  RBS, relying on *First Alliance*, responded that

10   the UCL does not allow recovery of proceeds or profits of the "speculative future amounts that Plaintiffs

11   might have at some point paid" to a subsequent purchaser.  *See* RBS' Resp. to Plaintiff's Obj. to RBS'

12   Supp. Filing, Doc. 408.

13        After oral argument, the parties filed supplemental briefing regarding plaintiffs' loan.  RBS

14   revealed that it purchased plaintiff's loan (which itself originated on July 28, 2005) from Paul Financial

15   in September 2005.  *See* RBS' Supp. Filing Regarding Sale of Subject Loan, Doc. 404, Ex. 1, ¶ 3.  It

16   then sold the loan to Treasury Bank, an unaffiliated entity, in December of 2005.  *Id.* at ¶¶ 4-5.  RBS

17   states that "although RBS received loan payments made by plaintiffs to their loan servicer during the

18   three month period that it owned the subject loan, contrary to plaintiffs' allegations, those ceased upon

19   the loan's sale to Treasury Bank."  *Id.* at 3.

20        RBS therefore received actual payments from the plaintiffs during the three month period it

21   owned the loan.  The concern before the *First Alliance* court was that "the money in which the

22   borrowers purport to have an ownership interest is the money that flowed from First Alliance to

23   Lehman, in the form of bundled mortgage payments to repay [Lehman's] capital line, and to the

24   bondholders to whom Lehman sold the mortgage-backed securities.  In order to draw the necessary

25   connection between the Borrowers' ownership interest and these funds, however, the court would have

26   to assume that all of the money that flowed to Lehman pursuant to its relationship with First Alliance

27   was taken directly from the Borrowers and should not have been."  471 F.3d at 997.  Drawing such an

28   assumptive and indirect connection is unnecessary here, since payments were made directly from the

United States District Court
For the Northern District of California

plaintiffs to RBS, not just bundled mortgage payments by a large group of borrowers. Here, the three months of payments and the portion (if any) that was "ill gotten" is directly calculable. Therefore, at this time, it appears that restitution remains a viable remedy, and, therefore, summary judgment is inappropriate on the UCL claim.

This leaves open the question as to the viability of plaintiffs' second theory of restitution -- that they can recover the proceeds paid to RBS by Treasury Bank (the subsequent loan purchaser) because those proceeds were paid on the anticipation of the plaintiffs' future mortgage payments to Treasury Bank. The Court is skeptical that such attenuated and prospective proceeds are subject to a claim for restitution. As plaintiffs point out, however, RBS chose to file this motion for summary judgment before discovery was complete, presumably so it could be heard at the same time as plaintiffs' motion for class certification. Considering the changing information before the Court regarding plaintiffs' loan, the Court finds it appropriate to deny summary judgment on the theory of restitution at this time. This issue may be re-raised prior to trial.

In conclusion, defendants motion for summary judgment is DENIED. The Court will now turn to plaintiffs' motion for class certification.

## II.    MOTION FOR CLASS CERTIFICATION

Plaintiffs move for certification of a class under Fed. R. Civ. P. 23(b)(3). Plaintiffs seek to certify the following class:

> All individuals who within the four-year period preceding the filing of Plaintiffs' original complaint through the date that notice is mailed to the Class (the "Class Period"), obtained an Option ARM loan from Paul Financial, LLC that either (a) was secured by real property located in the State of California, or (b) was secured by real property located outside the State of California where the loan was approved in or disseminated from California, which loan had the following characteristics: (I) the yearly numerical interest rate listed on page one of the Note is 3.0% or less; (ii) in the section entitled "Interest," the Promissory Note states that this rate "<u>may</u>" instead of "<u>will</u>" or "<u>shall</u>" change, (e.g., "The interest rate I will pay **may** change"); (iii) the yearly numerical interest rate listed on page one of the Note was only effective through the due date for the first monthly payment and then adjusted to a rate which is the sum of an "index" and "margin"; and (iv) the Note does not contain any statement that paying the amount listed as the "initial monthly payment(s)," will definitely result in negative amortization or deferred interest. Excluded from the Class are Defendants' employees, officers, directors, agents, representatives, and their family members, as well as the Court and its officers, employees, and relatives.

1        In their motion for certification, Plaintiffs stated that they also sought to certify a subclass

2   consisting of all Class members whose Option ARM loans were sold or otherwise assigned by Paul

3   Financial to RBS Financial Products, Inc. (the "RBS Subclass"), which Mr. and Mrs. Goldhaber seek

4   to represent; and a second subclass of all Class members whose Option ARM loans were sold to HSBC,

5   which Jordan was to represent.  Since that time, Jordan has dismissed his claims against HSBC, and

6   plaintiffs have not sought to join any new class representatives.  Therefore, the Court understands

7   plaintiffs to be seeking a single class, as described above, consisting of all Class members whose Option

8   ARM loans were assigned to RBS.

9        The Court notes, initially, that it denied plaintiffs' motion for class certification in an earlier

10  iteration of this case.  *See Jordan v. Paul Financial*, 2009 WL 192888, No. C 07-04496 SI (N.D.Ca. Jan.

11  27, 2009).  At that time, the putative class representative was Jordan and the defendants included Paul

12  Financial, HSBC, and Luminent.  The Court found that plaintiffs failed to establish traceability, a

13  requirement for standing, because under the class definition provided by the plaintiffs, members of the

14  putative class owned loans that were held or serviced by entities other than the companies that held and

15  serviced Jordan's loan.  The Court held that plaintiff could not use class discovery to identify other

16  defendants and only then join named plaintiffs that would have standing against the newfound

17  defendants.  Plaintiffs cure that defect here by seeking class certification against only RBS, the

18  purchaser of the Goldhabers' loan.

19       The Court also notes that two other courts in this district have certified classes alleging claims

20  nearly identical to those alleged here.  In *Plascencia v. Lending 1st Mortgage*, 259 F.R.D. 437 (N.D.Ca.

21  2009), Judge Wilken granted in part plaintiffs' motion for class certification for claims against Lending

22  1st, the loan originator, as well as EMC, the mortgage purchaser, of strikingly similar Option ARM

23  loans.  *Id.* at 441.  There, like here, the plaintiffs' TILDS included a schedule of estimated payments

24  based on the initial teaser rate despite the fact that the interest rate rose almost immediately.  As here,

25  following the payment schedule would lead to certain negative amortization.  Judge Wilken found that

26  plaintiffs met their burden for certification on their common law fraud and UCL claims.  *Id.*  Likewise,

27  in *Lymburner v. U.S. Financial Funds*, 263 F.R.D. 534 (N.D.Ca. 2010), Judge Laporte certified a class

28  asserting fraud claims where a loan certain to negatively amortize pursuant to its payment schedule used

a promissory note claiming the interest rate "may" increase, instead of "will" or "shall." *Id.* While that suit was brought only against the loan originator, many of its arguments are apposite here. The Court finds persuasive the reasoning in both cases, and where appropriate, will adopt their reasoning.

### A.    Standing

In their opposition to plaintiffs' motion for class certification, RBS reasserts its challenge to plaintiffs' standing to sue RBS, citing the Goldhabers' Chapter 7 bankruptcy. The Court rejected this argument with regard to defendants' summary judgment motion. *See* Section I.A. The same reasoning applies here: due to the trustee stipulation, the Goldhabers have standing to challenge fraudulent behavior committed by Paul Financial and RBS with respect to the loan documents.[6]

### B.    Rule 23(a) Requirements

The requirements of Rule 23(a) are numerosity, commonality, typicality, and adequacy. They will be discussed in turn.

#### 1.    23(a)(1) - Numerosity

In order to certify, the class must be so numerous that joinder of all members individually is "impracticable." *See* Fed. R. Civ. P. 23(a)(1). RBS contends that plaintiffs have failed to identify the number of borrowers who received the Option ARMs as defined by the proposed class in the Fourth Amended Complaint and the class certification motion.[7] RBS acknowledges, however, that the number in the subclass is at least 3,000. Def.'s Opp. at 11, n. 11. The Court finds that this is sufficient to establish numerosity under 23(a)(1).

---

[6]In their "Standing" section, defendants also cite plaintiffs' bankruptcy as a reason to reject their adequacy as class representatives. This issue will be addressed below. *See* Section II.B.4.

[7]RBS argues that plaintiffs "surreptitiously" proposed a much bigger class in their motion for certification than the 4AC. The 4AC cited specific loan forms that used the terms at issue here; the proposed definition in the class motion simply describes the characteristics of those terms. The Court will allow the modification. *See In re TFT-LCD (Flat Panel) Antitrust Litigation*, 267 F.R.D. 583, 591 (N.D.Ca. 2010) (allowing "proposed modifications [that] are minor, require no additional discovery, and cause no prejudice to defendants.")

United States District Court
For the Northern District of California

### 2.   23(a)(2) - Commonality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class."  RBS does not specifically attack commonality under 23(a)(2); it instead disputes commonality under Rule 23(b)(3).  Def.'s Opp. at 17; *citing Danvers Motor Co. v. Ford motor Co.,* 542 F.3d 141, 148 (3d. Cir. 2008) (when class certification is sought under Ruler 23(b)(3), the "commonality requirement is subsumed by the predominance requirement" because "it is far more demanding.")  The Court finds that plaintiffs satisfy the requirements of 23(a)(2), and will address RBS' arguments related to commonality with respect to 23(b)(3) below.[8]  *See Plascencia*, 259 F.R.D. at 443; *Lymburner*, 263 F.R.D. at 539-40.

### 3.   Typicality

Rule 23(a)(3) requires the named plaintiffs to show that their claims are typical of those of the class.  To satisfy this requirement, the named plaintiffs must be members of the class and must "possess the same interest and suffer the same injury as the class members."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (quotation marks and citation omitted).  The typicality requirement "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citation omitted).  Rule 23(a)(3) is "permissive" and only requires that the named plaintiffs' claims be "reasonably co-extensive with those of absent class members."  *Hanlon*, 150 F.3d at 1020.

RBS argues that the proposed class representatives – the Goldhabers – lack typicality because of individual reliance issues and because their loan documents differed from those of other class members.  Def.'s Opp. at 13.

---

[8]For example, all classmembers purchased a loan from Paul Financial, which, in turn, sold it to RBS. All classmembers' loan documents contained a low teaser rate that dictated the "payment rate" outlined by the TILDS payment schedule, but lasted only one month.  All of the loan documents stated the interest rate "may" change, rather than "will" change.  The legal question of whether these statements and omissions constitute misrepresentations, a required element of fraud, is also common to the class.

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### a.    Reliance

As discussed in Section I.D, in order to establish their fraudulent omission claim**,** plaintiffs must show that they relied on the concealed or suppressed fact. *Hahn v. Mirda*, 147 Cal. App. 4th 740, 748 (2007); *see also Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC* , 162 Cal. App. 4th 858, 868-69 (2008) (one element of fraud is justifiable reliance). RBS argues that the Goldhabers relied on a third-party brokers' oral statements in choosing to obtain the loan, and therefore, they are not typical of the class. Def.'s Opp. at 12. In Section I.D, *supra*, the Court found that there remains a genuine issue of material fact as to whether the Goldhabers relied on the loan documents. The Goldhabers repeatedly stated at deposition that had the omitted information been provided, they would have acted differently. *See* E. Goldhaber Dep., 87:19-88:22, 127:25-127:8; J. Goldhaber Dep., 133:23-134:2, 134-7-14. The Court finds that plaintiffs have made a sufficient showing of reliance for the purposes of typicality under Rule 23(a)(2).

RBS also argues that "evidence of reliance on third party statements precludes an individual from showing reliance on documents as pled here," citing to *Ostayan v. Serrano Reconveyance Co.*, 77 Cal. App. 4th 1411, 1419 (Cal. 2000). Def.'s Opp. at 12. However, that case stands for the unremarkable proposition that "a plaintiff's concession that he did not rely on a defendant's statement preclude[s] him from establishing reliance on his fraud claim." Def.'s Opp. at 12. Here, plaintiffs did not concede that they did not rely on the loan documents; rather, they repeatedly stated they *did* rely on the loan documents. *See* E. Goldhaber Dep., 87:19-88:22, 127:25-127:8; J. Goldhaber Dep., 133:23-134:2, 134-7-14. Moreover, in establishing that a misrepresentation was a cause of injury-producing conduct, "[i]t is not necessary that the plaintiff's reliance upon the truth of the fraudulent misrepresentation be the sole or even predominant or decisive factor influencing his conduct. It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision." *In re: Tobacco II Cases* 46 Cal. 4th 298,, 326-27 (2009). Here plaintiffs have established, at the very least, that the omissions in the documents regarding the actual interest rate and the certainty of negative amortization played a substantial factor in influencing their decisions to obtain

30

United States District Court
For the Northern District of California

the loan.[9]

The Court finds that plaintiffs have sufficiently shown reliance for the purposes of typicality.

### b.    The Loan Documents

RBS also contends that the Goldhabers are not typical because their loan documents "differ from those of other members." Def.'s Opp. at 12. The Court disagrees. Plaintiffs have limited the class definition to those who accepted loans with characteristics similar to the Goldhabers' loan: low initial rate that adjusts after one month, statement that negative amortization "may" occur, and guaranteed negative amortization based on the disclosed payment amount. This is sufficient to establish Rule 23(a)(3) typicality.

### 4.    Adequacy

Rule 23(a)(4) permits the certification of a class action only if "the representative parties will fairly and adequately protect the interests of the class." Representation is adequate if: (1) the class representative and counsel do not have any conflicts of interest with other class members; and (2) the representative plaintiff and counsel will prosecute the action vigorously on behalf of the class. *See Staton,* 327 F.3d at 954. Plaintiffs argue that the claims of the class members and the proposed representatives are "virtually coextensive," and that the law firms representing them have solid reputations for excellence, and, therefore, they have met the requirements of 23(a)(4).

RBS contests plaintiffs' adequacy on three grounds: that their claims are time barred; that they do not understand their claim; and that their bankruptcy, for various reasons, affected their adequacy.

### a.    Timeliness

RBS argues that the Goldhabers' claims are time-barred. In California, the statute of limitations

---

[9]Defendants' considerable discussion of reliance by former-plaintiff Jordan is irrelevant to the current motion. The Goldhabers have explicitly stated that they read the loan documents, and no evidence has been presented that a broker described the negative amortization inherent to the loan. *See* J. Goldhaber Dep., Moore Ex. 3, 77:3-8 ("Did he [the mortgage broker] tell you anything about what the terms of the loan were going to be?" "No. He says to me, 'We going to send the documents. You have all the time in the world to read them.' And we did.'")

is three years for fraudulent omission claims and four years for UCL claims.  A plaintiff who identifies Doe defendants in a complaint has three years from the filing of the complaint to identify and serve defendants.  *See* California Code of Civ. P. §§ 474 and 583.210(a).  The defendant is then considered a party to the action from its commencement.  *Fuller v. Tucker*, 84 Cal. App. 4th 1163, 1170 (Cal. Ct. App. 2000).  *See Solomon v. E-Loan, Inc.*, 2011 WL 1253840, at *6 (E.D. Cal. Mar. 30, 3011).

The Goldhabers obtained the subject loan on July 28, 2005.  The original complaint was filed on August 30, 2007, and named Does 1-10.  RBS was  named as a defendant, and identified as Doe 1, in the 4AC on October 7, 2009.  Because plaintiffs named RBS within the allowable time period, for the purposes of the statute of limitations they are considered to have been named as defendants on August 30, 2007 – within both the fraud and UCL claims' statute of limitations.  The claims are therefore timely.

### b.        Claim Comprehension

RBS contends that the Goldhabers do not understand the nature of their claims, and, therefore, they are not adequate representatives.  Def.'s Opp. at 15; *citing Bodner v. Oreck Direct, LLC*, 2007 WL 1223777, *2 (N.D. Cal. Apr.25, 2007) (Patel, J.) (plaintiffs' "undeniable and overwhelming ignorance regarding the nature of this action, the facts alleged, and the theories of relief against [the] defendant" rendered them inadequate under Rule 23(a)(4).)  RBS cites to the fact that the 4AC describes the subject transaction as a refinance of their home, when it was instead a purchase of a home. 4AC, ¶ 3.  According to RBS, had plaintiffs read the complaint, they would have noticed (and, presumably, amended) the error.

The Court disagrees that this error renders the plaintiffs inadequate.  A single error in a complaint is not a basis to find that plaintiffs do not understand the nature of their claims.  The court in *Bodner* found dispositive the fact that the plaintiff met his attorney for the first time the day before his deposition, and that the firm representing the plaintiff had faced past controversy regarding its relationships to plaintiffs.  *Bodner*, at *1.  There are no such claims here.  Instead, at his deposition, Eli Goldhaber expressed an understanding of the nature of the claims of this suit.  *See, e.g.,* E. Goldhaber Dep., 135:5-17 ("I pay my payment, 1300 a month.  I look in my statement, and I see minus - another

United States District Court
For the Northern District of California

minus 1400. So they're taking 3,000 – almost 3,000 a month out of my equity . . . It just doesn't show it to me here, in my opinion.")  The Goldhabers sufficiently and adequately comprehend the claims in this suit.

c.      **The Goldhabers' Bankruptcy**

RBS argues that filing for bankruptcy rendered the Goldhabers' inadequate class representatives because (1) their standing "fix" (i.e., the stipulation) creates an impermissible conflict of interest with members of the class, and (2) their initial failure to disclose this claim in their bankruptcy proceedings raises questions about their credibility.

As discussed above, the Goldhabers filed a voluntary petition for Chapter 7 bankruptcy on March 18, 2010. *See In re Goldhaber,* No 2:10-BK-20052 (Bankr. C.D. Cal. Mar. 18, 2010).  They did not list any interest in this litigation in their schedules or petition. *Id.*  After being presented with challenges by RBS regarding their standing and judicial estoppel considering their failure to list their claims, the Goldhabers successfully petitioned the Bankruptcy Court to reopen their case.  They then amended the schedule to add their interest in this litigation, and entered into the stipulation with the trustee granting them standing in this case.  The Court has already found the stipulation granted the Goldhabers standing to pursue their claims. *See* Section I.A.

RBS argues that the stipulation creates "a clear conflict of interest between the Goldhabers and members of the class." Def.'s Opp. at 15.  According to RBS, if the class is approved, the Goldhabers would be "beholden to two masters" -- the trustee and the class -- and thus could not serve as adequate class representatives.   In support, RBS relies on Judge Posner's opinion in *Dechert v. Cadle Co.,* 333 F.3d 801, 803 (7th Cir. 2003) (vacating class certification). There, the Seventh Circuit analyzed whether a bankruptcy trustee could serve as a class representative.  While explicitly stating that they "do not want to lay down a flat rule that a trustee in bankruptcy (or, what is the equivalent, a debtor in possession) can never be a class representative," the court held that the trustee in bankruptcy in that case was an inadequate representative due to a fundamental conflict of interest: it was an agent of both the estate and the class.  The court first noted that a class representative always has some conflict of interest between her own interests and that of the class.

United States District Court
For the Northern District of California

So what difference does it make whether the named plaintiff is a trustee in bankruptcy? The difference is that in the usual class action the named plaintiff is a nominal party and the real party is the lawyer for the class. The lawyer has no reason to favor the named plaintiff over the rest of the class members. When the named plaintiff is a fiduciary, however, he cannot just 'go along' with the class lawyer. He has a duty to seek to maximize the value of his claim, and this duty may collide with his fiduciary duty as a class representative (if he is permitted to be the class representative) to represent all members of the class equally. Such a collision is especially likely in a case in which the fiduciary is a trustee in bankruptcy, because class-action litigation tends to be protracted yet the Bankruptcy Code requires the trustee to complete his work expeditiously.

*Id.* at 803. The court also noted a separate conflict of interest in that case: the defendant in the class action was affiliated with a creditor to the estate that the trustee represented, thereby putting the trustee on both sides of the action. *Id.*

The Court finds that *Dechert* does not control here. First, the latter concern is not present: RBS is not a creditor of the Goldhabers' estate, and thus is not on both sides of the controversy. More fundamentally, the Goldhabers are not the trustees in bankruptcy. While the facts here are idiosyncratic, they remain the debtors. The stipulation granting them standing states that the "[d]ebtors are hereby delegated and granted authority and standing to prosecute, on behalf of the Debtor's Estate subject to exemption rights, the Debtor's claims as pleaded." Weiss Decl., Ex. 9. Unlike the trustee in *Dechert*, the Goldhabers have a personal stake in this litigation. At the same time, that personal stake is limited to the their exemption rights - a total of $1,820. The claims of the class are likely well in excess of that amount, as RBS recognizes. *See* Def.'s Opp. at 25. Because the Goldhabers' personal stake is below the claimed damages, there is no reason to believe they will fail to "go along" with the class lawyer out of an interest to "maximize the value of [their] claim" - the primary concern of the Seventh Circuit in *Dechert*. *See also Cobb v. Monarch*, 913 F.Supp. 1164, 1173 (N.D. Ill. 1995) (in suit for violation of lending laws, where bankrupt plaintiff maintained $1,025 in exemption rights, court found she was an adequate class representative.)

Moreover, in this case, the Court need not merely ponder the theoretical effects of any conflicts of interest presented by the unusual facts before it. Here, the very situation that concerned the Seventh Circuit *has already occurred*. RBS attempted to settle with the trustees of the Goldhabers' estate after the stipulation was entered into. *See In re Goldhaber*, Doc. 35, No 2:10-BK-20052 (Bankr. C.D. Cal.

United States District Court
For the Northern District of California

Mar. 18, 2010).  RBS offered the estate $30,000 to settle this claim.  *Id.*  The Goldhabers would have received their full exemption rights in this settlement.  *Id.* at 4.  It would also clearly have been in the creditors' interest to receive an immediate $30,000 rather than risk the possibility of protracted class litigation and lesser or no damages.  Indeed, that is why the trustee attempted to enter into the settlement in the first place.  However, the Goldhabers not only opposed the offer, they filed oppositions and fought the trustee's standing to settle.  The Bankruptcy Court agreed with the Goldhabers and rejected the trustee's standing to settle.  Therefore, the situation has presented itself where the Goldhabers could have advanced the interests of their estate over the interests of the class.  They rejected that opportunity.  This is ample evidence that the concerns present in *Dechert* about a potential conflict of interest are inapplicable here.

The Court does have a secondary concern about the adequacy of the Goldhabers as class representatives with respect to the bankruptcy.  At the motion hearing, the Court expressed issue with the general proposition of a bankrupt representing a class.  This concern is exacerbated by the fact that, as RBS points out, that the Goldhabers failed to disclose this claim with their petition.  "The honesty and credibility of a class representative is a relevant consideration when performing the adequacy inquiry because an untrustworthy plaintiff could reduce the likelihood of prevailing on the class claims."  *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010) (Chen, J.).  The Court asked plaintiffs to file supplemental authorities wherein a bankrupt represented a class, which plaintiffs have done.  *See* Doc. 403; *citing, e.g., Hunt v. Check Recovery Systems, Inc.*, 241 F.R.D. 505, 511 (N.D. Cal. 2007) (Jenkins, J.) (plaintiffs were adequate class representatives to pursue their FDCPA claims against check recovery company despite bankruptcies); *Hobson v. Lincoln Insurance Agency, Inc.*, 2001 WL 648958 (N.D. Ill. 2001) ("neither the fact that [plaintiff] filed for bankruptcy protection . . . nor her lack of knowledge about the particulars of her case suggest the sort of 'antagonistic or conflicting claims' that will result in unfair and inadequate representation" of a suit against insurance agency); *Wanty v. Messerli & Kramer,* 2006 WL 2691076, *1 (E.D. Wis. Sept. 19, 2006) (where defendant's sole opposition to class certification was plaintiffs' bankruptcy, the court still found that plaintiffs were adequate class representatives);  *Cobb,* 913 F. Supp. at 1173 (where bankrupt plaintiff maintained exemption rights, she was an adequate class representative.)  Plaintiffs have also submitted authorities

United States District Court
For the Northern District of California

where other plaintiffs failed to initially disclose their claims in their bankruptcy petitions. *See Cobb*, 913 F. Supp. at 1173 (plaintiffs filing of an amended schedule of exempted property repaired their ability to become class representatives); *Hubbard v. Midland Credit Management, Inc.*, 2008 WL 5384219, *3 (S.D. Ind. Dec. 19, 2008) (failure to disclose lawsuit regarding plaintiffs FDCPA claim was not a bar to adequacy because plaintiff later amended her bankruptcy schedule asset list). After review of the authorities provided by plaintiff, the Court's concerns regarding the adequacy of the Goldhabers as class representatives are assuaged. Their bankruptcy will not bear directly on the litigation, nor will it raise such unique defenses so as to render them inadequate class representatives. *See Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 638 (N.D.Cal. 2010) (Hamilton, J.) ("In general, it is only when the representative's credibility bears directly on matters directly relevant to the litigation, or when the alleged conflict jeopardizes the interests of the class, that the court should find the representative inadequate.") The Court finds that plaintiffs have met the requirements of 23(a)(4).

## C.    Rule 23(b) Requirements

Along with the requirements of 23(a), a plaintiff must also establish that one or more of the grounds for maintaining the suit are met under Rule 23(b). Here, plaintiffs seek certification under Rule 23(b)(3), which provides that a case may be certified as a class action if:

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3). Plaintiffs argue that they have satisfied these requirements; RBS contends that plaintiffs have failed to show either predominance or superiority.

### 1.    Predominance

The test for predominance asks "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon*, 150 F.3d at 1022 (quoting *Amchem*, 117 S.Ct. at 2249). In contrast to the commonality requirement of Rule 23(a), Rule 23(b)(3) "focuses on the relationship between the common and individual issues." *Id.* Claims need not be identical for common issues of

1    law and fact to predominate, they need only be reasonably coextensive with those of absent class

2    members.  *Hanlong*, 150 F.3d at 1020.

3         Plaintiffs contend that common issues predominate for their fraudulent omissions and UCL

4    claims, as well as issues of assignee liability.  Pl.'s Mot. for Class Cert., 17-24.  RBS disputes

5    predominance on three grounds -- that possible bankruptcies of individual class members will require

6    individualized inquiries, that reliance issues destroy predominance, and that different borrowers have

7    varying degrees of alleged harm.

8

9                                    **a.      Potential Bankruptcies**

10        RBS contends that "in light of current economic conditions," it likely that some number of

11   proposed class members will have filed for bankruptcy.  According to RBS, individualized questions

12   regarding each class member's standing will therefore predominate.  The Court disagrees.  First, RBS

13   has not provided any evidence that a number of purported class members have declared bankruptcy.

14   A defendant cannot defeat class certification by simply making an *ipse dixit* allegation that because of

15   the economic downturn, many members of a class will likely be bankrupt; if it could, Rule 23 would be

16   eviscerated.  Moreover, even if some members of the class have declared bankruptcy, determining their

17   standing will be a relatively straightforward manner.  The court in *Wilborn v. Dun & Bradstreet Corp.*,

18   180 F.R.D. 247, 256 (N.D. Ill. 1998) engaged this precise argument:

19            First, defendant asserts that some class members may have filed
             bankruptcy and failed to properly exempt their claims against defendant
20           such that they would lack standing to sue. Defendant argues that because
             the court will have to conduct an inquiry as to each class member's
21           standing, individual issues predominate.

22            Although some class members may not be entitled to personally recover
             damages because their claims have become part of a bankruptcy estate,
23           the common issues of law and fact regarding defendant's liability still
             predominate. If damages are awarded, the bankruptcy status of each
24           class member will have to be determined. This determination regarding
             damages, however, need not require a highly fact-intensive inquiry, as
25           defendant suggests. Many if not most class members will not have filed
             bankruptcy. As for those class members who have, determining whether
26           they have exempted their claims against defendant should be a relatively
             straightforward matter. The bankruptcy issue, therefore, does not
27           preclude certification.

28   *Id.*  This Court finds the *Wilborn* court's analysis persuasive, and adopts that analysis here.

                                              37

United States District Court
For the Northern District of California

### b.      Reliance

As discussed *supra*, *see* Sections I.D and II.B.3.a, in order to establish their claim for fraudulent omission, plaintiffs must show, *inter alia*, that they relied on the concealed or suppressed facts. *Hahn v. Mirda*, 147 Cal. App. 4th 740, 748 (2007); *see also Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC* , 162 Cal. App. 4th 858, 868-69 (2008) (element of fraud is justifiable reliance.)  RBS argues that determining whether each member of the class relied on the loan documents will require an individualized inquiry and cannot be decided by common proof. Def.'s Opp. at 18. According to RBS, the question of reliance cannot be resolved solely by analyzing the loan documents, but requires looking at external factors that may have affected each classmembers' understanding of the documents.  The analysis will entail, for example, whether the classmember had significant borrowing experience (as RBS claims the Goldhabers did); the substance of any conversations with a mortgage broker; whether the classmember read the loan documents; and whether the borrower may in fact have desired the type of loan Paul Financial was selling.

The resolution of RBS' argument lies in determining whether the class is entitled to a presumption of reliance.  Plaintiffs contend that the class is owed a presumption of reliance, and, therefore, the individualized inquiries proposed by RBS are irrelevant to the class certification inquiry. In support, plaintiffs rely on *Plascencia*, one of the two cases in this district that certified a class nearly identical to the one proposed here.[10]  *See also Lymburner*, 263 F.R.D. at 542.  In *Plascencia*, the court relied on *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972) in holding that reliance may be presumed in the case of a material fraudulent omission.  *Plascencia*, 259 F.R.D. at 447. RBS responds that the *Plascencia* analysis is wrong, because it "misrepresent[s] the applicability of *Affiliated Ute* to fraud claims" under California law, as the California Supreme Court rejected the adoption of the *Ute* presumption in California.  Def.'s Opp. at 21 (*citing Quezada v. Loan Center, Inc.*, 2009 WL 5113506, *4 (E.D.Cal. 2009)).

---

[10]In *Plascencia*, loan originator Lending 1st sold Optional ARMs with a 1% teaser rate, which, like the loan documents at issue here, actually controlled only the payment schedule; the actual interest rate substantially increased after the first month.  By following the payment schedule listed in the TILDS, the loan was guaranteed to negatively amortize. EMC, like RBS here, purchased the loans.

United States District Court
For the Northern District of California

After the parties filed their moving papers in this case, Judge Wilken revisited her class certification opinion in *Plascencia*. *See Plascencia v. Lending 1st Mortgage*, 2011 WL 5914278 (N.D. Cal. Nov. 28, 2011). Because the court's analysis is directly on point, it is cited at length:

> In the Class Certification Order, this Court held that individual questions would not predominate regarding the reliance element of Plaintiffs' common law fraud claim, because absent class members' reliance may be presumed in the case of material fraudulent omissions. The Court cited the United States Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

> The citation to *Ute* was incorrect. The California Supreme Court has held that the presumption of reliance established in *Ute* does not apply to fraud claims under California common law. *Mirkin v. Wasserman,* 5 Cal.4th 1082, 1093, 23 Cal.Rptr.2d 101, 858 P.2d 568 (1993). Nonetheless, California courts have held that absent class members are entitled to a similar presumption of reliance for state common law fraud claims in certain circumstances. First, a fraudulent omission must be material, such that "a reasonable man would have relied upon" the alleged omissions. *Vasquez v. Superior Court,* 4 Cal.3d 800, 814 n. 9, 94 Cal.Rptr. 796, 484 P.2d 964 (1971). Here, a jury could find on a class-wide basis that a reasonable person would have wanted to know that the initial one percent rate was ephemeral and that negative amortization was certain to occur if only the minimum payments were made. The jury thus could find that class members would not have taken out their loans if Defendants had clearly disclosed this information.

> Second, all class members must have received the same representations with allegedly fraudulent omissions; that is, the representations with misleading omissions must have been uniformly given to class members. *See Mirkin,* 5 Cal.4th at 1093–94, 23 Cal.Rptr.2d 101, 858 P.2d 568 (refusing to apply the class-wide presumption of reliance established in *Occidental Land, Inc. v. Superior Court,* 18 Cal.3d 355, 134 Cal.Rptr. 388, 556 P.2d 750 (1976), and *Vasquez* in a fraudulent omissions case where plaintiffs had not "pled that the defendants had made identical representations to each class member"). Defendants here are alleged to have acted in a uniform way toward all class members, by supplying class members with identical loan documents that failed to state in clear language material terms of the loan.

> Finally, the class representatives must establish "actual reliance." *Iorio v. Allianz Life Ins. Co. of N. Am.,* 2008 U.S. Dist. LEXIS 118344, at *79–80 (S.D.Cal.). *See Mirkin,* 5 Cal.4th at 1095, 23 Cal.Rptr.2d 101, 858 P.2d 568 (citing *Vasquez,* 4 Cal.3d at 814–15, 94 Cal.Rptr. 796, 484 P.2d 964; *Occidental,* 18 Cal.3d at 362–63, 134 Cal.Rptr. 388, 556 P.2d 750). The named Plaintiffs have alleged that they in fact did rely upon Defendants' omissions.

*Plascencia,* 2011 WL 5914278, at *1-*3; *but see Ralston v. Mortgage Investors Group, Inc.*, 08-cv-

00536-JF (N.D.Cal. Feb. 27, 2012) (Fogel, J.).[11]

The Court agrees with Judge Wilken's analysis and adopts it here.  As in *Plascencia*, a jury could find that a reasonable person would want to know that the teaser rate in plaintiffs' loan documents was ephemeral and that, if the borrower followed the TILDS payment schedule, negative amortization was certain to occur.  *See* Section I.B.1; *Vasquez v. Superior Court*, 4 Cal. 3d 800, 814 n.9 (1971).  Second, all class members received the same representations; indeed, the class is defined by those representations.  *See* Section II, Introduction.  Finally, the class representatives have sufficiently established actual reliance.  *See* Section  I.B.1.  As in *Plascencia*, the class is therefore owed the presumption of reliance.  *See also Lymburner*, 263 F.R.D. at 542; *Yokoyama v. Midland National Life Ins. Co.*, 594 F.3d 1087, 1093 (9th Cir. 2010) (reversing denial of class certification, finding that under Hawaii's Deceptive Practices Act, reliance on alleged misrepresenations can be shown by an objective, reasonable person standard).

In the alternative, RBS argues that it has rebutted the presumption because the class representatives -- the Goldhabers – did not rely on the loans.  Def.'s Opp. at 22 (*citing Quezada v. Loan Ctr. of California, Inc.*, 2009 WL 5113506,  (E.D. Cal. Dec. 18, 2009) (Shubb, J.)).  RBS reiterates its claims that Ms. Goldhaber stated she relied upon statements from her broker, and that the Goldhabers were "experienced borrowers with vast mortgage experience, who despite their alleged confusion, did not ask any questions about their loan documents."  *Id.*  The Court has already addressed and disposed of these arguments, *supra*.  *See* Section I.D; Section I, n.1.  RBS' reliance on *Quezada* is also unavailing.  *Quezada* is another case addressing nearly identical loan documents.  There, however, the court rejected class certification on typicality grounds because the plaintiff did not read English (the

---

[11]Judge Fogel came to the opposite conclusion when faced with similar facts.  After citing *Plascencia*, Judge Fogel analyzed the Ninth Circuit's opinion in *Poulos v. Ceasars World, Inc.*, 379 F.3d 654 (9th Cir. 2004).  There, the Ninth Circuit held that the presumption of reliance "should not be applied to cases that allege both misstatements and omissions unless the case can be characterized as one that primarily alleges omissions."  *Id.*  Judge Fogel went on to find that the plaintiff's "confusion allegedly stemmed from the fact that he believed that the loan documents represented that his interest rate would be 1% *and* that they failed to disclose that the 1% rate would be in effect for only one month," and, therefore, it was a "mixed" case not appropriately granted the presumption.
         This Court differs in its analysis, and finds that the Goldhabers' case is one primarily of omission. The 1.375% interest rate did exist, albeit for only one month; the documents omitted the fact that payment according to the payment schedule was certain to cause negative amortization.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  language of the loan documents), had the loan documents explained to her via translation, and admitted

2  that she did not read the terms of the loan documents outside of recognizing several numbers on the

3  pages of those documents. *Id.* at *3. Those considerations do not apply to the Goldhabers, who have

4  demonstrated that they read and relied on the loan documents. E. Goldhaber Dep., 62:17-25, 80:19-

5  81:3, 87:19-88:22, 127:25-127:8; J. Goldhaber Dep., 133:23-134:2, 134-7-14.

6  The Court therefore finds that the class is owed a presumption of reliance that RBS has failed

7  to rebut.[12]

8  ### c.   Varied Harm

9  RBS also argues that class certification is inappropriate because plaintiffs' proposed method for

10  calculating damages is flawed. Def.'s Opp. at 23; *citing* Lyons Reply Decl. ¶ 6. According to RBS,

11  various loan outcomes, including short sales and foreclosures, will result in individualized inquiries, thus

12  defeating predominance. The Court disagrees. "The amount of damages is invariably an individual

13  question and does not defeat class certification." *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975).

14  While the parties dispute the propriety of the model for calculating damages proposed by plaintiff, the

15  Court need not decide the precise method for calculating damages at this stage. The Court finds that

16  calculation of damages will be sufficiently mechanical that whatever individualized inquiries need occur

17  do not defeat class certification. Moreover, the Court has the inherent power to modify the class

18  definition if some subset of borrowers present insurmountable individualized issues.

19  _____

20  [12]Following submission of this matter, RBS submitted a request for permission to file a statement of two
recent decisions. The two decisions RBS seeks to submit are *Buckley v. Countrywide Financial Corp.*,
21  2012 U.S. App. LEXIS 1235 (9th Cir. Jan. 20, 2012) and *In re Countrywide Financial Mortgage
Marketing and Sales Practices Litigation*, 2011 U.S. Dist. LEXIS 147689 (S.D. Cal. Dec. 16, 2011).
22  The first is an unpublished (and therefore non-precedential) opinion from the Ninth Circuit affirming
a District Court's application of Washington state law in denying class certification based on individual
23  issues of reliance in a similar mortgage context. *See* Circ. R. 36-3(a). The two-sentence opinion
"assum[es] that changes to the written disclosures were routinely made orally," an assumption not
24  applicable here. 2012 U.S. App. LEXIS at *1.
The second is an unpublished Southern District of California case that differs with Judge
25  Wilken's conclusion in *Plascencia*. In *Countrywide*, Judge Sabraw found there was "substantial
evidence" that loan brokers made oral representations about "the features of the various loan products,
26  interest rate options, negative amortization, other issues of interest and specific to individual followers,"
and the brokers and loan officers "provided the supposedly omitted information to each borrower in oral
27  communications or in other loan documents that varied form borrower to borrower." 2011 U.S. Dist
LEXIS 147689, at *23, *36. Similar evidence, in type or quantity, is not present here. In any event, the
28  Court agrees with Judge Wilken's analysis. Neither opinion alters the Court's decision.

United States District Court
For the Northern District of California

The proposed class is based on uniform material omissions made in nearly identical loan documents. The class is owed a presumption of reliance, which RBS has failed to rebut. The Court therefore finds that plaintiffs have shown that common questions of law and fact predominate over individual questions.

### 2. Superiority

Rule 23(b)(3) also requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." The test for superiority of the class action mechanism requires "[d]etermination of whether the objectives of the particular class action procedure will be achieved in the particular case," which "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Hanlon*, 150 F.3d at 1023.

The Court finds that a class action is a superior method for adjudication of the plaintiffs' claims. As with *Plascencia* and *Lymburner*, the Court finds that "a single action would be superior to maintaining a multiplicity of individual actions involving similar legal and factual issues." *Plascencia*, 259 F.R.D. at 449. As Judge LaPorte found in *Lymburner*, individual claims for damages would "not only burden the court system that would be deciding the same legal issues in a number of small cases, but would also not make economic sense for litigants or lawyers. It is possible that in many, if not most, individual cases, 'litigation costs would dwarf potential recovery.'" 263 F.R.D. at 543 (*citing Hanlon*, 150 F.3d at 1023).

RBS argues that a class action is not a superior method for adjudicating plaintiffs' claims because of the "overwhelming amount of individualized evidence required to establish standing, reliance, causation, and damages." Def.'s Opp. at 24 (*citing Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001) ("[i]f each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'") The Court disagrees. *Zinser* is inapposite here. In *Zinser*, the putative class brought suit for products liability due to deformation of lead in a pacemaker. The Ninth Circuit found that it would be too difficult to determine a common cause of injury among the 10,500 classmembers because many factors would contribute to the deformation, "including manufacturing and shipping history [as well as]

United States District Court
For the Northern District of California

handling of the lead by physicians or staff.  In view of the formidable complexities here inherent in trying claims of negligence, products liability, and medical monitoring with differing state laws, Zinser does not persuade us that class treatment is superior to individual adjudication." *Id.*  Clearly the same concerns are not present here.  *Zisner* involved a surgically implanted medical device.  Here, the underlying issue is nearly identical loan documents, differing only in rates; furthermore, unlike *Zisner*, only the law of California applies.  Individualized evidentiary issues are not so "numerous and substantial" as to defeat the superiority of a class action in this matter. *Id.*; *see also In re: Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 140 (2nd. Cir. 2001) (Sotomayor, J.) ("[F]ailure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored, and should be the exception rather than the rule.")

Finally, RBS argues that a class action is not superior because there is a strong incentive for individual suits.  In support, it states that "using plaintiffs' formula for calculation, the Goldhabers' claim is in excess of $50,000," and, therefore, there is sufficient incentive for class members to bring individual claims.  Def.'s Opp. at 25.  The Court is unpersuaded.  RBS provides no evidence as to the size of other classmembers' claims.  Moreover, classmembers may choose to opt out of the class and pursue their claims individually.

As in *Plascencia* and *Lymburner*, this Court finds that a class action is the superior method of adjudicating plaintiffs' claims.

*///*

1

**CONCLUSION**

2          For the foregoing reasons, the Court hereby DENIES defendant's motion for summary judgment

3    and GRANTS plaintiffs' motion for class certification.  As the class definition has likely changed since

4    HSBC was dismissed as a defendant, the Court orders plaintiffs to submit a proposed order certifying

5    a class that conforms with this order.  Plaintiff must submit the proposed class definition by **August 31,**

6    **2012** Defendants may submit objections to that proposal only if the proposed definition is not in

7    conformity with this Order, and must do so by **September 7, 2012.**

8

9          **IT IS SO ORDERED.**

10   Dated: August 23, 2012

                                                                    _____

11                                                                  SUSAN ILLSTON
                                                                    United States District Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California